UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| TOWN OF LEXINGTON, on behalf of itself and all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>PHARMACIA CORPORATION, SOLUTIA INC., and MONSANTO COMPANY,<br><br>Defendants. | Case No. |

## CLASS ACTION COMPLAINT

### I. INTRODUCTION

1.      Plaintiff Town of Lexington brings this putative class action on behalf of itself

individually and on behalf of a plaintiff class consisting of all school districts in Massachusetts

that have one or more buildings with airborne polychlorinated biphenyls ("PCBs") above the

public health levels established by the United States Environmental Protection Agency ("EPA").

2.      PCBs were a common component of building products used to construct and

renovate schools in Massachusetts during the 1950s, 1960s, and 1970s.  PCBs are persistent

environmental pollutants that have been demonstrated to cause cancer, as well as a variety of

other adverse health effects.  Children are particularly vulnerable to the toxic effects of PCBs.

On September 25, 2009, the EPA issued a press release advising school administrators about the

presence of PCBs in school buildings built between 1950 and 1978.  Concurrent with the press

release, for the first time the EPA established public health levels for PCBs in school indoor air.

3.      From 1935 to 1978, "Monsanto Company" was the exclusive manufacturer of PCBs in the United States.  "Monsanto Company" reaped enormous profits from its monopoly of the PCB market, all the while knowing about the toxicity of PCBs.  Today, "Monsanto Company" is known as defendant Pharmacia Corporation.  Defendants Solutia Inc. and Monsanto Company are affiliated companies that have assumed liabilities related to the historical manufacture of PCBs.

4.      Through this action, the Town of Lexington seeks compensatory damages for the costs to investigate, remediate, and monitor PCB contamination of school indoor air; treble and/or punitive damages; and reasonable attorneys' fees and costs for itself and the plaintiff class.

## II. PARTIES

5.      Plaintiff Town of Lexington ("Lexington") is a town existing under the laws of the Commonwealth of Massachusetts.  Lexington is located in Middlesex County and has a population of approximately 31,000.  It operates a public school district, which includes six elementary schools, two middle schools, and one high school.

6.      Defendant Pharmacia Corporation ("Pharmacia" or "Old Monsanto") is a Delaware corporation with its principal place of business in Peapack, New Jersey.  Prior to April 2000, Pharmacia was known as "Monsanto Company," the company that was the exclusive manufacturer of PCBs in the United States for over 40 years.  Pharmacia is now a wholly-owned subsidiary of Pfizer, Inc.

7.      Defendant Solutia Inc. ("Solutia") is a Delaware corporation with its headquarters and principal place of business in St. Louis, Missouri.  Solutia is a global chemical manufacturer that was formed in 1997 by the divestiture of the chemical business of the company then known

2

as "Monsanto Company." This transferred the assets and liabilities of the chemical business, including those related to the manufacture and sale of PCBs, to Solutia.

8.    Defendant Monsanto Company ("New Monsanto") is a Delaware corporation with its principal place of business in St. Louis, Missouri. New Monsanto is an agricultural company that was formed in February 2000 under the name "Monsanto Ag Company." It was formed as a wholly owned subsidiary of defendant Pharmacia, which at that time was known as "Monsanto Company." In March 2000, "Monsanto Company" changed its name to "Pharmacia Corporation," and "Monsanto Ag Company" assumed the name "Monsanto Company."

9.    Pursuant to various agreements, Old Monsanto, Solutia, and New Monsanto have apportioned amongst themselves liabilities for claims arising from Old Monsanto's chemical business, including the manufacture and sale of PCBs. Old Monsanto, Solutia, and New Monsanto are collectively referred to herein as "Defendants."

## III.  JURISDICTION AND VENUE

10.    This Court has jurisdiction pursuant to 28 U.S.C. sections 1331 and 1332.

11.    Venue is appropriate in this judicial district pursuant to 28 U.S.C. section 1391(a) because a substantial part of the property that is the subject of the action is situated in this judicial district.

