UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| TOWN OF LEXINGTON, on behalf of itself and all others similarly situated, ....Plaintiff, <br><br> v. <br><br> PHARMACIA CORPORATION, SOLUTIA INC., and MONSANTO COMPANY, ....Defendants. | C.A. No. 12-CV-11645 |

## DEFENDANTS PHARMACIA CORPORATION, SOLUTIA INC., AND MONSANTO COMPANY'S MEMORANDUM IN SUPPORT OF MOTION TO STRIKE THE AFFIDAVIT OF DAVID L. MACINTOSH AND EXCLUDE HIS EXPERT OPINIONS

Lexington cannot satisfy its burden of proof of showing that Dr. David MacIntosh is qualified to provide all the opinions disclosed in his reports and/or that the methodology and data underlying his opinions are reliable. Certain of Dr. MacIntosh's opinions should be excluded for the following reasons:

- Dr. MacIntosh is unqualified to predict the cost per square foot of PCB remediation costs of the putative class members because he has no experience, education or training in accepted cost estimation techniques and methods.

- Dr. MacIntosh's opinion that it is possible to "provide a formulaic approach to calculate projected mitigation and remediation costs" on a per square foot basis for the entire putative class ignores the wide variation in project scope and methods that may be appropriate for each building, contradicts his own previous statements that "the cost of interventions can be variable and substantial," and it is classic impermissible *ipse dixit* because it is presented without any support other than his own conclusory statement that such an estimate would be representative of the putative class costs.

1

- The survey method Dr. MacIntosh used to calculate his $10 to $40 per square foot estimate of PCB remediation costs is unreliable because it is not based on any commonly accepted cost estimation techniques or methods, it fails to account for wide variation in project scope and methods, it is based on a flawed data set derived primarily from other estimates instead of finished projects, and it **contradicts his own previous statement that the costs of interventions can range from $1 to $20 per square foot.**

- Dr. MacIntosh is unqualified to opine on the "typicality" of the Estabrook School's building design, construction, and building materials because he has no education training or experience in architecture, building design or engineering.

- Dr. MacIntosh's method of assessing Estabrook's similarity to other schools in Massachusetts (the entire extent of which amounted to observing photographs of the exterior of other schools and casually observing school exteriors) is unreliable, because he failed to conduct any substantive analysis of the design elements or construction of other school buildings which in many cases vary from the Estabrook's design.

- Dr. MacIntosh should be precluded from testifying on the EPA's requirements regarding PCB remediation because he has no basis for his incorrect statements that once building material with PCB content over 50 ppm are identified, they "must be removed" and "a remediation plan must be submitted to the EPA." Neither of these "opinions" is true.

Pharmacia requests that this court strike Dr. MacIntosh's affidavit in support of Lexington's Motion for Class Certification and preclude him from testifying on these subjects hearing or trial.[1]

## I.   PRELIMINARY STATEMENT

---

[1] Pharmacia is not moving to exclude Dr. MacIntosh from testifying regarding the remediation work he did for Lexington discussed in his first report.

Lexington makes three claims against Pharmacia,[2] styled: (1) breach of implied warranty of merchantability – design defect; (2) breach of implied warranty of merchantability – failure to warn; and (3) violation of Massachusetts Consumer Protection Act (See Exhibit A, Doc. #1 at ¶¶49-59). It claims (without proof) that Pharmacia manufactured polychlorinated biphenyl compounds ("PCBs")[3] that were mixed into window caulk (and/or sealant) by some unknown intermediary and that the caulk was later installed by unknown curtain wall manufacturers or building contractors in or around external windows in the construction of its Estabrook Elementary School prior to 1961. (See Exhibit B, Plaintiff Town of Lexington's Response to Pharmacia LLC's First Set of Interrogatories, p. 7.)

Lexington claims it has suffered "property damage" due to the presence of PCBs in the air at Estabrook Elementary School. (Doc. #1, ¶¶ 27, 38, 43(f), 43(g); Exhibit B.) Lexington's Complaint states class action allegations, defining the putative class, "pursuant to Federal rules of Civil Procedure 23(a) and (b)(3)" as:

> All school districts in Massachusetts that have one or more buildings with airborne PCB in excess of the EPA's public health levels for PCB's in school indoor air. The Class does not include claims for PCB remediation that commenced more than four years before the filing of this action or any claims for personal injuries.[4]

---

[2] Pharmacia was known as "Monsanto" during the relevant time period for this action. Co-defendants Solutia and Monsanto Company did not exist during this time period, never manufactured PCBs, and have no conceivable liability in this action. For ease and convenience, the defendants are collectively called "Pharmacia" herein.

