UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| TOWN OF LEXINGTON, on behalf of itself and all others similarly situated, Plaintiff, | ) ) ) ) | C.A. No. 12-CV-11645 |
| v. | ) ) | |
| PHARMACIA CORPORATION, SOLUTIA INC., and MONSANTO COMPANY, Defendants. | ) ) ) ) ) | |

## MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS PHARMACIA LLC, SOLUTIA INC., AND MONSANTO COMPANY'S MOTION TO EXCLUDE THE EXPERT OPINIONS OF ROBERT HERRICK, Sc.D.

The defendants Pharmacia LLC, Solutia Inc. and Monsanto Company respectfully submit this memorandum in support of their motion pursuant to Rule 702 of the Federal Rules of Evidence to preclude the expert opinions of Dr. Robert Herrick, the proposed expert witness of the plaintiff the Town of Lexington ("Lexington").

Dr. Herrick's report is the <u>only</u> evidence of numerosity offered by Lexington in support of its motion for class certification. However, Dr. Herrick's expert report suffers from major errors in methodology, internal inconsistencies, and fuzzy math, which directly affect the reliability of his opinions. Some of these flaws include:

- Dr. Herrick failed to conduct an any kind of field study with respect to public schools in Massachusetts and instead relied only on an attorney-created Excel spreadsheet, about the current state of Massachusetts school buildings without regard to any renovations conducted on these schools since 1979;

- Dr. Herrick improperly relied on studies which are not comparable to Massachusetts school buildings and whose results are directly contrary to his conclusions;

1

- Dr. Herrick disregarded all unfavorable data to find an "excellent agreement" and "strong relationship" between PCBs in exterior caulk and PCBs in indoor air when, in fact, there would be no correlation at all if Dr. Herrick had properly evaluated the studies he relied on;

- Dr. Herrick used a poorly defined methodology, which allowed him to manufacture results that can be neither proven nor disproven;

- Dr. Herrick based many of his opinions on sheer speculation in contravention to the facts at issue in this case and offers opinions on facts that are not at issue at all.

In addition, Dr. Herrick cannot demonstrate that he is qualified in the subject matter on which he offers his opinions.  For these reasons, his opinions must be excluded.

### STATEMENT OF FACTS

In September 2009, the EPA issued a press release outlining recommendations for PCBs in school indoor air, which varied according to the age of the school children.  *See* EPA, "Public Health Levels for PCBs in Indoor School Air", available at http://www.epa.gov/epawaste/hazard/tsd/pcbs/pubs/caulk/maxconcentrations.htm.[1]  After testing all seventeen of its older buildings, Lexington determined that only three buildings contained PCB concentrations in building caulk that exceeded 50 ppm.  Letter from Ammar M. Dieb to Patrick Goddard, Nov. 13, 2009, attached as Exhibit A.  A year later, in the summer of 2010, Lexington tested the indoor air of those buildings for the presence of PCBs and found that a select few classrooms in the Estabrook Elementary school exceeded the EPA's recommendations.  Letter from Gerard Cody to Board of Health, Aug. 11, 2010, attached as Exhibit B.  After spending almost $2 million to

---

[1]  Public Health Levels of PCBs in School Indoor Air (ng/m3): (1) Age 1 -2; 70; (2) Age 2-3; 70; (3) Age 3-6; 100; (4) Age 6-12; 300; (5) Age 12–15; 450; (6) Age 15–19; 600; (7) Age 19+; 450.

remediate the Estabrook Elementary School, Lexington then demolished the school and built a new one right next door.

Lexington filed the present product liability suit against Pharmacia[2] on behalf of a class of "[a]ll school districts in Massachusetts that have one or more buildings with airborne PCBs in excess of the EPA's public health levels for PCBs in school indoor air." Doc. #119, p. 5. After a year of discovery and with Lexington's class certification looming, Lexington failed to proffer any evidence identifying school districts in the putative class, identifying the affected schools, or identifying the concentration of PCBs in indoor air within those schools.

Instead, Lexington relies exclusively on Dr. Herrick to establish the numerosity requirement for class certification. *See* Affidavit of Robert Herrick in Support of Plaintiff Town of Lexington's Motion for Class Certification and attached "Report of Robert F. Herrick, Sc.D, CIH for Town of Lexington v. Pharmacia Corp., U.S.D.C. Case No. 12-cv-11645", collectively attached as Exhibit C (hereinafter "Herrick Report"). Dr. Herrick, an industrial hygienist, is similarly unable to identify who the putative class members are, or where the affected schools are located. What Dr. Herrick does offer is a report that estimates the range of probabilities in which "the odds are high" that a school district might contain at least one school whose concentration of PCBs in indoor air exceeds 100 ng/m$^3$. Herrick Report at p. 18. Herrick makes the following conclusions:

- Between 27% and 54%, or 247 and 495, of the Massachusetts schools constructed between 1950 and 1979 contain detectable PCB levels in building caulk and sealants, Herrick Report at pp. 17, 19; and

---

[2] Pharmacia was known as "Monsanto" during the relevant time period for this action. Co-defendants Solutia and Monsanto Company did not exist during this time period, never manufactured PCBs, and have no conceivable liability in this action. Doc. #134. For convenience only, the defendants are collectively called "Pharmacia" herein.