## IV.  FACTUAL ALLEGATIONS

### A.    The Manufacture and Use of PCBs

12.    Polychlorinated biphenyl, or "PCB" for short, is a molecule comprised of chlorine atoms attached to a double carbon-hydrogen ring (a "biphenyl" ring). PCBs are man-made chemicals, and there is no known natural source of PCB.

13.     PCBs were first manufactured commercially in the late 1920s by the Anniston Ordnance Company, which subsequently changed its name to Swann Chemical Company.  In 1935, Old Monsanto bought Swann Chemical Company, becoming the sole PCB manufacturer in the United States.  Around that time, Old Monsanto licensed companies in other countries to manufacture PCBs for international use.  Old Monsanto remained the exclusive producer of PCBs in the United States until manufacture and use of the product was discontinued in 1978.

14.     PCBs are odorless and tasteless.  They are either oily liquids or solids that are colorless to light yellow in appearance.  Because they are non-flammable, chemically stable, have a high boiling point, and electrical insulating properties, PCBs have been used in a wide range of industrial applications.  PCBs have been used in applications in which the PCBs are held completely within the equipment (*i.e.*, "closed systems"), such as transformers, motor start capacitors, and lighting ballasts.  They have also been used in applications in which the PCBs are in direct contact with their surroundings (*i.e.*, "open systems"), such as caulk, paint, adhesives, and flame retardants.  The most common trade name for PCBs in the United States was "Aroclor," which was trademarked by Old Monsanto.

15.     Between about 1950 and 1978, products containing PCBs were widely used in the construction and renovation of buildings throughout the United States.  For example, Old Monsanto's manufacture of PCBs just for use in caulk and other plasticizers ranged from three million pounds in 1957 to 19 million pounds in 1969.

16.     Between 1950 and 1978, there was a rise in school construction corresponding with the post-World War II "Baby Boom" generation attending school.  PCBs were widely and foreseeably used in the construction and renovation of these schools.  Accordingly, PCBs are

likely to be present in the caulk around windows, door frames, masonry columns, and other masonry building materials in schools built or renovated during this period.

17.     PCBs are very stable compounds that do not readily degrade.  As a result, PCBs persist in the environment for long periods of time.  PCBs cycle between air, water, and soil, even when not physically disturbed.  PCBs easily migrate from building materials such as caulk into surrounding materials such as masonry, wood, drywall, and soil, thereby causing damage to those surrounding materials.

**B.     PCB Toxicity**

18.     Just as in the environment, PCBs accumulate in the human body.  According to the EPA, PCBs have been demonstrated to cause cancer, as well as a variety of other adverse health effects on the immune, reproductive, nervous, and endocrine systems of animals and humans.

19.     In 1996, the EPA completed an assessment of PCB carcinogenicity, which was peer-reviewed by 15 experts on PCBs, including scientists from government, academia, and industry.  The peer reviewers agreed with the EPA's conclusion that PCBs are "probable human carcinogens."  The International Agency for Research on Cancer, the National Toxicology Program, and the National Institute for Occupational Safety and Health have reached similar conclusions.

20.     PCBs have been demonstrated to affect the immune system by decreasing the size of the thymus gland, decreasing resistance to pneumonia and infections, and increasing the risk of non-Hodgkin's lymphoma.  Studies have been unable to identify a level of PCB exposure that does not affect the immune system.

21.     The reproductive effects of PCBs include decreased birth weight and a significant decrease in gestational age with increasing exposure to PCBs.

22.     The neurological effects of PCBs include significant deficiencies in visual recognition, short-term memory, and learning.

23.     PCBs have been demonstrated to affect thyroid hormone levels, which are critical for normal growth and development.

24.     PCBs are also associated with elevated blood pressure, serum triglycerides, and serum cholesterol.

25.     The primary pathways for PCBs to enter the human body are ingestion, inhalation, and dermal contact.  Although children are exposed to PCBs through the same pathways as adults, their intake of PCBs is likely greater than that of adults because children consume more food, air, and water per pound of body weight than adults.  Further, children are more vulnerable to PCBs because of their smaller size and developing systems.  The Agency for Toxic Substances and Disease Registry explained:

>     Younger children may be particularly vulnerable to PCBs because, compared to adults, they are growing more rapidly and generally have lower and distinct profiles of biotransformation enzymes, as well as much smaller fat deposits for sequestering the lipophilic PCBs.