[3] Lexington rests its assertion that Pharmacia was the manufacturer of the PCBs incorporated into the window caulk by an unknown intermediary on Pharmacia's status as the largest manufacturer of PCBs in the United States. But it has no proof that the PCBs in the window caulk (or the window caulk itself, the windows, or the curtain walls) were made in the United States.

[4] It is undisputed that the only way to know whether a building contains PCBs in the indoor air is to conduct air testing. Lexington has not presented evidence that any other cities and towns have ever tested for PCBs in the indoor air in their schools during the relevant time period. Consequently, Lexington does not know which, or how many school districts may be members of the putative class it proposes for certification. Lexington provides no road map for ascertaining which "school districts in Massachusetts that have one or more buildings with airborne PCB in excess of the EPA's public health levels for PCBs in school indoor air" and as discussed in Pharmacia's Opposition to Class Certification, ascertaining which schools contain airborne PCBs above the screening level would take a individualized inquiry into the facts surrounding each school building.

In its demand for relief, Lexington requests an order that Defendants "pay all investigation, remediation, and monitoring costs incurred by Plaintiff and members of the Class to comply with the EPA's public health levels." However, there is no indication that any other school districts have even tested for PCBs, and critically, Lexington has presented no evidence that a single other school district has yet "incurred" any costs for any PCB investigation, remediation or monitoring. By the plain terms of Lexington's own request for relief, if no other school districts have incurred costs for remediation, then there would be no school districts that have standing for the relief requested. Even if other school districts had incurred testing or remediation costs, clearly each project would be different in scope and result in different costs, necessitating a individualized inquiry and separate "mini-trials" on damages for each prospective class member, which would defeat the efficiency rationale for class treatment.

Lexington's apparent strategy for avoiding separate "mini-trials" on damages is to assert, through Dr. MacIntosh, that class-wide "damages can be computed on a cost-per-square-foot basis." (See Exhibit C, Doc. 119 at p. 14.)[5] Dr. MacIntosh submitted an affidavit in support of Lexington's Memorandum in Support of Class Certification, which included the following statements:

> "29.     While the costs of mitigation and remediation measures will differ from building to building, costs can be computed on a cost-per-square-foot basis which , when coupled with objective criteria about the affected buildings (e.g. type and size of building, area that must be remediated) provide a formulaic approach to calculate projected mitigation and remediation costs."

> "30.     Based on my experience in overseen remediation work and a review of relevant literature, remediation costs for most school buildings would be between $10 to $40 per square foot with a central tendency of approximately $20 per square foot." (See Exhibit D, Affidavit of David L. MacIntosh at ¶¶ 29-30; Exhibit F, Expert Report of David MacIntosh at p. 9)

---

[5] Dr. MacIntosh is a lead scientist at EH&E, the consultancy that advised Lexington on its PCB remediation project at the Estabrook School. He disclosed two reports, one on February 14, 2014 and the other on August 29, 2014.

Lexington does not spell out in its brief, or anywhere else, how exactly it proposes to ascertain which potential class members have "incurred costs" or how to apply Dr. MacIntosh's "formulaic approach" to allocate damages among the class members.

## II.   ARGUMENT

The admission of expert evidence is governed by the Federal Rule of Evidence 702, which was codified by *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579, 113 (1993). Rule 702 states the following:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

Fed.R.Evid. 702.

The trial court must determine whether the expert's testimony "both rests on a reliable foundation and is relevant to the task at hand" and whether the expert is qualified. *Daubert*, 509 U.S. at 597; *United States v. Diaz*, 300 F.3d 66, 73 (1st Cir. 2002). An expert's methodology is the "central focus of a *Daubert* inquiry," but a court "may evaluate the data offered to support an expert's bottom-line opinions to determine if that data provides adequate support to mark the expert's testimony as reliable." *Ruiz-Troche v. Pepsi Cola of P.R. Bottling Co.*, 161 F.3d 77, 81 (1st Cir. 1998); *Bonner v. ISP Techs, Inc.*, 259 F.3d 924, 929 (8th Cir. 2001) (deeming it clear that "it is the expert witness' methodology, rather than their conclusions, that is the primary concern of Rule 702").

The proponents of the expert testimony must establish that the testimony is reliable by a preponderance of the evidence. *In re Neurontin Mktg., Sales Practices, & Products Liab.*

*Litig.*, 612 F. Supp. 2d 116, 130 (D. Mass. 2009).  *Daubert* listed four factors which should guide judges in the determination of reliability:

> (1) Whether the theory or technique can be and has been tested;
> (2) Whether the technique has been subject to peer review and publication;
> (3) The technique's known or potential rate of error;
> (4) The level of the theory's or technique's acceptance within the relevant discipline

*United States v. Mooney*, 315 F.3d 54, 62 (1st Cir. 2002) (citing *Daubert*, 509 U.S. at 593-94).