- Between 52 and 104 of schools will have indoor PCB air levels exceeding the EPA recommendation of 100 ng/m$^3$, Herrick Report at pp. 17, 19.

In addition to his range estimates, and despite Lexington's exclusion of all personal injury claims in its proposed class, Dr. Herrick's report includes two sections titled "Public Health Significance" and "Hazards of PCB Exposures", in which he opines about the toxic health effects of PCBs.  Herrick Report at p. 19-22.

Lexington submitted Dr. Herrick's report as an exhibit in support of its motion for class certification.  Dr. Herrick was subsequently deposed on October 13, 2014. Deposition of Robert Herrick, October 13, 2014, attached as Exhibit D ("Herrick Dep.").

## ARGUMENT

## I.    LEGAL STANDARD

Federal Rules of Evidence 702 requires that an expert witness must be qualified "by knowledge, skill, experience, training, or education", and the expert testimony must be reliable and relevant.  Fed. R. Evid. 702.  "Federal Rule of Evidence 702 imposes a special obligation upon a trial judge to 'ensure that any and all scientific testimony . . . is not only relevant, but reliable.'" ***Kumho Tire Co. v. Carmichael***, 526 U.S. 137, 147-49 (1999) (quoting ***Daubert v. Merrell Dow Pharmaceuticals, Inc.***, 509 U.S. 579, 589 (1993)).  In ***Kumho Tire,*** the Supreme Court expanded the court's gatekeeper function to all experts providing specialized testimony "whether the testimony reflects scientific, technical, or other specialized knowledge."  526 U.S. at 149.

Expert testimony is reliable where (1) the testimony is based on sufficient facts or data; (2) the testimony is the product of reliable principles and methods; and (3) the expert has reliably applied the principles and methods to the facts of the case. Fed. R. Evid. 702(b)-(d).  In addition,

the Court may consider the following nonexclusive list of factors regarding reliability: (1) whether the theory is scientific knowledge that will assist the trier of fact and can be tested; (2) whether the theory has been subjected to peer review or publication; (3) the known or potential rate of error and the existence of standards controlling the technique's operation; and (4) the extent to which the methodology or technique employed by the expert is generally accepted in the scientific community. ***Bricklayers & Trowel Trades Int'l Pension Fund v. Credit Suisse Sec. (USA) LLC***, 752 F.3d 82, 91 (1st Cir. 2014).

An expert's opinion is relevant where it meets the requirements of Federal Rule of Evidence 402, and if it "likely would assist the trier of fact to understand or determine a fact in issue." ***Ruiz-Troche v. Pepsi Cola of P.R. Bottling Co.***, 161 F.3d 77, 81 (1st Cir. 1998) (citing ***Daubert***, 509 U.S. at 591-92); *see also* Fed. R. Evid. 702(a).  However, even relevant evidence may be excluded if "its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury." Fed. R. Evid. 403.

Unreliable or irrelevant expert opinion must be excluded.  *See* Fed. R. Evid. 702. The proponent of the expert opinion has the burden of establishing that it meets these admissibility requirements by a preponderance of the evidence.  ***United States v. Monteiro***, 407 F. Supp. 2d 351, 356 (D. Mass. 2006).  A district court has considerable discretion to admit or exclude expert testimony.  *See* ***Gen. Elec. Co. v. Joiner***, 522 U.S. 136, 138-39 (1997).  For the reasons set forth below, Lexington cannot meet this burden as to Dr. Robert Herrick.

## II.    DR. HERRICK IS NOT QUALIFIED TO RENDER THE EXPERT OPINIONS PROVIDED IN HIS REPORT

"[T]rial judges have broad discretionary powers in determining the qualification, and thus, admissibility, of expert witnesses." ***Richmond Steel Inc. v. Puerto Rican Am. Ins. Co.***, 954 F.2d 19, 21 (1st Cir. 1992).  "That a witness qualifies as an expert with respect to certain

5

matters or areas of knowledge, [does not mean] that he or she is qualified to express expert opinions as to other fields." ***Levin v. Dalva Bros., Inc.***, 459 F.3d 68, 78 (1st Cir. 2006) (internal quotations omitted); ***McDonald v. Federal Laboratories, Inc.***, 724 F.2d 243, 248 (1st Cir. 1984) (in action for breach of warranty against manufacturer of mace canister, Court precluded witness from testifying as to design of canister where his area of expertise was the chemical components of mace).

As an industrial hygienist, Dr. Herrick is not qualified to render any of the opinions in his report regarding an estimate of schools with PCBs in caulk or indoor air, or the supposedly toxic health effects of PCBs. *See* Herrick Report at pp. 3, 16-19, 20-22. Industrial hygiene is "the science of anticipating, recognizing, evaluating, and controlling workplace conditions that may cause workers' injury or illness." OSHA, "Information Booklet on Industrial Hygiene", available at https://www.osha.gov/Publications/OSHA3143/OSHA3143.htm. Dr. Herrick himself describes his occupation as "dedicated to preventing occupational disease and injury," particularly "the prevention of hazardous conditions." Herrick Dep. at p. 90:3-22.