## C.     Old Monsanto's Knowledge of PCB Toxicity

26.     As early as the 1930s, Old Monsanto knew of the toxicity of PCBs but continued to manufacture, sell, and promote the products.  For example:

- An October 11, 1937 Old Monsanto memorandum states that "[e]xperimental work in animals shows that prolonged exposure to [PCB] vapors evolved at

high temperatures or by repeated oral ingestion will lead to systemic toxic effects."

- On September 15, 1938, the Dean of the Harvard School of Public Health provided a report to Old Monsanto on the results of animal studies that showed liver damage to animals exposed to PCBs.

- A February 29, 1952 Old Monsanto memorandum states that the "toxicity hazard of [PCB] fumes is well established."

- An Old Monsanto document dated September 1, 1953 states: "As I am sure you know, [PCBs] cannot be considered nontoxic."

- On November 14, 1955, Old Monsanto's Medical Department recommended that "eating of lunches should not be allowed in [the PCB] department" because "[PCB] vapors and other process vapors could contaminate the lunches[.]"

27.    Notwithstanding its knowledge, Old Monsanto willfully and callously failed to provide adequate warnings of PCB toxicity, preferring instead to deny or downplay the dangers of its product.  This was motivated by the company's desire to protect and prolong its "very profitable" PCB business.  Old Monsanto recognized that if the dangers of PCBs were known, use of the product would be severely curtailed, if not eliminated altogether.

28.    By the late 1960s, public researchers had begun questioning the safety of PCBs.  On August 25, 1969, Old Monsanto formed an "ad hoc" committee to respond to these concerns.  An October 2, 1969 report from this committee states:

The objective of the committee was to recommend action that will:

1.  Protect continued sales and profits of [PCBs];

7

2. Permit continued development of new uses and sales, and
3. Protect the image of the Organic Division and the Corporation as members of the business community recognizing their responsibilities to prevent and/or control contamination of the global ecosystem.

The report goes on to state:

> The committee believes there is little probability that any action that can be taken will prevent the growing incrimination of [PCBs] as nearly global environmental contaminants leading to contamination of human food (particularly fish), the killing of some marine species (shrimp), and the possible extinction of several species of fish-eating birds.
>
> &ast;  &ast;  &ast;
>
> There are, however, a number of actions which must be undertaken in order to prolong the manufacture, sale and use of these particular [PCBs] as well as to protect the continued use of other members of the [PCB] series.

29.     In 1970, the year after Old Monsanto formed the "ad hoc" committee, PCB production in the United States peaked at 85 million pounds.

## D.     The Federal Ban on PCBs

30.     In 1976, Congress passed the Toxic Substances Control Act, which banned most uses of PCBs in the United States effective January 1, 1979.  The Toxic Substances Control Act authorized the EPA and other federal and state agencies to apply restrictions related to PCBs. Old Monsanto discontinued the manufacture of PCBs in 1977, but the company's PCBs continued to be sold and distributed through the end of 1978.

## E.     The EPA's Guidance to Schools Regarding Airborne PCB

31.     It was not until September 2009 that school districts could possibly have known that PCBs contained in building materials can be emitted into the air at concentrations that pose a threat to public health.

32.    On September 25, 2009, the EPA issued a press release to school administrators recommending they take steps "to reduce exposure to PCBs that may be found in caulk in many buildings constructed or renovated between 1950 and 1978."  The press release further stated:

> Building owners and facility managers should also consider testing
> to determine if PCB levels in the air exceed EPA's suggested
> public health levels.  If testing reveals PCBs in the air above these
> levels, building owners should be especially vigilant in
> implementing and monitoring ventilation and hygienic practices to
> minimize exposures.  Owners and managers are encouraged to
> retest PCB levels in air to determine whether these practices are
> reducing the potential for PCB exposures.  Should these practices
> not reduce exposure, caulk and other known sources of PCBs
> should be removed as soon as practicable.