"*Daubert* analysis focuses on 'principles and methodology' used by the expert, and a court may reject 'opinion evidence that is connected to the existing data only by the *ipse dixit* of the expert.'"  *Calisi v. Abbott Labs.*, CIV.A. 11-10671-DJC, 2013 WL 5441355 at *5 (D. Mass. Sept. 27, 2013).  Under *Kumho Tire v. Carmichael*, the critical inquiry is whether the expert "employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field."  526 U.S. 137, 152 (1999).  When "the factual basis of an expert's testimony is called into question, the district court must determine whether the testimony has 'a reliable basis' in light of the knowledge and experience of the relevant discipline."  *Crowe v. Marchand*, 506 F.3d 13, 17 (1st Cir. 2007) (quoting *Kumho Tire*, 526 U.S. at 148, 119).

In *Calisi*, the Court excluded testimony from the Plaintiff's "warnings expert," Dr. Michael Hamrell, because he did not provide reliable data to support his conclusion that the labels on the drug branded "Humira" failed to warn doctors about a possible increased risk of lymphoma that may be associated with use of the drug.  2013 WL 5441355 at 8-12.  The Court found that Dr. Hamrell's criticisms of the product labeling were insufficient and conclusory because he failed to provide any significant analysis on the type of information that a prescribing doctor would need or expect from such a warning label, and neglected to explain how his

proposed alternative warnings would have a different effect on the actions of prescribing doctors. *Id.*

The Court noted that Dr. Hamrell was unqualified to offer an opinion on how prescribing doctors would interpret the warning labels because he was not a physician himself, and had not established a basis for opinions on that subject by pointing to research studies or any significant experience in that area. *Id.* The Court so found despite Dr. Hamrell's testimony that he was "sure" he worked on labeling for a pharmaceutical company in the past, and he was "sure" he had involvement in developing warning label guidance in conjunction with the Food and Drug Administration ("FDA"). *Id* at 11-12. Dr. Hamrell's opinions, based on no more than his own unqualified say-so and not on sufficient data were unreliable. The Court granted the Defendants' *Daubert* motion, and because the plaintiff had no other warnings expert, the Court also granted summary judgment in favor of the defendants. *Id.*

A.    **DR. MACINTOSH IS UNQUALIFIED TO OPINE ON PCB PROJECT COST ESTIMATION**

Cost estimation for environmental remediation needs to be performed carefully and systematically by an experienced and qualified estimator, tailored to the needs and specific scope of a particular project. (See Exhibit H, Expert Report of CCA at p. 95.) Dr. MacIntosh is not qualified in architecture, engineering, mechanical engineering, structural engineering, building engineering, or cost estimating. (See Exhibit I, Deposition of Dr. David L. MacIntosh at 26:1-10.) He has no personal experience drafting cost estimates for any indoor air PCB remediation projects. (Id. at 33:1-36:1, 50:20-51:18.)[6] There is nothing in his resume that would indicate that

---

[6] Other than his litigation work for Lexington, the only other time Dr. MacIntosh could remember assisting with cost estimation was in connection with the disposal of PCB materials in connection with the demolition of the Estabrook School in "2012 or 2013," after all the work to reduce PCB concentrations in the indoor air had already been completed. Id. at 35-36. He "thought" EH&E provided a cost estimate of PCB disposal during demolition of the school. Id. at 36-37. Dr. MacIntosh did not do any cost estimation work for any of EH&E's other PCB remediation

he has any engineering experience or that he has ever designed a remedy or prepared a detailed engineering cost estimate. (See Resume and CV attached hereto as Exhibit G.)

When asked whether he had ever used any cost estimating software program or manual, he stated that he had "looked through" a reference book in the past but could not remember the name of the resource. (Exhibit I at 33:7-15.) When asked whether the manual was "RS Means," Dr. MacIntosh answered in the affirmative. (Id. at 33:14-20.) He claims to have reviewed the manual "for an hour or two" before drafting his report in this case, but ultimately decided not to use the manual as a resource for his report. (Id. at 38:13-5.) He also remembered having casual conversations with staff in his office about the possibility of applying traditional cost estimation techniques, but decided not to use them in connection with his estimates for Lexington. (Id. at 37:17-38:5.) Just as in *Calisi*, Dr. MacIntosh is unqualified to opine on cost estimation techniques despite working in proximity to those who might be qualified. 2013 WL 5441355 at *6, 11-12.