Dr. Herrick, however, was not asked to provide opinions about recognizing, evaluating and controlling PCBs at Massachusetts schools; he was not asked to opine about the engineering and administrative controls necessary to reduce children's exposure to PCBs in the air. Instead, he was asked to opine about two issues:

1. "[E]stimate the number of school buildings in Massachusetts that may have PCB containing building materials (focusing on caulk and sealants as a primary source)"; and

2. "[E]stimate the number of those schools which contain airborne PCB levels in excess of the EPA guidelines for indoor air in schools."

Herrick Report at p. 2. Neither of these topics relate to industrial hygiene. The first topic requires at least some familiarity with the types of building materials used in Massachusetts

schools, the types of products into which PCBs were incorporated, and at least some understanding about the useful life of those product.  *See Wilson v. Bradlees of New England, Inc.*, 250 F.3d 10, 18 (1st Cir. 2001) (chemist lacked the relevant knowledge and experience to testify as an expert on the usages and practices in the silk-screening industry, ink manufacture, logo design, or the use of flame-retardant ink).  Dr. Herrick admits he has no expertise or familiarity in these areas.  Herrick Dep. at pp.155:14 – 157:10.

The second topic requires a general understanding about the chemical properties of PCBs, the rate at which PCBs volatize from different products in different settings (e.g. interior versus exterior settings), and the contours of a building's ventilation system and its efficacy at dispersing air throughout the building.  *See* Expert Report of Thomas Starr, attached as Exhibit E ("Starr Report"); John P. Woodyard, PE, Expert Report, attached as Exhibit F ("Woodyard Report"); Declaration of Thomas A. Barocci, Ph.D. at ¶¶ 21-26, attached as Exhibit G ("Barocci Declaration"); Excerpts from CCA Expert Report, attached as Exhibit H ("CCA Expert Report").  At minimum, opining on issues of PCBs in indoor air require some experience with actually testing for PCBs in indoor air.  Dr. Herrick has none.  In the few studies Dr. Herrick performed regarding PCBs in caulk, no air data was ever collected and he never even attempted to correlate the presence of PCBs in caulk with PCBs in indoor air.  Woodyard Report at p. 20.

In addition, as an industrial hygienist without any experience performing individualized studies on PCBs, Dr. Herrick is not qualified to opine about the possible health effects of PCBs. Herrick Report at p. 19-22.  In his report, Dr. Herrick opines, "While cancer risk has been the primary, and well-documented concern associated with PCB exposure, recent studies have demonstrated a range of other toxic effects, including many that pose particular hazards in the school environment."  Herrick Report at p. 20.  Dr. Herrick is not a toxicologist or an

7

epidemiologist, Herrick Dep. at p. 80:10 – 83:2; his work does not involve the study of PCBs' effect on the human body; he has never published any peer-reviewed articles regarding the human health effects of PCBs; he has never conducted any laboratory research on the health effects of PCBs. Herrick Dep. at 108:8 – 110:21; 117:23 – 118:7; 120:3-15; Herrick Report, "Curriculum Vitae".

Dr. Herrick was only asked to render his opinions regarding the toxicology of PCBs shortly before he submitted his report, Herrick Dep. at p. 17:13 – 18:8, and in fact, his "opinion" is drawn entirely from the New York Lawyers for the Public Interest brochure which he cites. NYLPI, "PCB Lighting in NYC Schools: Dangerous, Inefficient and Obsolete" at pp. 9-11 (February 2011), attached as Exhibit I ("NYLPI Pamphlet").  Reading and repeating the contents of a brochure which itself was authored and issued *by lawyers* hardly amounts to the "knowledge, skill, experience, training, or education" as required by Federal Rule of Evidence 702.  *See **Williams v. Illinois***, 132 S. Ct. 2221, 2241 (2012) (trial courts must strictly enforce qualification requirement to "screen out experts who would act as mere conduits for hearsay").

Dr. Herrick lacks any knowledge, skill or experience in the relevant subject matters on which he offers an opinion.  This obviates any assistance his opinions may be to the trier of fact because they lack any sort of reliable foundation on which he can form these expert opinions. *See* Fed. R. Evid. 702(a).  Accordingly, the Court should find that Dr. Herrick is unqualified to render any of the opinions in his report, and preclude his testimony and opinions on these issues.

## III.  DR. HERRICK'S ESTIMATES ARE ENTIRELY UNRELIABLE AND MUST BE PRECLUDED

An expert opinion is unreliable where it is "connected to existing data only by the *ipse dixit* of the expert." **Joiner**, 522 U.S. at 146.  In these circumstances, "[a] court may conclude that there is simply too great an analytical gap between the data and the opinion proffered." ***Id***.