33.    Concurrent with the September 25, 2009 press release, for the first time the EPA established public health levels for PCBs in school indoor air.  These public health levels, which provide an objective standard for evaluating PCB contamination in air, are as follows:

<u>Public Health Levels of PCB in School Indoor Air</u>

| Age 1 ≤ 2 | Age 2 ≤ 3 | Age 3 ≤ 6 | Age 6 ≤ 12 (Elementary School) | Age 12 ≤ 15 (Middle School) | Age 15 ≤ 19 (High School) | Age 19 + (Adult) |
|---|---|---|---|---|---|---|
| 70 ng/m$^3$ | 70 ng/m$^3$ | 100 ng/m$^3$ | 300 ng/m$^3$ | 450 ng/m$^3$ | 600 ng/m$^3$ | 450 ng/m$^3$ |

(ng/m$^3$ = nanograms per cubic meter)

34.    School districts in Massachusetts are statutorily charged with a duty to maintain their buildings in good order and ensure a healthy environment for students.  This duty is coextensive with the need to comply with health-protective environmental standards, such as public health levels established by the EPA.  Because the public health levels for PCBs in school indoor air were established on September 25, 2009, Lexington and other members of the plaintiff class did not suffer appreciable property damage from airborne PCB before that date.

35.     Even assuming that school districts suffered appreciable harm before the establishment of the EPA's public health levels, a school district could not have reasonably discovered such harm until the September 25, 2009 public announcement by the EPA.  To the extent there was information about PCB contamination reasonably available to school administrators before September 25, 2009, such information was limited to "closed system" applications and did not warn of the danger of airborne PCB or provide any standard by which to evaluate the danger of airborne PCB.  For instance, pre-2009 guidance from the EPA to school administrators only recommended visual inspections of lighting ballasts in schools and did not mention or recommend any air testing.[1]  The EPA's pre-2009 guidance did not mention the possibility – in fact, likelihood – that other building materials such as caulk, paint, and sealant could be emitting dangerous levels of PCBs even in the absence of PCB lighting ballasts.  Thus, any knowledge about the dangers of leaking PCB lighting ballasts could not have reasonably informed school districts that they had dangerous levels of airborne PCB that would require costly investigation, remediation, and monitoring.

F.      **Lexington's Detection of and Response to PCBs**

36.     Lexington owns and operates a public school system.  In response to the September 2009 guidance from the EPA, Lexington developed a plan to conduct air testing of all of its schools built or renovated between 1950 and 1978.

37.     In 2010, one of Lexington's schools – Estabrook Elementary School – was found to have concentrations of airborne PCBs in excess of the EPA's public health levels.

---

[1]  A visual inspection is adequate to identify a PCB-containing lighting ballast because lighting ballasts manufactured without PCBs after January 1, 1979 are required to be labeled "No PCBs."  In contrast, there is no label or marking on caulk, sealant, paint, and other "open system" PCB products.  Similarly, because lighting ballasts leak PCBs in liquid form, leaks can be detected visually whereas "open system" PCB products can emit PCBs without any visual warning.

38.     In August 2010, Lexington commenced extensive remediation work to repair property damage at Estabrook Elementary School.  This work included removing certain PCB contaminated materials, encapsulating other PCB contaminated materials, thoroughly cleaning hard surfaces, and modifying ventilation systems, among other things.  Lexington has incurred substantial costs to comply with the September 2009 EPA public health levels for PCBs in indoor school air.

39.     Since Estabrook Elementary School was constructed when Old Monsanto was the sole manufacturer of PCBs in the United States, Lexington alleges on information and belief that the PCBs at its schools were manufactured by Defendants.