Dr. MacIntosh's cost estimate should be excluded because he is inexperienced and unqualified in the accepted methods and techniques of cost estimation.

**B.    DR. MACINTOSH'S OPINION THAT HE CAN OFFER A "FORMULAIC APPROACH" TO CALCULATE CLASS-WIDE PCB REMEDIATION COSTS BY SQUARE FOOT SHOULD BE EXCLUDED BECAUSE IT IS OFFERED WITHOUT ANY REASONING OTHER THAN HIS OWN SAY SO AND CONTRADICTS HIS OWN TESTIMONY THAT EACH PROJECT IS UNIQUE**

Dr. MacIntosh's opinion that it is possible to "provide a formulaic approach to calculate projected mitigation and remediation costs" on a per square foot basis for the entire putative

---

projects. Id. at 34, 50-51. In fact, Dr. MacIntosh's experience with indoor air PCB remediation does not extend much past his work for Lexington. His only other experience with PCB remediation was for the University of Cincinnati in "2012 or 2013." Id. at 41. He also claimed to have some "marginal" involvement with developing a risk assessment for another Town in Massachusetts, and conducting a blood serum study for the University of Rhode Island. Id. at 44. **It appears that the Lexington project was Dr. MacIntosh's first indoor air PCB remediation project.** His inexperience is evident in his misstatements regarding the EPA's PCB regulations and the haphazard way EH&E addressed remediation at the Estabrook School project.

class ignores important differences in the scope and methods between projects, contradicts his own statement that "the cost of interventions can be variable and substantial," and is classic impermissible *ipse dixit* as it is presented without any support other than his own statement.

Due to the unique nature of a building, remediation scopes are unique to a site; hence it is critical that an individual scope is developed for each and every building and/or site. (Exhibit H at p. 95-97). Because the scope of remediation varies from building to building, reliable cost estimation must be based on a detailed scope of work unique to the particular project. Id. In his report, Dr. MacIntosh provides a laundry list of reasons why every remediation project is unique:

> "As described in EH&E's literature review of building-related PCBs prepared for EPA, the costs of PCB remediation are influenced by numerous factors which include but are not limited to: extent and unit costs of environmental sampling and analysis required to characterize building conditions; amount of caulk or other materials manufactured with PCBs; extent of other materials that contain PCB level that warrant remediation; accessibility of PCB-containing materials; co-contamination with asbestos; relocation of educational activities, (transportation, rent or building-out or retrofit of temporary classroom space); scheduling of remediation work; occupancy of the building; disposal fees; post-remediation PCB characterization; and ongoing PCB-related operations and maintenance." (See Exhibit E, Expert Report of David L. MacIntosh at p.8.)

MacIntosh writes: "Based on my experience the remediation process from building related PCBs can be broken down into five stages of work." (Id at p. 3.) The first stage, according to MacIntosh, is the "Building Characterization", which means that each suspected building must be examined "to determine the nature and extent of PCB caulk..." (Id.) In his deposition, MacIntosh states: "Well, every building, in my experience, needs its own plan..." (Exhibit I at 111:15-22.) Further, on page 4 of his report MacIntosh says, "...the actual remediation method (or methods) employed differs across buildings." (Exhibit E, p. 4.)

Despite all these statements about the variability of remediation methods and attendant costs, Dr. MacIntosh nonetheless opines in his affidavit:

> While the costs of mitigation and remediation measures will differ from building to building, costs can be computed on a cost-per-square-foot basis which, when coupled

with objective criteria about the affected buildings (e.g. type and size of building, area that must be remediated) provide a formulaic approach to calculate projected mitigation and remediation costs.  (See Exhibit D, ¶¶ 29.)

Dr. MacIntosh offers no explanation of how, given all the variables that affect the cost of remediation, he is able to opine that such a "formulaic approach" is possible. He makes no attempt to describe any reasoning to explain why costs can vary widely from building to building, but can be "computed" as a function of square footage.  He simply offers up the statement with no more support that his own say-so. For that reason, it is classic *ipse dixit* testimony that must be excluded.