It is patently obvious from the four corners of his report and his deposition testimony that Dr. Herrick undertook a superficial factual investigation and used mathematical calculations to bootstrap opinions that are nothing more than rank speculation. *See* Herrick Report at pp. 6, 17-18 ("Restricting this to buildings [constructed during this time period] where PCB levels exceeded 50 ppm [where PCBs were detected], the range is 27 to 42%"; "there is a 20% *chance* that any school of this age will be in exceedance"; "the *odds are high* that these districts contain at least one school with PCB levels exceeding the EPA guidelines") (emphasis added). Perhaps, the most telling admission is found at page 17 of his report: "***Without testing it is not possible to validate this estimate….***" Statistical results and predictions that cannot be validated are worthless. ***Daubert***, 509 U.S. at 593 (key question in admissibility of expert opinion is "whether it can be (and has been) tested").

Lacking all necessary qualifications for the task at hand, Dr. Herrick employed an over-simplistic, crude methodology that relied on unsupported assumptions, and whose results were "not possible to validate without testing" to reach his ultimate opinions. Herrick Report at p. 17. In doing so, Dr. Herrick placed himself in the enviable position of being right in the absence of any proof.

### A. Dr. Herrick Failed To Fully Comprehend The Information Represented In The 2010 Needs Survey Report.

The factual foundation for Dr. Herrick's analysis and opinions is the *2010 Needs Survey Report* published by the Massachusetts School Building Authority (attached as Exhibit J), the state agency responsible for assisting municipalities in financing school construction and renovation. At page 2 of his report, Dr. Herrick described the purpose of the *2010 Needs Survey Report* by partially quoting from the first sentence of the Executive Summary. The full sentence reads: "The 2010 Needs Survey Report is the culmination of twelve months of work

9

commissioned by the Massachusetts School Building Authority ('MSBA') to collect, verify, update and analyze data on the conditions of district-owned public K-12 school facilities throughout the Commonwealth."   The *2010 Needs Survey Report* provides a snapshot of the Commonwealth's schools as they existed at the time (four years before Dr. Herrick undertook his assignment), MSBA's construction and renovation of schools prior to publication of the Survey, and its plans (or "pipeline") for ongoing construction and renovation of the state's schools.

In fact, Dr. Herrick used only two data from the *2010 Needs Survey Report*: (1) 1757 active schools (at page 14), and (2) 916 schools built between 1950 and 1979 (derived from the "School Summaries" reported at pages 66 to 109).[3]  Dr. Herrick professed ignorance of most of the facts and findings recorded by the MSBA in the *2010 Needs Survey Report*.[4]  Some examples of those facts and findings highlight the fallacy of Dr. Herrick's opinions (references are to Dr. Herrick's deposition transcript pages):

- There was a school construction boom between 2000 and 2009. (p. 224)

- 70,000,000 sq. ft. of new school space was constructed between 2000 and 2010, but he cannot identify those schools. (p. 224/225)

- There were 428 schools on MSBA's waiting list for construction funding as of 2004, but he cannot identify those schools. (p. 225/226)

- School districts filed another 400 Statements Of Interest ("SOIs") in 2007 when the MSBA's financing moratorium was lifted, but he cannot identify those schools.  (p. 226)

- He does not know the nature of construction and renovation done at the 828 schools (46% of all schools in the state) on the MSBA project list on and after the 2010 Needs Study.  (p. 228)

---

[3]  Actually, Dr. Herrick used an EXCEL spreadsheet of the School Summaries prepared by Lexington's lawyers. Deposition of Robert Herrick, October 13, 2014 at 20-22.

[4]  Pharmacia submits that Dr. Herrick's profound lack of knowledge about the *2010 Needs Survey Report* shows that he never actually read it.

- MSBA reported that a large number of schools (150) were no longer used as schools, but he did not identify the unused schools.   (p. 231/244)

- He was unaware that 80 schools had closed since the MSBA's *2005 Needs Survey* and had no knowledge which schools they were.   (p. 231/243)

- He never read the *2005 Needs Survey.*   (p. 232)

- He was unaware that 1,000,000 sq. ft. of classrooms in the state were no longer being used as classrooms.   (p.232)

- He acknowledged that 68,000,000 sq.ft. of school space was new or newly renovated as of 2010, but he could not identify the schools involved.   (p. 234)

- Of the 23 schools rated as being in poor condition, 10 were invited into the MSBA construction/renovation program, but he never identified them and does not know if they even exist today.   (p. 234/235)

- Of the 244 schools rated as "3" (needing substantial repairs), 63 were invited into the MSBA capital pipeline, but he never identified them and does not know if the capital projects were done.   (p. 235)

- MSBA spent $7.5 billion in capital expenditures on 1156 schools between 1986 and 2005, but he cannot identify those schools. (p. 236)

- MSBA approved $500 million per year in grants ($2 billion for 300 schools under its new program), but he cannot identify the schools involved.   (p. 236)

- He cannot identify from "the data presented" in the *2010 Needs Survey Report* which of the 1757 schools he uses as a baseline were either reconstructed prior to the time of the report or in the MSBA pipeline for construction/ renovation.   (p. 237)