## V.  CLASS ACTION ALLEGATIONS

40.     Plaintiff brings this action both on behalf of itself individually and as a class action, pursuant to Federal Rules of Civil Procedure  23(a) and (b)(3), on behalf of the following class (the "Class"):

> All school districts in Massachusetts that have one or more buildings with airborne PCB in excess of the EPA's public health levels for PCBs in school indoor air.  The Class does not include claims for PCB remediation that commenced more than four years before the filing of this action or any claims for personal injuries.

41.     There are approximately 522 school districts and 1,879 schools in Massachusetts. According to a 2006 report by the Massachusetts School Building Authority, over half of the schools in Massachusetts were built during the 1950s through 1970s when PCBs were commonly used in construction projects.  The EPA has reported that the presence of PCB in schools and other buildings built or renovated between 1950 and 1978 "could be widespread."  Accordingly, the number of Class members is likely too numerous for joinder to be practical.

42.     Plaintiff's claims are typical of the claims of the Class in that Plaintiff is subject to the same September 2009 EPA public health levels for PCBs in school indoor air as other members of the Class, Plaintiff and all Class members were harmed by the same defective product, and Plaintiff seeks the same relief as the Class.

43.     Numerous contentions of law or fact arising from Defendants' manufacture, marketing, and sale of PCBs are common to the Class, including

    a.    that PCBs are toxic and persistent environmental contaminants;

    b.    that Defendants knew or should have known of PCBs' toxicity and danger to the environment;

    c.    that the design of Defendants' PCBs posed a likelihood of harm;

    d.    that the use of Defendants' PCBs in Class members' buildings was a foreseeable use;

    e.    that consumers of Defendants' PCBs did not expect the products to be a toxic contaminant that would damage their property;

    f.    that Defendants failed to provide adequate warnings of PCBs' toxicity and danger to the environment to foreseeable users of the products;

    g.    that the release and migration of PCBs into building structures and indoor air constitutes property damage;

    h.    that Defendants breached the implied warranty of merchantability;

    i.    that Defendants violated the Massachusetts Consumer Protection Act;

    j.    that the EPA's public health levels for PCBs in school indoor air are an appropriate standard for evaluating property damage caused by PCBs;

> k.   that school districts did not suffer appreciable property damage from airborne PCBs prior to the establishment of the EPA's public health levels on September 25, 2009; and
>
> l.   that a reasonable school district would not have recognized injury prior to September 25, 2009 without actually undertaking PCB remediation work.

44.   These common questions of law or fact are common to the Class and predominate over any other questions affecting only individual Class members.

45.   Plaintiff will fairly and adequately represent the interests of the Class because it is a typical school district and has no conflicts with any other member of the Class.  Furthermore, Plaintiff has retained competent counsel experienced in class action, product liability, and environmental litigation.

46.   A class action is superior to the alternatives, if any, for the fair and efficient adjudication of this controversy.

47.   Prosecution of separate actions by individual Class members would create the risk of inconsistent or varying adjudications, establishing incompatible standards of conduct for the Defendants.

48.   Plaintiff reserves the right to expand, modify or alter the Class definition in response to information learned during discovery.

## VI.  CLAIMS

### FIRST CAUSE OF ACTION
### (Breach of Implied Warranty of Merchantability – Design Defect)

49.   Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein.

50.     Defendants manufactured and sold PCBs.  By doing so, Defendants impliedly warranted that PCBs are merchantable, safe, and fit for ordinary purposes.

51.     The PCBs manufactured and sold by Defendants were defective in design because they can contaminate building structures, soil, and air, creating a significant threat to public health and the environment.  PCBs are dangerous to an extent beyond that which would be contemplated by the ordinary consumer of PCBs.  This design defect constitutes a breach of Defendants' implied warranty of merchantability.

52.     As a direct and proximate result of Defendants' design defect, Plaintiff and the Class have suffered property damage, requiring investigation, remediation, and monitoring costs in an amount to be determined at trial.  Defendants are strictly, jointly, and severally liable for all such damages.

## SECOND CAUSE OF ACTION
### (Breach of Implied Warranty of Merchantability – Failure to Warn)

53.     Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein.