## C.    DR. MACINTOSH'S PROJECT COST ESTIMATION METHODOLOGY IS WILDLY UNRELIABLE, HIS DATA IS INSUFFICIENT, AND HE OFFERS NO EXPLANATION FOR HOW HIS SURVEY RESULTS ARE REPRESENTATIVE OF OTHER BUILDINGS

Dr. MacIntosh's methodology is unreliable because he eschews traditional cost estimation techniques in favor of a "literature review" survey with absolutely no explanation or rationale of why the results of his survey are likely to be representative of the other school buildings in Massachusetts.  (See Ex. J, Expert Report of John Woodyard p. 25-29.) The data behind Dr. MacIntosh's method for arriving at his $10-$40 per square foot figure is insufficient because it is based almost entirely on cost data from project *estimates*, not final costs.[7]  Further, Dr. MacIntosh make no attempt to confine the cost figures to expenses related to remediation of indoor air concentrations of PCBs due to caulk.  Rather, he includes cost data from projects that include window replacement, wall demolition, student transport, soil removal, and remediation of PCB light ballasts, among other tasks unrelated to indoor air remediation.  His opinions should therefore be excluded.

---

[7] The only finished school project he cites for cost data is the Estabrook School.

To support his PCB remediation cost estimate, Dr. MacIntosh conducted a "literature review" of other PCB project costs, which consisted of a search of Google and PubMed (Exhibit I at 124:13- 125:7.) Dr. MacIntosh assigned his colleague, Kathleen Brown, to put together table of other PCB projects, which was included with his August report.   (Id. at 129:1.) Dr. MacIntosh's table, which was the sole basis for his cost estimates, included a list of only ten projects. (Exhibit E at p. 9.)

Three of the ten projects listed in MacIntosh's reports were not public school buildings, but rather office and university buildings.   Dr. MacIntosh admitted school buildings are constructed differently than other building types, and so he did not use those examples when calculating his estimated cost range. (Exhibit I at 129:13-130:8.)  Dr. MacIntosh was not sure how many of the projects he cited were elementary schools, as opposed to high schools or middle schools.  (Id at 144:11-19.)

Five out of seven projects used as sources and data points for his cost estimation *are themselves project estimates, not final costs.*  (Exhibit I at 144:20-145:15, Ex. J, Expert Report of John Woodyard, p. 26.) Dr. MacIntosh admitted that in the context of PCB remediation, estimates made up front do not always reflect the final cost of the project. (Exhibit I at 121:7-14.) He admitted that was true for almost any construction or remediation project. (Id at 121:15-22.) He admitted that EH&E's own estimate for Estabrook was a "substantial" understatement of costs that accrued. (See Exhibit M, Email from David L. MacIntosh.)  He did not know whether the projects cited in his literature review were still on-going, or whether the "cost" numbers he cited were representative of final costs. (Exhibit I at 145:16-19.) Dr. MacIntosh did not calculate an error rate, standard error, or other statistical parameter to assess the reliability of his work. (Id at 152:20-153:15.)

Dr. Macintosh's survey of these other projects is not representative of indoor air PCB remediation projects because he admitted that the scope and the work for the various projects varied widely and in some cases went well beyond indoor air PCB reduction and remediation of PCBs in caulk.  (Id at 145:24-146:14.)  Some of the projects in the survey included costs for unrelated expenses, such as window replacement, structural changes to the school, student transportation, and remediation of PCBs containing soil demolition.  (See Exhibit J at p. 25-29.) The scope of work for each school varied widely, and therefore was not representative of caulk-based PCB indoor air remediation projects.

Dr. MacIntosh wrote in his report that in order to generate a cost per square foot for each project, he divided the project cost by square footage of the "area affected" in each school. (Exhibit E at p. 8.) He does not indicate in his report, and could not say in his deposition how he determined what the "area affected" was for each school, and did not know whether the square footage listed for each project in his table represented the entire area of the school, or some lesser "area affected." (Exhibit I at 151:18-21; Exhibit H at p. 98.)

Dr. MacIntosh did not know how he arrived at the square footage figure for each project. He testified that for at least some of the projects, his colleague Kathleen Brown estimated the square footage of the buildings using the ruler tool on Google Maps.  (Id at 147:1-13.)  Dr. MacIntosh doesn't know of any specialized training Kathleen Brown has for estimating square footage based on aerial photographs or satellite images from Google maps.  (Id at 148:21-149:16.)  Dr. MacIntosh didn't recall whether, when calculating square footage, his team used less than the total square footage of the building to account for only the "impacted area" of a building. (Id at 151:2-21.)

For these reasons, his assertion that "most school buildings would be between $10 to $40 per square foot with a central tendency of approximately $20 per square foot" is statistically unsound and misleading, and represents no more than a "thumb in the wind" because it was unrepresentative of the range of results.  (See Exhibit K, Expert Report of Tom Barocci at p. 5-7.)