- He does not know the schools that have been added to the MSBA rebuild or capital reconstruction program since 2010.   (p. 237)

- MSBA reports 981 (of the 1757) schools submitting SOIs as of the 2010 Needs Survey, but he cannot identify them or state whether the projects were approved.   (p. 237/238)

- MSBA reports that historically it builds or renovates 3,600,000 sq. ft. of school space per year, but he does not know what MSBA did since 2010. (p. 238/239)

- MSBA reported that it approved $300 million in expenditures for its 2010 (2011) "Green Repair Program" to replace roofs, boilers, windows and doors and that

173 schools had been invited into the program, but he cannot identify those schools. (p. 240/241)

- MSBA reported that 625 schools had window repairs or replacements under the Green Repair Program as of 2010 (and 677 had HVAC repairs), but he cannot identify them. (p. 242)

- He never undertook the effort to actually inspect schools constructed or renovated under MSBA projects.  (p. 248)

- He has no knowledge of MSBA's "Accelerated Repair Program" (which replaced the 2010-2011 Green Repair Program) and has no knowledge of the renovations performed under it.  (p. 249)

- He made no effort to determine from MSBA records the number of schools that were replaced or renovated since its 2010 report.   (p. 251)

Dr. Herrick made no effort whatsoever to determine the actual state of public school construction and repair in Massachusetts from the time he accepted his assignment in summer 2014 until he gave his deposition testimony on October 13, 2014.  He merely <u>assumed</u> that the "916 schools founded in Massachusetts between 1950 and 1979" (the datum derived from the EXCEL spreadsheet given to him by Lexington's lawyers), Herrick Report at p. 6, were unchanged since the time of their original construction.  His assumption was demonstrably unjustified in the face of the facts and findings reported by the MSBA in its *2010 Needs Survey Report.*

Dr. Herrick also concedes the uniqueness of each school building.  He testified that the EPA Region 1 PCB Coordinator, Kim Tisa, delivered "a good bit of advice" when she reported at an October 2014 professional conference on PCBs and schools at Woods Hole Oceanographic Institute "that every school was different and had to be evaluated singularly."  Herrick Dep. at p. 254:15-21.  Dr. Herrick endorsed the axiom that comparing schools across different eras can be difficult because they were built using different standards, guidelines, and construction practices in place at the time.   Herrick Dep. at p. 243:1-13.  All of this information ignored by Dr. Herrick

– and individualized nature of it – impacts the numerosity of any proposed class; without it, his opinions are unreliable.

### B. Dr. Herrick Relies On Studies That Are Not Representative Of Massachusetts Schools

To estimate the number of Massachusetts schools with PCB-containing products, Dr. Herrick employed a two-step approach which he described as an "accepted method of estimating the number of schools which contain PCB building materials".  Herrick Report at p. 3.  There is, however, no reference to any industry standards or studies that created or promulgated this "accepted method", and no indication that Dr. Herrick's methods of estimation were ever peer-reviewed or accepted by the scientific community.

From the two data drawn from the *2010 Needs Survey Report,* Dr. Herrick ultimately concludes that 52 to 104 Massachusetts schools might have PCB air levels exceeding the EPA recommendation of 100 ng/m$^3$ for children ages 3 to 6 (this only represents 5.2% to 11.2% of all Massachusetts schools constructed between 1950-1979).  *See* Herrick Report at p. 17; CCA Expert Report at p. 90.  Following a two-step analysis, he first estimated the probability of Massachusetts schools that might have PCB-containing caulk based on three articles primarily about commercial buildings in Switzerland[5] (29 "concrete" public buildings), Canada[6] (70 buildings plus "an additional 25 buildings chosen to include institutional buildings" in Toronto), and Massachusetts[7] (24 buildings pre-selected by the authors on the belief that they contained PCB caulk) that are best described as anecdotal "case reports."  Dr. Herrick then assumed that there was a definite correlation between concentrations of PCBs in exterior caulk and the levels

---

[5] Kohler et al., "Joint Sealants: An Overlooked Diffuse Source of Polychlorinated Biphenyls in Buildings", 39:7 Environ. Sci. & Tech. 1967 (2005), attached as Exhibit K ("Kohler Study").
[6] Robson et al., "Continuing sources of PCBs: The significance of building sealants", 36 Environ. Int'l 506 (2010), attached as Exhibit L ("Robson Study").
[7] Herrick et al., "An Unrecognized Source of PCB Contamination in Schools and Other Buildings", 112:10 Environ. Health Perspectives 1051 (July 2004), attached as Exhibit M ("Herrick Study").

of PCBs in indoor air, referencing other published anecdotal case reports (several from Germany, Denmark, and Sweden, including abstracts only in foreign languages) and an EPA model regarding PCB emission rates.