54.     The use of PCBs in the construction and renovation of schools was a reasonably foreseeable use.  Defendants knew or should have known that PCBs used in this manner can contaminate building structures, soil, and air, creating a significant threat to public health and the environment.  Defendants had a duty to warn Plaintiff and the Class of these hazards. Defendants, however, failed to provide adequate warnings of these hazards.

55.     As a direct and proximate result of Defendants' failure to warn, Plaintiff and the Class have suffered property damage, requiring investigation, remediation, and monitoring costs

in an amount to be determined at trial.  Defendants are strictly, jointly, and severally liable for all such damages.

### THIRD CAUSE OF ACTION
### (Violation of Massachusetts Consumer Protection Act)

56.     Plaintiff incorporates by reference all preceding paragraphs of this Complaint as if fully set forth herein and further alleges as follows:

57.     The wrongful acts of Defendants, including its representations, omissions and breaches of implied warranty, constitute unfair and deceptive acts in violation of Massachusetts General Laws Chapter 93A, §§ 2 and 9.

58.     The Defendants' violations of Chapter 93A were willful and knowing.

59.     Pursuant to Massachusetts General Laws Chapter 93A, section 9(3), Plaintiff delivered to each Defendant a written demand for relief on behalf of itself and the Class. Defendants failed to make a timely and adequate response, thereby entitling Plaintiff and the Class to judgment for all damages authorized by statute and reasonable attorneys' fees and costs.

### VII.    PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands judgment against Defendants as follows:

A.      A declaration that this action is a proper class action under Federal Rule of Civil Procedure 23(b)(3) on behalf of the Class defined herein, and an order directing that reasonable notice of this action, as provided by Federal Rule of Civil Procedure 23(c)(2), be given to each member of the Class;

B.      A declaration that Defendants have breached their implied warranty of merchantability to Plaintiff and the Class;

15

C.      A declaration that Defendants have violated the Massachusetts Consumer

Protection Act;

D.      An order that Defendants pay all investigation, remediation, and monitoring costs

incurred by Plaintiff and members of the Class to comply with the EPA's public health levels;

E.      An award to Plaintiff and the Class for the costs of this suit (including expert

fees), and reasonable attorneys' fees, as provided by law;

F.      An award for treble and/or punitive damages; and

G.      An award for such other and further relief as the nature of this case may require or

as this court deems just, equitable and proper.

## DEMAND FOR JURY TRIAL

Pursuant to Federal Rule of Civil Procedure 38, Plaintiff demands a jury trial.

Dated:  September 4, 2012                Respectfully submitted,

                                        ANDERSON & KRIEGER LLP

                                        /s/ Kevin D. Batt
                                        Scott P. Lewis (BBO # 298740)
                                        Melissa C. Allison (BBO # 657470)
                                        Kevin D. Batt (BBO #634852)
                                        One Canal Park, Suite 200
                                        Cambridge, Massachusetts 02141
                                        Telephone:    (617) 621-6500
                                        Facsimile:    (617) 621-6501
                                        Email:        slewis@andersonkreiger.com
                                                      mallison@andersonkreiger.com
                                                      kbatt@andersonkrieger.com

SHER LEFF, LLP

/s/ Jessica L. Grant
Jessica L. Grant
  (*pro hac vice* application pending)
Esther L. Klisura
  (*pro hac vice* application pending)
450 Mission Street, Suite 400
San Francisco, California 94105
Telephone:      (415) 348-8300
Facsimile:      (415) 348-8333
Email:          jgrant@sherleff.com
                eklisura@sherleff.com


KENNEDY & MADONNA, LLP

/s/ Kevin J. Madonna
Kevin J. Madonna
  (*pro hac vice* application pending)
48 Dewitt Mills Road
Hurley, New York 12443
Telephone:      (845) 331-7514
Facsimile:      (845) 230-3111
Email:          kmadonna@kennedymadonna.com

*Counsel for Plaintiff Town of Lexington and the
Putative Class*