Further, Dr. MacIntosh's report contradicts his own prior statements.  He was scheduled to speak at a conference in Woods Hole, Massachusetts and present a paper entitled "Exposure Controls: Evaluation, Efficacy and Cost" the week before his deposition, but he withdraw from the conference and had his colleague Kathleen Brown present the paper instead.  (Exhibit I at 157: 7-16; 159: 3-5.)  Dr. MacIntosh wrote an abstract which was disseminated to workshop participants.  (See Exhibit L, Abstract: "Exposure Controls: Evaluation, Efficacy and Cost".)  The abstract described how assessing the effectiveness of PCB remediation is challenging because the levels of PCB in the air at any given time are largely a function of temperature and ventilation:

> ...differences in temperature and ventilation during pre- and post-intervention assessments can yield variability that exceeds the potential efficacy of an intervention itself. Failure to account for these factors has the potential to yield false negative and false positive findings. Id. at _.

Dr. MacIntosh's abstract accentuated the variable nature of PCB remediation costs, and stated a range for remediation costs that is substantially lower and even more variable that that provided in his affidavit: **"implications of unreliable findings are large as the cost of interventions is variable and substantial and ranges from less than $1 to more than $20 per square foot."**  (Exhibit L; Exhibit I at 170: 8-12.)  In explaining the apparent discrepancy between the two, Dr. MacIntosh stated that the paper abstract was written for "a different audience." (Exhibit I at 172:1-4.)  After a prolonged break in the deposition, Dr. MacInstosh

requested that he be able to address the cost range provided in the abstract, and explained that the range referred to in the abstract differed because it referred to "each intervention," meaning each remediation task itself, rather than the total cost of the remediation project. (Id. at 174:16.) He did not address the fact that, by his own admission, the types of interventions will necessarily vary from building to building, and that some "remediation projects" may amount to no more than "mitigation" and administrative controls (in other words, performing regular, required maintenance, or shifting classroom schedules.) (Id at 139:5-22.)

Dr. MacIntosh's testimony should be struck and absolutely disregarded because he abandons accepted and reliable cost estimating techniques for a survey, itself based almost entirely on other cost estimates, that provides no justification for extrapolation to the entire population of Massachusetts school districts. Dr. MacIntosh's cost estimates are unreliable and should be excluded because he lacks even the most basic qualifications for cost estimating, he exhibits flagrant disregard for statistical rigor, and he contradicts his own prior statements and findings.

**D. DR. MACINTOSH'S OPINION THAT ESTABROOK'S DESIGN WAS "TYPICAL" OF OTHER SCHOOL BUILDINGS SHOULD BE EXCLUDED BECAUSE IT IS UNSUPPORTED BY ANY SCIENTIFIC OR RELIABLE METHODOLOGY**

In support of the class certification requirement that the representative class member must be "typical" of the other class members, Dr. MacIntosh opines that Estabrook's "design and structure was typical of schools constructed in Massachusetts in the 1960s and 1970s." (See Exhibit D, at ¶¶ 16.) He opined that similar construction elements between Estabrook and other schools included "curtain wall construction that is with the aluminum framing and glass or opaque panels inserted within the frames, with the roofs supported by I-beams, these steel

14

beams, and masonry around those beams" as well as caulk application. (Exhibit I at 194:5-195:12.)

Dr. MacIntosh's method for assessing whether Estabrook's building design was "typical" of other school in Massachusetts was limited to viewing photographs of exteriors of schools he found online. (Id at 191:13-192:10.) Dr. MacIntosh also testified that he reviewed the MSBA survey, but could not say what information he derived from it that lead him to the conclusion that Estabrook was typical. (Id at 192:11-16.) He doesn't recall if he has notes, photographs, spreadsheets or other documentation of his field observations of other schools. (Id at 195:22-196:1.) Dr. MacIntosh completely fails to address the wide variation in design and structure between different public school buildings in Massachusetts, which include multiple story buildings, different building materials, and different construction methods, which vary from the curtain wall design of Estabrook. (Exhibit H at 83- 86.)

Dr. MacIntosh failed to conduct any substantive analysis of the design elements or construction of other school buildings in Massachusetts, which in many cases vary from the Estabrook's single-story curtain wall design.  His opinions should be excluded for those reasons.