Dr. Herrick's first step involved two levels of calculations: in the first level, he sorted an Excel spreadsheet of all the schools in Massachusetts by district and the number of schools that were constructed during the period of interest.  Herrick Dep. at p. 21:17 – 22:4.  Importantly, Dr. Herrick did not create this spreadsheet of all the schools in Massachusetts; he did not eliminate schools that were renovated since their construction; he did not exclude the schools that were no longer used as schools.  Herrick Dep. at pp. 231:3 – 232:11; 248:11 – 249:19.  The spreadsheet itself was created and provided by Lexington's *attorneys*, who indiscriminately incorporated each school listed in the *2010 Needs Survey Report*.  Herrick Dep. at p. 21:17 – 22:13.

For the next step, he consulted the scientific literature to see what he could learn "about the likelihood that a building constructed during that time period would have incorporated PCBs in the building material" above 50ppm.  Herrick Dep. at p. 24:20 – 25:1; Herrick Report at p. 6. While it might have been prudent for Dr. Herrick to research the building materials used and the various construction means and methods used in Massachusetts public schools during the relevant time period, *see* CCA Expert Report at p. 83-86, he instead based his estimation on the three[8] aforementioned case reports from Switzerland (Kohler Study), Canada (Robson Study), and Massachusetts (Herrick Study).  Herrick Report at p. 3-6.  Based on these studies, he concludes that there is a 27% to 54% probability that buildings built during the relevant time frame contained PCBs.  Herrick Report at p. 6.

---

[8] At his deposition, Dr. Herrick conceded, after reviewing these studies and discussing their purpose with the study's author, a fourth study based in San Francisco was not suitable for this task.  (Klosterhaus, et al., "Polychlorinated biphenyls in the exterior caulk of San Francisco Bay Area buildings, California, USA", 66 Environ. Int'l 38 (2014) attached as Exhibit N).  Dr. Herrick did not explain why he failed to undertake the necessary review before including this study in his report in the first place.  Herrick Dep. at p 29:6-14.

It is not possible to scientifically predict the number of Massachusetts schools with PCB containing caulk based on these studies.  First, the studies on which Dr. Herrick relies did not profess to determine the probability that a school building would possess PCB-containing building materials.  The Robson study was undertaken "[t]o investigate the significance of these [PCB-containing] sealants as a remaining source of PCBs" in the environment.  Robson Study at p. 507.  Similarly, the Herrick study was not a random sample of buildings but focused on buildings which Dr. Herrick already suspected contained PCB-containing building products based on the experience of members of the International Union of Bricklayers and Allied Craft Workers (and even in these buildings some did not contain any PCBs).  Herrick Study at p. 1052. The Kohler study is the only study to conduct a nationwide survey of the abundance of PCB-containing joint sealants in buildings, but this occurred *in Switzerland*.  Kohler Study at p. 1968.

Second, the studies' samples are not representative of all Massachusetts schools.  Barocci Declaration at ¶¶ 21-27; Starr Report at p. 8; *see also* CCA Expert Report at p. 91-92.  In relying on the Kohler study of non-school buildings in a different country, Dr. Herrick must necessarily assume that there are *no* differences between construction means and methods in the U.S. and Switzerland, that there were *no* differences in the types of construction materials used in the U.S. and Switzerland, and that there were *no* differences in the PCB industry between the U.S. and Switzerland.  *See* CCA Expert Report at p. 91-92.  There is simply no objective evidence that these study samples are representative of Massachusetts schools.  Starr Report at p. 8.

In short, Dr. Herrick's calculations assume that all buildings constructed globally during the same time period are comparable to the construction and building materials used in Massachusetts public schools.  These results cannot be scientifically defended.  Starr Report at p. 9.

### C. Dr. Herrick Failed To Consider The Appropriate EPA Levels For PCBs In Indoor Air Applicable To School-Age Children In Massachusetts

To estimate the number of schools with PCBs in their indoor air *that exceeded EPA recommendations*, Dr. Herrick calculated potential class members based on an arbitrary target that does not correspond to the majority of school-age children.

There is no single PCB recommendation for school indoor air that can be applied to all Massachusetts schools.  The EPA 2009 recommendations for PCBs in indoor air set seven tiers of PCB concentrations which vary according to the school age children occupying the building. *See* EPA, "Public Health Levels for PCBs in Indoor School Air", available at http://www.epa.gov/epawaste/hazard/tsd/pcbs/pubs/caulk/maxconcentrations.htm.[9]  The levels applicable to school age children were as follows: 100 ng/m$^3$ for pre-k through kindergartners; 300 ng/m$^3$ for elementary schools; 450 ng/m$^3$ for middle schoolers; 600 ng/m$^3$ for high schoolers.

Accordingly, Dr. Herrick's use of 100 ng/m$^3$ does not correspond to the class definition which Lexington seeks to certify, that is, "all school districts in Massachusetts that have one or more buildings with airborne PCBs in excess of the EPA's public health levels for PCBs in school indoor air."  Doc. #119, p. 5.  At 100 ng/m$^3$, the only schools which would *exceed* EPA's public health levels are pre-K and kindergartens.  CCA Expert Report at p. 88.  When asked to explain why he chose this particular target level, Dr. Herrick had no explanation:

> Q.  And the numeric that you used was what?
> A.  I used 100 nanograms per cubic meter.
> Q.  What is the age level that the 100 nanograms per cubic meter datum applies to?
> A.  As I remember correctly, and I can double-check it, I think it's for kids of ages three through six.
> Q.  And you did not use the higher level guidelines from the EPA in your report; is that right?
> A.  I didn't use the higher level or the lower level.