**E.    DR. MACINTOSH'S OPINIONS ON THE EPA REGULATIONS RELATED TO PCB REMEDIATION SHOULD BE EXCLUDED BECAUSE HE PROVIDES NO BASIS FOR THEM**

Dr. MacIntosh should be precluded from testifying on the EPA's requirements regarding PCB remediation because he has no basis for his incorrect statements that (1) once building material with PCB content over 50 ppm are identified, they "must be removed" and (2) that "a remediation plan must be submitted to the EPA" when such materials are found." (Exhibit E at p. 3.) Actually, there is no regulatory requirement to sample building caulk for PCBs, there is no regulatory deadline for removing caulk once discovered, there is no regulatory requirement to

15

submit a remediation plan to EPA for review. (See Exhibit J at p. 3-6.)  The only regulatory standard for PCBs in air is the OSHA Permissible Exposure Limit (PEL) of 1 mg/m$^3$ for Aroclor 1242 and 0.5 mg/m$^3$ for Aroclor 1254, which is orders of magnitude above the levels found at Estabrook. (Id. at p. 6.)

In his deposition, Dr. MacIntosh admits that:

- The EPA regulations do not specify a timeline for PCB remediation; (Exhibit I at 91:1-92:11.)

- He was "not sure" whether PCBs can remain indefinitely; (Id. at 95:7-10.)

- He doesn't know what regulation requires building owners to remediate materials over 50 ppm; (Id. at 97:2-24.)

- He doesn't know if regulations require submission of a plan to EPA for review or engage the EPA at all; (Id. at 97:2-98:19.)

- There are times when he would recommend a school leave building materials in place even if they exceed 50 ppm, and he did so at Estabrook; (Id. at 100:10-101:4, 103:15-20, 122:18-123:16.)

- The EPA PCB in indoor air recommendations do not have the force of law; (Id. at 108:11-13.)

- He did not include OSHA standards in his report; (Id. at 108:22-109:2.)

- He doesn't know if there is any limit on how long PCB containing caulk can be left in place. (Id. at 123:17-20.)

Dr. MacIntosh should be precluded from testifying on the EPA's requirements regarding PCB remediation because he is unqualified to opine on them. Moreover, he was unable to describe any basis for his incorrect statements that once building material with PCB content over

50 ppm is identified, it "must be removed," and the incorrect assertion that "a remediation plan must be submitted to the EPA" when such materials are found." (Exhibit E, p. 3.)

## III. CONCLUSION

For the foregoing reasons, the Court should strike the affidavit of David MacIntosh and exclude his opinions.

Dated: November ___, 2014

                                        Respectfully Submitted,

                                        MONSANTO COMPANY,
                                        SOLUTIA INC., and
                                        PHARMACIA CORPORATION

                                        By their attorneys,

                                        CAMPBELL CAMPBELL
                                        EDWARDS & CONROY, P.C.


                                        /s/ Richard P. Campbell_____

                                        Richard P. Campbell (BBO# 071600)
                                        Richard L. Campbell (BBO # 663934)
                                        Brandon L. Arber (BBO # 676425)
                                        Diana A. Chang (BBO # 682317)
                                        One Constitution Center, 3rd Floor
                                        Boston, MA 02129
                                        (617) 241-3000
                                        rpcampbell@campbell-trial-lawyers.com
                                        rlcampbell@campbell-trial-lawyers.com
                                        barber@campbell-trial-lawyers.com
                                        dchang@campbell-trial-lawyers.com

                                            and

                                        HUSCH BLACKWELL LLP

                                        Carol A. Rutter (pro hac vice)

Robyn D. Buck (pro hac vice)
190 Carondelet Plaza, Suite 600
St. Louis, Missouri 63105
Tel: (314) 480-1500
carol.rutter@huschblackwell.com
robyn.buck@huschblackwell.com

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this ___ day of November, 2014, the foregoing document was filed electronically.  Notice of this filing will be sent by e-mail to the following parties by operation of the Court's electronic filing system:

Esther L. Klisura (pro hac vice)
Sher Leff, LLP
450 Mission Street, Suite 400
San Francisco, California 94105
Telephone: (415) 348-8300
eklisura@sherleff.com

Robert Chapman (pro hac vice)
Jon-Jamison Hill (pro hac vice)
Eisner Kahan Gorry Chapman Ross & Jaffe
9601 Wilshire Boulevard, Suite 700
Beverly Hills, California 90210
(310) 855-3200
rchapman@eisnerlaw.com

Scott P. Lewis
Melissa C. Allison
David S. Mackey
Anderson & Kreiger LLP
One Canal Park, Suite 200
Cambridge, MA 02141
(617) 621-6500
slewis@andersonkreiger.com

malison@andersonkreiger.com
dmackey@andersonkreiger.com

Kevin J. Madonna (pro hac vice)
Kennedy & Madonna, LLP
48 Dewitt Mills Road
Hurley, New York 12443
Telephone: (845) 331-7514
kmadonna@kennedymadonna.com