---

[9]  Public Health Levels of PCBs in School Indoor Air (ng/m3): (1) Age 1 -2; 70; (2) Age 2-3; 70; (3) Age 3-6; 100; (4) Age 6-12; 300; (5) Age 12–15; 450; (6) Age 15–19; 600; (7) Age 19+; 450.

Q.    So your analysis was limited to one datum from the EPA about an indoor air guideline, and that's for kids under the age of six?
A.    I would have to double-check the table, but that's my recollection.  I'm sorry.  I don't have to check.  I have it here.  It's on Page 13.  Yeah, the guideline for children age three to six is a hundred.  That's right.

Herrick Dep. at p. 43:4 – 44:2.

### D.  There is No Scientific Basis For Dr. Herrick's Assertion That A Strong Relationship Exists Between PCBs In Exterior Caulk And Indoor Air

To estimate the number of Massachusetts schools with PCBs in their indoor air, Dr. Herrick reviewed twelve studies[10] and an EPA consent order to determine whether there was any relation between PCBs in caulk and PCBs in indoor air.  Herrick Report at p. 6-12.  Rather than find a correlation, Dr. Herrick observed "there's really a great deal of diversity within the studies…for example if you look at the level of PCB in the caulking material, in school one it was less than one up to 90,000 parts per million and then a wide range of air levels as well." Herrick Dep. at p. 38:1-15.   Finding that these studies showed **no observable correlation** between PCBs in caulk and PCBs in air levels (see Tables 3 & 4 in Herrick Report at p. 10-11), Dr. Herrick should have concluded that it was impossible to mathematically predict the concentrations of PCBs in indoor air based on the presence of PCB-containing caulk alone.  But Dr. Herrick chose to ignore the "diversity" of data represented in these studies completely.

Instead, Dr. Herrick relied on an EPA-promulgated equation which measured the relationship between PCBs in interior caulk and indoor air under controlled artificial conditions. Herrick Dep. at p. 40:11-23; Starr Report at p. 5.  The EPA acknowledged that "[i]t is not known if these results are representative of older schools nationwide, both in terms of the presence of PCB-containing materials and components and the environmental concentrations measured in and around the school buildings."   Xue, et al., "Polychlorinated Biphenyls (PCBs) in School

---

[10] Dr. Herrick did not even review the full articles for two studies – Burkhardt (1990) and Fromme (1996) – but instead relied exclusively on their abstracts.

Buildings: Sources, Environmental Levels and Exposures", EPA/600R-12/051, 30 Sept. 2012, attached as Exhibit O.  Ignoring the EPA's warnings, Dr. Herrick plugged his target air level into the equation and determined that caulk with a PCB concentration of 6,667 ppm would result in PCBs in indoor air at levels of 100 ng/m$^3$.  Herrick Dep. at p. 44:5 – 45:1.

The EPA's own studies and the studies which Dr. Herrick summarily ignored are clear on this point: absent site specific measurements, it is simply impossible to predict with any reliability the PCB levels in indoor air. Starr Report at p. 8.  The EPA study took into account numerous factors such as the surface area of caulk, room size, indoor air exchange rate and temperature.  Herrick Dep. at p. 40:24 – 41:12; Starr Report at p. 5.  Because of the number of variables at issue, there will be substantial school to school and room to room variations in measured indoor air concentrations of PCBs.  *See* Starr Report at p. 6.  In contrast, Dr. Herrick failed to account for ***any*** of these factors when he blindly applied this equation to ***every school in Massachusetts***, regardless of the type of building construction, the building materials, the design and operation of the various ventilation systems, the room exchange rate, or the indoor and outdoor temperatures.  Woodyard Report at p. 22; Starr Report at p. 5  The EPA study was never meant to simulate the types of conditions in an uncontrolled environment such as widely varying school environments of 329 different school districts.  *See* Woodyard Report at p. 20.

Finally, Dr. Herrick cannot cite any other relevant data or study that suggests PCBs in caulk in Massachusetts schools resulted in or even contributed to PCBs in the indoor air because none exist.  Woodyard Report at p. 24.

Dr. Herrick's calculations on the number of schools with PCBs in indoor air are categorically unreliable because they ignore unfavorable data, reach a result inconsistent with the actual data cited, and fail to cite any affirmative data that might support them.

## IV.    DR. HERRICK'S TESTIMONY REGARDING THE TOXIC HEALTH EFFECTS ARE IRELEVANT AND SHOULD BE EXCLUDED

Expert testimony regarding a non-essential element of the case must be excluded as irrelevant. *See United States v. Cantrell*, 999 F.2d 1290, 1292 (8th Cir. 1993) (excluding expert testimony where the proposed testimony was not an essential element of the case and would not have assisted the jury); Fed. R. Evid. 401.   Nevertheless, even relevant evidence may be excluded where "its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury."  Fed. R. Evid. 403.  "Because of this risk, the judge in weighing possible prejudice against probative force under Rule 403… exercises more control over experts than over lay witnesses."  *Daubert*, 509 U.S. at 595.