/s/ Richard P. Campbell

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| TOWN OF LEXINGTON, on behalf of itself and all others similarly situated,<br>　　　Plaintiff,<br><br>v.<br><br>PHARMACIA CORPORATION,<br>SOLUTIA INC., and<br>MONSANTO COMPANY,<br>　　　Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | C.A. No. 12-CV-11645 |

**DECLARATION OF BRANDON L. ARBER IN SUPPORT OF DEFENDANTS'
MOTION TO STRIKE THE AFFIDAVIT OF DAVID L. MACINTOSH AND EXCLUDE
HIS EXPERT OPINIONS**

1.  I am an attorney at Campbell, Campbell Edwards and Conroy, P.C. and I am one of the attorneys representing the defendants in this action.

2.  Attached as Exhibit A is a true and accurate copy of the Class Action Complaint.

3.  Attached as Exhibit B is a true and accurate copy of Plaintiff Town of Lexington's Responses to Pharmacia LLC's First Set of Interrogatories.

4.  Attached as Exhibit C is a true and accurate copy of Memorandum of Reasons in Support of Plaintiff Town of Lexington's Motion for Class Certification.

5.  Attached as Exhibit D is a true and accurate copy of the Affidavit of David L. MacIntosh in Support of Plainttiff Town of Lexington's Motion for Class Certification.

6.  Attached as Exhibit E is a true and accurate copy of the report David L. MacIntosh dated August 29, 2014.

7.  Attached as Exhibit F is a true and accurate copy of the report David L. MacIntosh dated February 14, 2014.

8.  Attached as Exhibit G is a true and accurate copy of the CV of David L. MacIntosh.

9.  Attached as Exhibit H is a true and accurate copy of the expert report of CCA dated November 13, 2014.

10. Attached as Exhibit I is a true and accurate copy of the deposition transcript of David L. Macintosh dated October 15, 2014.

11. Attached as Exhibit J is a true and accurate copy of the expert report of John P. Woodyard dated November 14, 2014.

12. Attached as Exhibit K is a true and accurate copy of the expert report of Thomas A. Barocci.

13. Attached as Exhibit L is a true and accurate copy of abstract from the Eighth International PCB Workshop held in Woods Hole, MA from October 5-9, 2014.


Signed under the pains and penalties of perjury.

/s/Brandon L. Arber_____
One of the Attorneys for the Defendants

Respectfully Submitted,

MONSANTO COMPANY,
SOLUTIA INC., and
PHARMACIA CORPORATION

By their attorneys,

CAMPBELL CAMPBELL
EDWARDS & CONROY, P.C.


/s/ Richard P. Campbell

Richard P. Campbell (BBO# 071600)
Richard L. Campbell (BBO # 663934)
Brandon L. Arber (BBO # 676425)
Diana A. Chang (BBO # 682317)
One Constitution Center, 3rd Floor
Boston, MA 02129
(617) 241-3000
rpcampbell@campbell-trial-lawyers.com
rlcampbell@campbell-trial-lawyers.com
barber@campbell-trial-lawyers.com
dchang@campbell-trial-lawyers.com

and

HUSCH BLACKWELL LLP

Carol A. Rutter (pro hac vice)
Robyn D. Buck (pro hac vice)
190 Carondelet Plaza, Suite 600
St. Louis, Missouri 63105
Tel: (314) 480-1500
carol.rutter@huschblackwell.com
robyn.buck@huschblackwell.com

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 17th day of November, 2014, the foregoing document was filed electronically.  Notice of this filing will be sent by e-mail to the following parties by operation of the Court's electronic filing system:

Esther L. Klisura (pro hac vice)
Sher Leff, LLP
450 Mission Street, Suite 400
San Francisco, California 94105
Telephone: (415) 348-8300
eklisura@sherleff.com

Robert Chapman (pro hac vice)
Jon-Jamison Hill (pro hac vice)
Eisner Kahan Gorry Chapman Ross & Jaffe
9601 Wilshire Boulevard, Suite 700
Beverly Hills, California 90210
(310) 855-3200
rchapman@eisnerlaw.com

Scott P. Lewis
Melissa C. Allison
David S. Mackey
Anderson & Kreiger LLP
One Canal Park, Suite 200
Cambridge, MA 02141
(617) 621-6500
slewis@andersonkreiger.com
malison@andersonkreiger.com
dmackey@andersonkreiger.com

Kevin J. Madonna (pro hac vice)
Kennedy & Madonna, LLP
48 Dewitt Mills Road
Hurley, New York 12443
Telephone: (845) 331-7514
kmadonna@kennedymadonna.com

/s/ Richard P. Campbell_____