Dr. Herrick's testimony regarding the toxic health effects of PCBs are irrelevant in a case involving property damage based on the contamination of indoor air at levels exceeding the EPA's recommendations.  Herrick Report at pp. 19-22.   Lexington does not claim any personal injury from the PCBs in its indoor air (Doc. #1 at ¶¶ 52, 55, 59 & Prayer for Relief), and both Lexington officials and Lexington's environmental consultant admitted that the PCBs in its indoor air did not pose a health risk to the students and teachers in the building.[11]  Moreover, as already discussed above, Dr. Herrick's last minute "opinions" regarding the health effects of PCBs are a thinly veiled attempt to pass off the opinions of lawyers as those of an expert. *Compare* Herrick Report at pp. 19-22 *with* NYLPI Pamphlet at pp. 9-11.

Even if the Court finds that these opinions are somehow relevant to Lexington's property damage claims, these opinions are highly prejudicial, inflammatory, and misleading and should be excluded from all evidentiary and fact-finding proceedings related to class certification or in

---

[11] See Town of Lexington Office of Community Development, August 30, 2010 Press Release, attached as Exhibit P; EH&E, "Estabrook School indoor Environmental Concerns: Commonly Asked Questions and Answers", Sept. 6, 2010, attached as Exhibit Q.

support of Lexington's claims.  Dr. Herrick's opinions on the toxic effects of PCBs are provided without any citations to a published study or any reference to objective methods he employed in reaching these conclusions.  For example, in the "Public Health Significance" section of his report, Dr. Herrick states, without citation or support, that there exists "a positive association between years spent at the contaminated school and serum levels of the combined lower chlorinated congeners."  Herrick Report at p. 19.  This statement has the potential to mislead a jury, because there are no scientific studies linking higher serum levels of PCB congeners to any known disease.  Herrick Dep. at p. 189:16-22; 190:22-191:10.

Accordingly, because Dr. Herrick's opinion on PCB's alleged health effects will not make any fact of consequence more or less probable and only has the potential to inflame or prejudice the jury, the Court should preclude Dr. Herrick's testimony on this topic and exclude his opinions from all evidentiary and fact finding proceedings related to class certification or on the merits.

## CONCLUSION

For all the foregoing reasons, Dr. Herrick's testimony should be precluded because he is not qualified to render an expert opinion on the topics for which he is offered, and he cannot provide relevant or reliable testimony on these topics.  Therefore, Dr. Herrick's testimony must be excluded from all evidentiary and fact-finding proceedings related to class certification or in support of Lexington's claims.

Respectfully Submitted,

MONSANTO COMPANY,
SOLUTIA INC., and
PHARMACIA CORPORATION

By their attorneys,

CAMPBELL CAMPBELL
EDWARDS & CONROY, P.C.


/s/ Diana A. Chang_____

Richard P. Campbell (BBO# 071600)
Richard L. Campbell (BBO # 663934)
Brandon L. Arber (BBO # 676425)
Diana A. Chang (BBO # 682317)
One Constitution Center, 3rd Floor
Boston, MA 02129
(617) 241-3000
rpcampbell@campbell-trial-lawyers.com
rlcampbell@campbell-trial-lawyers.com
barber@campbell-trial-lawyers.com
dchang@campbell-trial-lawyers.com

and

HUSCH BLACKWELL LLP

Carol A. Rutter (pro hac vice)
Robyn D. Buck (pro hac vice)
190 Carondelet Plaza, Suite 600
St. Louis, Missouri 63105
Tel: (314) 480-1500
carol.rutter@huschblackwell.com
robyn.buck@huschblackwell.com

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that on this 17th day of November, 2014, the foregoing document was filed electronically.  Notice of this filing will be sent by e-mail to the following parties by operation of the Court's electronic filing system:

Esther L. Klisura (pro hac vice)
Sher Leff, LLP
450 Mission Street, Suite 400
San Francisco, California 94105
Telephone: (415) 348-8300
eklisura@sherleff.com

Robert Chapman (pro hac vice)
Jon-Jamison Hill (pro hac vice)
Eisner Kahan Gorry Chapman Ross & Jaffe
9601 Wilshire Boulevard, Suite 700
Beverly Hills, California 90210
(310) 855-3200
rchapman@eisnerlaw.com

Scott P. Lewis
Melissa C. Allison
David S. Mackey
Anderson & Kreiger LLP
One Canal Park, Suite 200
Cambridge, MA 02141
(617) 621-6500
slewis@andersonkreiger.com
malison@andersonkreiger.com
dmackey@andersonkreiger.com

Kevin J. Madonna (pro hac vice)
Kennedy & Madonna, LLP
48 Dewitt Mills Road
Hurley, New York 12443
Telephone: (845) 331-7514
kmadonna@kennedymadonna.com

/s/ Diana A. Chang

22