UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| TOWN OF LEXINGTON, on behalf of itself and all others similarly situated, Plaintiff, <br><br> v. <br><br> PHARMACIA CORPORATION, SOLUTIA INC., and MONSANTO COMPANY, Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

C.A. No. 12-CV-11645

## MEMORANDUM IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

One needs look no further than to the statements of the United States Environmental Protection Agency ("EPA"), the Town of Lexington's ("Lexington") retained expert, and Lexington itself to realize Pharmacia is entitled to judgment as a matter of law:

> Kim Tisa, EPA Region 1 PCB Coordinator (Sept. 2010): "Just because an indoor air number may exceed our screening number *does not mean that there's going to be harm… We don't have any reason to believe…levels slightly above or somewhat above those screening levels will cause harm…*

> Lexington School Superintendent Paul Ash (Sept. 2010): "I went to the bottom line, in your judgment from the EPA, since you put out these regulations, is it safe to keep school open? That's what I have been told… *I have not heard anything from health professionals that these numbers are unsafe for children…*"

> Lexington Health Director Gerard Cody (May 2010): "*the levels of PCBs in the air are below levels of concern*"

> Lexington Expert EH&E President John McCarthy, Sc.D. Harvard School of Public Health (Sept. 2010): "The EPA guidance numbers here are NOT a threshold above which people are not safe and below which they Are [sic]… *Airborne exposure, at the concentrations we are seeing, poses a nearly non detectable risk for children in the school.*"

SMF ¶¶ 113, 115, 116.[1]

---

[1] Citations to"SMF ¶__": shall hereafter refer to the corresponding numbered paragraph and supporting materials in *Defendant Pharmacia Corporation's Statement of Undisputed Material Facts* filed with *Pharmacia Corporation's Motion for Summary Judgment.*

In other words, even if Pharmacia manufactured the PCBs found in Estabrook (and there is absolutely no proof that it did), those PCBs were **not unreasonably dangerous** or otherwise defective at the time they left Pharmacia's hands. In fact, they caused Lexington no injury – even after the EPA September 2009 press release and recommendations – as both Lexington and the EPA admit the airborne PCB levels found in Estabrook presented no risk of harm. SMF ¶115. **If** there was any contamination or injury to Lexington's property from PCBs, it occurred immediately upon installation of the PCB-containing caulk in or before 1961 and not decades later after issuance of the EPA recommendations, which EPA, EH&E and Lexington itself acknowledge are not indicative of actual harm or legal requirements. SMF ¶¶113-116. A product liability claim based on an injury in or before 1961 requires Lexington to prove privity between the parties. Because privity is admittedly lacking here, Lexington's breach of warranty claims fail. Moreover, as a bulk supplier, Pharmacia discharged any duty to warn Lexington. Finally, even if Lexington has actionable claims against Pharmacia, they are barred by the applicable statute of limitation.

In sum, after a year of pre-trial activity, including voluminous discovery and numerous depositions, Lexington is situated in exactly the same place it occupied when it opposed Pharmacia's motion to dismiss: *it has no viable claim against Pharmacia.*[2]

## UNCONTROVERTED FACTUAL BACKGROUND

Lexington makes three claims against Pharmacia: (1) breach of implied warranty of merchantability – design defect; (2) breach of implied warranty of merchantability – failure to warn; and (3) violation of Massachusetts' Consumer Protection Act. (Complaint, ¶¶ 49-59). It claims (without proof) that Pharmacia manufactured polychlorinated biphenyls ("PCBs") that

---

[2]  Pharmacia was known as "Monsanto" during the relevant time period for this action. Co-defendants Solutia and Monsanto Company did not exist during this time period, never manufactured PCBs, and have no conceivable liability in this action. For ease and convenience, the defendants are collectively called "Pharmacia" herein.

SLC-7379253-1

were mixed into window caulk by some unknown intermediary, that the caulk was later installed by unknown window manufacturers into their products, or by unknown curtain wall manufacturers or building contractors in or around external windows in the construction of Estabrook Elementary School, and that it has suffered "property damage" as a result.[3] Complaint, ¶¶ 27, 38, 43(f), 43(g); Plaintiff Town of Lexington's Responses to Pharmacia LLC's Second Set of Interrogatories (filed as exhibit 5 to the SMF).

Lexington has no evidence of the date and place of manufacture of the PCBs found in the School's window caulk. SMF ¶13. It also has no evidence of the date and place of manufacture of the caulk itself, or the channels of distribution that sellers of the PCBs or window caulk followed that ultimately led to installation in the School. SMF ¶14. For all Lexington knows, the PCBs and/or window caulk was manufactured in Europe, Asia or elsewhere and imported into the United States. SMF ¶16. Lexington admits, however, that the caulk was installed no later than 1961. SMF ¶¶14, 17-19. PCBs were legal and useful products at the time. SMF ¶15.

Lexington's retained environmental and engineering consultants, EH&E, determined that volatilization or "off-gassing" of PCB molecules took place immediately upon installation of the caulk in the School and was most significant at the earliest days after installation. SMF ¶105. In other words, any contamination of the substrate/building structure or the indoor air, occurred decades ago upon installation. SMF ¶¶105-107.

Beginning in the 1970s and continuing through present day, Lexington **_knew_** that PCBs were incorporated into certain of its buildings' products, like paints, mastics, caulk and sealant, and fluorescent light ballasts (materials and products that were ubiquitous in its Town buildings). SMF ¶¶32-36, 67-94. It also **_knew_** of the congressionally-allowed and disallowed uses of such

---

[3] Lexington has no proof that Pharmacia manufactured the PCBs incorporated into the window caulk but brings its claims based on Pharmacia's status as the primary manufacturer of PCBs in the United States. *Cmplt.* ¶3.

PCBs, the persistence of PCBs in the environment, their toxicity, and remediation rules and practices for hazardous substances. SMF ¶¶ 32-39, 43-47, 49-51, 54-57, 59-65, 77-86, 89-94.

The School's students, faculty, staff, and visitors were never in any danger because of the PCB-containing caulk used in the School's construction. SMF ¶108. In more than 50 years of operation, no one claimed to be hurt or sick because of the building's caulk. SMF ¶109. Upon receipt of Nov. 2009 test results demonstrating PCB concentrations in the School's caulk at concentrations greater than 50 ppm, school and town officials did nothing – they did not evacuate or close the School and did not inform the parents, faculty, and staff of the test results. SMF ¶110-112. Lexington's officials didn't even inform the Board of Health of the test results until January 2010, which criticized the decision to test upon learning of it. SMF ¶111. In May 2010 and August 2010, at the urging of the Superintendent of Schools and the Director of Public Facilities, the Health Director issued public service notices to Town residents and employees stating the PCB indoor air levels "are below levels of concern." SMF ¶113.[4]

Throughout 2010, Lexington, EH&E, and EPA officials continued to assure the public that the School was safe and there was no harm, despite the fact that indoor air readings exceeded the EPA press release recommendations. SMF ¶¶113-116.

## ARGUMENT

## I.    THERE IS NO EVIDENCE THAT PCBs WERE UNREASONABLY DANGEROUS AT THE TIME OF SALE.

Massachusetts law equates breach of the implied warranty of merchantability with the sale of an "unreasonably dangerous" product. *Commonwealth v. Johnson Insulation*, 425 Mass. 650, 660 (1997). Thus, to succeed on its breach of warranty claims, Lexington must prove the

---

[4]  For a detailed analysis of the alleged health effects from PCB exposure, *see* the Expert Report of John Schell, attached hereto as Exhibit I. For an investigation into the alleged cancer-causing attributes of PCBs, *see* the Expert Report of Peter Shields, attached hereto as Exhibit J. For a detailed risk assessment of the PCB levels at Estabrook School, *see* the Expert Report of Thomas Starr, attached hereto as Exhibit K.

4

PCBs were unreasonably dangerous at the time they left Pharmacia's hands. *Id.; Alves v. Mazda Motor of America, Inc.*, 448 F.Supp.2d 285, 300 (D. Mass. 2006) (noting a plaintiff must show, among other things, "that a defect or unreasonably dangerous condition existed at the time the product left the defendant's hands so that it was not reasonably suitable for the ordinary uses for which goods of that kind were sold"); *Collins v. Sears, Roebuck and Co.*, 31 Mass. App. Ct. 961, 962 (1992) (a plaintiff bears the burden of showing that a defect existed at the time of sale).

Lexington can satisfy its burden either by showing a defect in the design of PCBs or by showing the lack of adequate warnings to foreseeable users. *Johnson v. Brown & Williamson Tobacco Corp.*, 122 F.Supp.2d 194, 206 (D. Mass. 2000) ("Breach of the implied warranty of merchantability can occur if either adequate warnings about the product were not given to foreseeable users or the product was defectively designed."). It has done neither.

### A. WITHOUT COMPETENT AND QUALIFIED EXPERT TESTIMONY, LEXINGTON CANNOT PROVE DEFECT.

*Lexington did not identify any expert witnesses or proffer any proof that Pharmacia's PCB products were defectively designed or sold without adequate and necessary warnings.* Under either breach of warranty theory, expert testimony is required. *Alves*, 448 F.Supp.2d at 297 ("Under Massachusetts law, when '[t]he nature of the defect or breach of warranty and its causal relation to the accident [are] complex,' a plaintiff <u>must</u> introduce expert testimony.") (emphasis added) (granting summary judgment in favor of defendant on breach of implied warranty claims, among others, given lack of expert testimony on alleged defective nature of air bag system); *see also Chartier v. Brabender Technologies, Inc.*, 2011 WL 4732940 at *9 (D. Mass. Oct. 5, 2011) ("In claims for both negligent design and warranty liability, the plaintiff <u>must</u> come forward with competent expert testimony that a defect in the product, present at the time it was sold, caused his injuries.") (emphasis added).

5

The presence of such a defect cannot be inferred, nor can the opinions of non-experts substitute for the absence of expert testimony. *Torres v. Skil Corp.,* No. CIV.A. 11-11232-MBB, 2013 WL 3105815, at *6 (D. Mass. June 17, 2013) ("in a products liability case of any sophistication, a plaintiff's failure to support her claims of a design defect with expert testimony is almost always fatal…[as] opinions of nonexperts are not a substitute where, as here, expert testimony is required"); *Chartier,* 2011 WL 4732940 at *9 ("[t]he presence of such a defect cannot be inferred in the absence of expert testimony…[and] [t]he opinion of nonexperts…cannot substitute for th[e] absence of expert testimony").

Without question, the design of PCBs is a complex matter necessarily requiring expertise in chemistry, chemical engineering, and manufacturing.  This is particularly true given the factors relevant to determine the suitability of a product's design: (1) the gravity of the danger posed by the challenged design, (2) the likelihood that such danger would occur, (3) the mechanical feasibility of a safer alternative design, (4) the financial cost of an improved design, and (5) the adverse consequences to the product and to the consumer that would result from an alternative design. *Osorio v. One World Technologies Inc.,* 659 F.3d 81, 84 (1st Cir. 2011) (citing *Back v. Wickes Corp.,* 375 Mass. 633, 642 (1978)).  The dangers posed by PCBs, the mechanical feasibility of alternative designs, if any, and the consequences to consumers of those alternatives designs are all outside the common knowledge of lay persons.

The same is true with respect to the adequacy of warnings for PCBs.[5]  Lexington must show that it was a foreseeable user of PCBs and that Pharmacia failed to adequately warn it of the dangers associated with their use. *Kearney v. Philip Morris, Inc.,* 916 F.Supp. 61, 64 (D. Mass. 1996).  The nature, content, and adequacy of warnings require substantial knowledge of

---

[5]  As noted *infra* pg. 9, Pharmacia discharged any duty to warn.

the chemical's structure, use, and potential hazards.   Again, these are matters outside the common knowledge and understanding of lay persons and therefore require expert proof.

Neither of Lexington's experts, however, utters a single word about the design of PCBs or the (lack of) warnings associated therewith, let alone opines as to their purported defective nature.   In his report, David Macintosh offers that caulk is the primary source of airborne PCBs in Estabrook and that the caulk was used for its intended purpose and not misapplied.   He also describes the process and cost for remediation of PCB-containing caulk and outlines a proposed method for calculating class-wide damages.   Nowhere is there any opinion as to why or how the PCBs were defective.   *See generally* MacIntosh Reports..   In his report, Robert Herrick simply opines as to the likely number of class members; again, no mention of product defect.   *See* Herrick Report at pg. 6.   And at their depositions, neither expert addressed the purported defective nature of PCBs.   *See generally*, Deposition of Robert Herrick (filed as Exhibit 15 to SMF); Deposition of David MacIntosh Depo (filed as Exhibit 16 to SMF).

Pursuant to the Court's scheduling order, Lexington was to provide all expert witness testimony offered "in support of the merits of the named Plaintiff's claims" by August 29, 2014 (by way of reports) and October 15, 2014 (by way of deposition).[6]   Doc. #112 at p. 2; Doc. #113 (Electronic Order).   Mr. MacIntosh and Mr. Herrick are now precluded from offering any opinions or testimony that should have been but was not included in their original reports or testimony, or that varies from such opinions and testimony.   *Id.*; L.R. 26.2(b)(2).   Given the lack of requisite expert testimony, Lexington's claims are entirely lacking of sufficient proof of product defect, entitling Pharmacia to summary judgment.

---

[6]   Lexington was ordered to "provide its expert disclosures with respect to any expert expected to testify, or otherwise provide evidence, about the Estabrook school, no later than February 14, 2014" (i.e., before the School was demolished).   Moreover, Lexington's expert reports had to be inclusive: "[t]he reports shall be fully compliant with Fed. R. Civ. P. 26(a)(2) and Local Rules 16.5 and 26.4 and any later disclosed opinion testimony that could have been included in the report shall be excluded in accordance with Local Rule 26.4(B)(2)." Doc # 98.

## B. PCBs ARE NOT INHERENTLY DANGEROUS AND THE EPA's 2009 PUBLICATION DOES NOT PROVE DEFECT AT TIME OF SALE.

"It is insufficient for a plaintiff to allege that an entire class of products is inherently dangerous." *Johnson ex rel. Estate of Johnson v. Brown & Williamson Tobacco Corp.*, 345 F.Supp.2d 16, 20 (D. Mass. 2004) (citations omitted). For instance, "[c]igarettes are not defective merely because smoking causes cancer." *Id.* Rather, in a product liability case, the law requires a showing that the specific cigarettes at issue were defective, by way of some design defect or inadequate warning. *Id.* To deem cigarettes defective so as to support product liability claims merely because they are harmful "would impermissibly override the congressional decision to allow their continued sale." *Id.* at 21 (citations omitted). "To sanction such a claim would be tantamount to imposing the categorical liability that courts have declined to impose." *Id.* (citations omitted).

Similarly here, it is insufficient for Lexington to claim that all PCBs, by their very nature, are inherently dangerous. First, it is hotly disputed and hardly accepted as "fact" that PCBs are inherently dangerous. Doc. #138. Second, even if they were (like cigarettes), Lexington is not freed of its burden of proof. It must prove (with expert evidence) that the PCBs found in the caulk within Estabrook School were defectively designed or inadequately warned against. To conclude that such PCBs were defective simply because PCBs may be harmful under certain circumstances and/or at certain doses, would impermissibly impose categorical liability and would override congressional decision to allow their continued existence and use in certain applications. 40 C.F.R. §§ 761.1–761.30. This includes the very caulk(s) at issue in this case, as Lexington is *not* prohibited from retaining and utilizing such PCB-containing caulk. *Id.*

Finally, Lexington's reliance on the EPA's 2009 recommendations adopted decades after a perfectly legal and useful product was installed in a building, as the basis or standard to render

8

the product unreasonably dangerous is faulty.  As noted, it is hornbook law that the safety and quality of a product is measured at the time the product was last in the hands of the manufacturer or seller.  *Supra* pg. 4-5..  Lexington must prove that this defect caused its injury – not that some federal agency's recommendations in a press release caused its injury.  *Kearney*, 961 F.Supp. at 64 ("In order to succeed in a breach of warranty case under Massachusetts law, a plaintiff must prove that his or her injury was…caused *by a defect in the product*.") (emphasis added).

Moreover, with respect to any duty to warn, the Supreme Judicial Court has rejected any "hindsight" analysis of the duty to warn in implied warranty failure to warn cases.  *Hoffman v. Houghton Chemical Corp.,* 434 Mass. 624, 637 (2001) (citing *Vassallo v. Baxter Healthcare Corp.*, 428 Mass. 1, 23 (1998)).  In other words, "a defendant will not be held liable under an implied warranty of merchantability for failure to warn or provide instructions about risks that were not reasonably foreseeable at the time of sale or could not have been discovered by way of reasonable testing prior to marketing the product."  *Id.* (citing *Vassallo* at 23).  Pharmacia, in 1960 or 1961, cannot be liable for failure to warn against risks only created or identified almost five decades later in 2009 by an EPA press release.

Finally, the EPA's indoor air recommendations are just that – *recommendations.*  They are not regulatory laws promulgated in accordance with the APA (and all of its procedural and substantive safeguards.)  SMF ¶ 21.  They are not mandatory cleanup levels and are not enforceable under any legal mechanism.  Lexington was under no obligation to comply with them.  They are hortatory recommendations issued in a press release by the EPA, admittedly prophylactic and designed to *prevent potential* harm; they do not and cannot represent actual, actionable harm, as even the EPA and EH&E acknowledge.  *Supra* pg. 2.  They certainly do not establish that a product was unreasonably dangerous at the time of its sale.

9

Nothing substitutes for the requisite expert testimony that the PCBs allegedly causing injury to Lexington's property were defectively designed or lacked adequate warning at the time of sale. Having provided no such expert evidence, Lexington's claims fail.

### C. PHARMACIA, A BULK SUPPLIER, SATISFIED ITS DUTY TO WARN AND IS NOT LIABLE UNDER A MARKET SHARE THEORY

#### 1. DUTY TO WARN

Massachusetts law unequivocally holds that a bulk supplier "satisf[ies] its duty to warn by reasonable reliance on an intermediary who understands the product's risks and is able to pass on to end users warnings about the product's hazards." *Hoffman*, 434 Mass. at 632, 634. The bulk supplier rule applies to a warnings claim where (as here), the supplier of raw materials proves (1) that its products were delivered in bulk;[7] (2) that it gave "adequate and sufficient" warning about the products to the intermediary; and (3) that the defendant reasonably relied on the intermediary to warn the ultimate users of the products. *Id.*

Pharmacia delivered its raw PCB chemicals for use as plasticizers in 55 gallon drums (or railroad cars or tank trucks) to intermediaries (or "formulators") who added Pharmacia's chemicals into a mix with a large variety of other additives to make caulk, sealant, paints, and mastics (among other products). SMF ¶4. At all relevant times, Pharmacia provided such intermediaries with warnings about known hazards, as well as safe handling instructions, all of which were reasonable, adequate, and consistent with the state of the art at the time.[8] SMF ¶¶ 5-8. At times, Pharmacia even advised those intermediaries that it relied on them to transmit

---

[7] "Bulk products often are delivered in tank trucks, box cars, or large industrial drums, and stored in bulk by the intermediary, who generally repackages or reformulates the bulk product." *Id.* at 632.

[8] Other courts have found these warnings to be adequate. *See Ditto v. Monsanto Co.*, 867 F.Supp. 585 (N.D. Ohio 1993). For more information on industrial warnings analysis, *see* Expert Report of Christine Wood, attached hereto as Exhibit A (hereinafter "Wood Expert Report"). For analysis of potential health risks associated with PCBs, *see* Expert Report of Jim Lamb, attached hereto as Exhibit B.

such warnings to end users. SMF ¶8.  Finally, in August 1970, Pharmacia ceased manufacturing and selling PCBs for use as plasticizers.  SMF ¶ 9.

Pharmacia reasonably relied on its intermediaries to pass along its warnings to the ultimate end users.  The reasonableness of Pharmacia's reliance depends on many factors such as: "(1) the dangerous condition of the product; (2) the purpose for which the product is used; (3) the form of any warnings given; (4) the reliability of the third party as a conduit of necessary information about the product; (5) the magnitude of the risk involved; and (6) the burden imposed on the supplier by requiring that he directly warn all users." *Hoffman*, 434 Mass. at 632 (internal quotes omitted).

Here, the PCBs were sold to intermediaries "often in a different industry from that of the supplier, with different means of production; and where the end users themselves are a remote and varied lot." *Id.* at 633.  Pharmacia never manufactured caulks, sealants, paints, etc.  SMF ¶12.  It simply sold PCBs in bulk to various entities which incorporated the PCBs into products they manufactured.  SMF ¶4.  Any label warnings Pharmacia might have provided on its bulk containers to transport PCBs were unlikely to remain after the purchasers repackaged the PCBs as one of many components in the final consumer product.  The intermediaries were often themselves sophisticated chemical companies who were reliable conduits of necessary information because they were equally well-informed about the dangers of PCBs as Pharmacia.[9] Accordingly, Pharmacia's purchasers understood the risks of PCBs and were well aware of federal guidelines establishing the safe handling, destruction and disposal of PCBs.

Moreover, as manufacturers of building products, these intermediaries had their own independent obligation to warn their customers of known hazards in their products.  Wood

---

[9] *See* Expert Report of Thomas Barocci at pg. 20-21, attached hereto as Exhibit C (hereinafter "Barocci Expert Report").

Expert Report at pg. 4-6.  It was reasonable for Pharmacia to expect that its customers would meet their own legal obligations.  "Modern life would be intolerable unless one were permitted to rely to a certain extent on others' doing what they normally do, particularly if it is their duty to do so." *Hoffman*, 434 Mass. at 634 (quoting Restatement (Second) of Torts, § 388, comment n).

Pharmacia clearly discharged its duty to warn; Lexington has no evidence to show otherwise; and Pharmacia is entitled to summary judgment on any duty to warn claim.

## 2. NO MARKET SHARE LIABILITY

That a bulk supplier such as Pharmacia had no duty to warn an unknown end user such as Lexington is further evidenced by the holding in *Santiago v. Sherwin-Williams Co.*, 782 F.Supp. 186 (D. Mass. 2001), which rejected application of a market share theory for product liability claims against a bulk supplier (there, manufacturers of the lead pigment that was sold in bulk to paint manufacturers and used as an ingredient in their products.)  The court found "particularly significant" that the defendants were bulk suppliers of only an ingredient in the allegedly offending paint, not the manufacturers or marketers of the paint itself.  *Id.* at 194.  It was the paint manufacturers, and not the defendants, that decided what amount of lead pigment to use in their paints, and whether to use any lead pigment at all.  *Id.* at 195.  Those paint manufacturers knew the hazards associated with the lead pigment and controlled the ultimate manufacture and packaging of the paint, as well as the warnings placed thereon.  *Id.*

In other words, the lead pigment manufacturers could not control all of the risks that their pigments may have presented to the public.  *Id.* at 194-95.  The court held market share liability is unavailable in such situations, because the doctrine is designed to hold "defendants responsible only to the extent that their product has contributed to the risk of injury to the public." *Id.* (citation omitted).  If there is a danger that defendants could be held liable for harm "exceeding

12

their responsibility," the theory cannot and does not apply. *Id.* (concluding that "[n]o court has applied market share theory to a defendant that supplies an ingredient for a product packaged and sold by others…The facts of this case do not warrant a different result.") (collecting cases).

Here, Lexington's claims against Pharmacia are based on a market share theory. *Supra* at n.2. Although Pharmacia was the largest U.S. producer of PCBs, its share of the global PCB market was less than 40%. SMF ¶10. Foreign-made PCBs were imported into the U.S. for various uses. SMF ¶11; Barocci Expert Report at pg. 13-14. Lexington does not know and cannot prove whether the PCBs detected in Estabrook are foreign-made or domestic-made PCBs. SMF ¶16. Even if Lexington had sued all domestic and foreign manufacturers of PCBs, however, the decision whether to incorporate PCBs into caulk at all, and if so, what mixture of PCBs to use, as well as what quantity, was entirely up to the caulk manufacturer.[10]  Pharmacia did not participate in the design, manufacture, or marketing of any such caulk. SMF ¶12

The specific composition of any PCB-containing caulk affected its physical and chemical properties, including the rate of release of the plasticizer. Reitman Expert Report at pg. 10. The very injury claimed here – the release of PCBs from caulk – depends on the composition of the caulk, *i.e.* what type of PCBs were incorporated, how much, what other fillers, additives or ingredients were used, how all such components interacted with one another, etc. *Id.* Those decisions were entirely in the hands of the caulk formulators, not Pharmacia. Thus, the risk of injury from the release of PCBs from caulk is not just attributable to PCBs themselves, but attributable to the formulation and compilation of the offending caulk(s) at issue. Because Pharmacia had no involvement in or control over such decisions/actions, it could not control for all of the risks that PCBs may have posed by their incorporation into others' caulking products.

---

[10]  See Expert Report of Maureen Reitman at pg. 11-12, attached hereto as Exhibit D (hereinafter "Reitman Expert Report").

Subjecting Pharmacia to a duty to warn and/or market share theory under such circumstances violates the spirit and letter of *Santiago*, entitling it to summary judgment.

## II. LEXINGTON FAILED TO DEMONSTRATE IT SUFFERED A LEGALLY COGNIZABLE INJURY

Lexington's claimed injury is an ever-moving target, suggestive of its fallacy. At one time or another, Lexington has claimed the following "injuries:"

> **(1) the contamination of its building structures and indoor air by PCBs** (*See Cmplt.* ¶4 (seeking damages associated with "*PCB contamination of school indoor air*"); ¶43(g) (listing as a common class question whether "the release and *migration of PCBs into building structures and indoor air* constitutes property damage"));
>
> **(2) the requirement to test for and clean up PCBs under the EPA's indoor health guidelines** (*See Cmplt.* ¶38 and Doc. #26 at p. 1 (both claiming Lexington must "*comply* with the September 2009 EPA public health levels for PCBs in indoor school air"); Doc. #38 at p. 4 ("[t]he injury alleged by Lexington is an impairment to its property rights, *i.e., the need to test for, and clean up, PCBs in order to use its property*"); and
>
> **(3) property damage from exceeding the EPA's indoor air guideline** (*See Cmplt.* ¶43(k) (listing as a common class question whether "the school districts did not suffer appreciable *property damage from airborne PCBs* prior to the establishing of the EPA's public health levels on Sept. 25, 2009")) (emphasis added).

Unquestionably the first claimed injury occurred in 1960 or 1961 upon installation of the caulk and <u>there is no</u> evidence as to any installation beyond this date. The second claimed injury is not an injury at all, in either the legal or factual sense, as <u>there is no</u> requirement to test for or clean up PCBs pursuant to the EPA guidelines. SMF ¶37. Lexington's voluntary choice to do such testing and cleanup does not and cannot constitute a legal injury. The third claimed injury is disproved by the undisputed facts of the case – the EPA, EH&E, and Lexington itself all have stated there was no damage or harm caused by the reported PCB air levels. That Lexington incurred costs as part of an entirely voluntary remediation does equate to actionable property damage. At best, Lexington has shown an injury occurred in 1961. To recover for such injury, it must show privity between the parties. Admitting there is no such privity, its claims fail.

14

## A. CONTAMINATION OF THE BUILDING AND/OR INDOOR AIR OCCURRED ON DATE OF LAST INSTALLATION IN 1961.

As the Court has noted, Massachusetts law holds privity of contract between the parties is a prerequisite for any breach of warranty claim based on an injury occurring prior to Dec. 16, 1973. Doc. #48 at p. 10. If Lexington's injury occurred after Dec. 16, 1973, however, it need not prove privity between the parties. *Id.* Here, "Lexington does not dispute lack of privity between it and [Pharmacia]." *Id.* at 9 (citing Doc. #26 at 7). The relevant question, therefore, is whether Lexington can prove its injury occurred after Dec. 16, 1973 and not prior thereto. *Id.*

To the extent Lexington claims that its "injury" occurred from the PCB contamination of its school buildings and/or indoor air, such injury occurred in 1960 or 1961 when the PCB-containing products were first installed. This is true as a matter of fact and law. Factually, Lexington's retained consultant on the Estabrook School project testified that the PCBs in the caulk absorbed into the substrate and volatilized into the indoor air immediately upon installation in the School. SMF ¶105-106. He also established that most of the PCB molecules off-gassed in the days and months immediately following installation. SMF ¶105. Legally, the date of injury to property occurs when the allegedly harmful product is installed in the building. *See Johnson Insulation*, 682 N.E.2d at 1333 ("The injury to the Commonwealth's property occurred when the asbestos-containing products were installed in the buildings.").[11]

To avoid dismissal, Lexington previously argued that PCBs were installed in Estabrook *after* Dec. 16, 1973 during renovations. The Court accepted such argument at the time, noting that "even if Lexington's alleged injury occurred, as a matter of law, when PCBs were installed

---

[11]  *See also Maryland Casualty Co.* v. *W.R. Grace & Co.*, 23 F.3d 617, 626-28 (2d Cir. 1994) ("The actual injury to property—the presence of the asbestos hazard—occurs upon installation and exists regardless of whether it yet has been discovered by the building owners."); *Eljer Mfg., Inc. v. Liberty Mutual Ins. Co.*, 972 F.2d 805, 814 (7th Cir. 1992) (holding that the incorporation of a defective product into another product inflicts physical injury at the moment of incorporation).

15

in Estabrook," it was "unable, at this stage and based on the record before it, to conclusively determine that [all] installation occurred prior to 1971 or 1973." Doc. #48 at p. 11 & 13.

The record has now been developed, and that record is entirely devoid of any proof that PCB-containing caulks (or any other PCBs) were installed or incorporated into the building after 1961, let alone after Dec. 16, 1973.  SMF ¶14.  Accordingly, Lexington's injury occurred no later than 1961, and it must show privity between the parties as a prerequisite to its claims. Having admitted no such privity exists, *supra* pg. 15, its claims fail as a matter of law.

### B. DATE OF INJURY IS NOT DATE EPA RECOMMENDATIONS WERE ISSUED AS NO REQUIREMENT TO COMPLY WITH THEM.

Also to avoid dismissal, Lexington argued that its injury was *the need to test for or otherwise comply with the EPAs recommendations* issued in 2009.  *See* Doc. #38 at p. 4.  In other words, it claimed it suffered no injury until the 2009 EPA recommendations were issued.

This Court implicitly rejected such argument earlier, Doc. #48 at p. 11, and it must do so again.  First, as noted, Lexington's injury must arise from a design or warning defect in the PCBs themselves, not the issuance of legally unenforceable, non-binding recommendations (issued decades after the product left Pharmacia's hands.) *Kearney*, 961 F.Supp. at 64.  Product defect is not determined via a hindsight analysis.  *Supra* pg. 4-5.  Second, Lexington was under **no obligation** to test for PCBs, to report the results of those tests, or to otherwise "comply" with EPA recommendations.[12]  Lexington **had no obligation** to remove or "clean up" the PCBs under the EPA recommendations, let alone in the comprehensive and costly fashion in which it did; simply cleaning the Estabrook HVAC system would have achieved the EPA recommendations, which Lexington knew but chose to ignore.  SMF ¶¶95-98.

---

[12] *See* Expert Report of John Woodyard at pg. 3-6, attached hereto as Exhibit E (hereinafter "Woodyard Expert Report").

The EPA recommendations therefore do not create any new "property right" that was "impaired." At all relevant times herein, Lexington was free to "use" Estabrook School despite the indoor air levels. Indeed, it did so, never closing the School's doors to students, faculty, staff, or others. SMF ¶111. This was its legal right to do so, as nothing forbids the use of property that might still contain PCB-containing building products. Woodyard Expert Report at p. 3-6. Nothing suggested Estabrook was unsuitable for use; the statements of the EPA, EH&E and Lexington itself dispel any such notion, as all claim Estabrook was perfectly safe. Because Lexington used Estabrook at all relevant times herein, and because it was never required to test for or comply with the EPA recommendations, they does not and cannot create an impairment to a vested property right.

### C. THERE WAS NO PROPERTY DAMAGE FROM PCB AIRBORNE LEVELS.

For the same reasons, there was no actionable "property damage" caused by PCB air levels in excess of the recommendations. Any costs associated with Lexington's *voluntary choice* to test its indoor air and its *voluntary development* of an aggressive remediation plan to rid Estabrook of airborne PCBs and/or PCB-containing caulk (as opposed to simply performing maintenance on its HVAC system, as suggested by the EPA), does not equate to actionable property damages. There is no claim that PCBs caused any part of the caulk, substrate, or the building itself to diminish in value or otherwise fail (nor would the evidence support such claim.) SMF ¶106. Any expenses incurred were entirely of Lexington's own accord; it cannot legally pass them on to Pharmacia under the guise of property damage or product liability claims.

### III. LEXINGTON'S G.L.c.93A CLAIM FAILS FOR THE SAME REASONS

Lexington's c.93A claim is entirely derivative of its breach of warranty claims. Doc. #1 at ¶57. Accordingly, for all of the reasons noted above as to why its breach of warranty claims

fail, so too does its c.93A claim. *Pimental v. Wachovia Mortg. Corp.*, 411 F.Supp.2d 32, 41

(D.Mass. 2006) (dismissing c.93A claim when the underlying breach of contract claim failed);

*Pembroke Country Club, Inc. v. Regency Savings Bank, F.S.B.*, 62 Mass.App.Ct. 34, 40-41

(Mass. App. Ct. 2004) (entering judgment on wholly derivative c.93A claim where judgment

entered on underlying claims).

As importantly, Lexington does not have a viable c.93A claim because any alleged

misconduct by Pharmacia occurred prior to the creation of a private cause of action under the

Massachusetts Consumer Protection Act.  Chapter 93A was enacted in 1967 and went into effect

on March 26, 1968.  St.1967, c. 813.  Section 9, which added a private cause of action for

consumers, went into effect on November 13, 1969.  St.1969, c. 690.  Massachusetts courts have

held that the rights provided under c.93A are substantive in nature and, because such rights did

not exist prior to the statute's enactment, c. 93A "may not be retroactively applied to acts

committed prior to its effective date."  *Lewis v. Ariens Co.*, 49 Mass. App. Ct. 301, 307

(Mass.App.Ct. 2000), aff'd, 434 Mass. 643 (2001).

## IV.   LEXINGTON'S CLAIMS ARE BARRED BY THE APPLICABLE STATUTE OF LIMITATIONS

Lexington's claims also are time-barred by the applicable three-year statute of

limitations.  G.L. c. 106, § 2-318; *Johnson Insulation*, 425 Mass. at 653; *Bay State-Spray &*

*Provincetown S.S., Inc. v. Caterpillar Tractor Co.*, 404 Mass. 103, 107-110 (1989).  Even with

the benefit of a discovery rule, Lexington's action is timely only if it filed within three years of

when it knew or should have known of its potential cause of action related to PCB-containing

products in its buildings.  *Bowen v. Eli Lilly & Co.*, 408 Mass. 204, 208 (1990); *Pitts v. Aerolite*

*SPE Corp.*, 673 F.Supp. 1123, 1127 (D. Mass. 1987) (cause of action accrues when plaintiff

knows or reasonably should know of injury); *Hanson Housing Auth. v. Dryvit System, Inc.*, 29

SLC-7379253-1

Mass. App. Ct. 440, 446-47 (1990) (focus is on whether knowledge of harm was "sufficient to stimulate further inquiry which was likely to alert it to a cause of action against a defendant.").

The statute of limitations is not tolled or suspended while Lexington assesses the number of buildings that incorporated PCB-containing products or the nature and extent of its alleged damages. *Bowen*, 408 Mass. at 208 (plaintiff need not have "probable cause" to believe that the defendant's conduct was the cause of injury for statute to begin to run); *Olsen* v. *Bell Telephone Labs., Inc.*, 388 Mass. 171, 175 (1983) ("If knowledge of the extent of injury were to control the actual accrual...the fixed time period of statutes of limitations effectively would be destroyed."). Nor can Lexington wait until it has reached an end result as to its damages to bring suit. *Id.*

The statutory time limit began to run (and does not stop) when Lexington, via knowledge of its employees, was on inquiry notice. *Bowen*, 408 Mass. at 208; *Errichiello* v. *Eli Lilly & Co.*, 618 F.Supp. 484, 486 (D. Mass. 1985). *Accord United States* v. *Bank of New England, N.A.*, 821 F.2d 844, 856 (1st Cir. 1987) (knowledge gained by employees acting in scope of their employment is imputed to the corporation); *Sunrise Prop., Inc.* v. *Bacon, Wilson, Ratner, Cohen, Salvage, Fialky & Fitzgerald, P.C.*, 425 Mass. 63, 66 (1997) ("under agency principles, notice to a corporation's agent is notice to the corporation").

By the late 1970s, Lexington knew of the regulatory laws that the EPA promulgated pursuant to the TSCA, which informed Lexington that PCBs were incorporated into products like paints, caulk, sealant, and fluorescent light ballasts (materials and products that were ubiquitous in its Town buildings).[13]   SMF ¶¶ 33-36.  It also knew this through its Chair of the Board of Health, Dr. Heiger-Bernays, who had decades of research, writing, and field experience with PCBs, including their potential toxicity, volatility, and fate and transport to indoor air, substrate,

---

[13]   Lexington also had comparable knowledge of Massachusetts statutes and regulations regarding hazardous substances, including PCBs.

soils, and water.  SMF ¶¶ 87-89, 92.  With the distribution and discussion of Herrick's 2004

article on PCB-containing caulk in buildings and schools, Lexington was explicitly warned and

therefore knew of the "hazard" that brought about its lawsuit eight years later.  SMF ¶¶ 87-94.

Lexington knew that it could (but was not required to) test its buildings for PCBs.  SMF ¶37.  In

2006, it conducted town-wide PCB hazardous waste removal as to PCB-containing fluorescent

light ballasts from its buildings.  SMF ¶99-101.  But it did nothing as far as the presence of other

PCBs until late 2009, after citizen inquiries prompted by the 2009 EPA press release.  SMF ¶22.

Only after a town official ordered testing without consulting the Board of Health, which

revealed air levels in excess of the EPA guidelines, did Lexington reach out to EH&E:

> To make a long story short, the facilities manager in Lexington decided, without
> consulting the board of health/health director to respond to a parent's request for
> testing for PCBs in schools with an analysis.  Needless to say the results were
> problematic for reasons you are well aware. … *Since we have already opened up
> this can of worms, it is too late to push them back.*

SMF ¶31.  After this problematic handling of the matter, Lexington published recommendations

to follow in deciding how to respond to possible PCBs in schools, which first noted to clean all

HVAC systems and equipment.[14]  SMF ¶¶95-98.  MDPH/BEH's recommendations suggested

intact caulk not be removed.  SMF ¶24.  Although Dr. Heiger-Bernays knew back in 2000 that

testing and remediation were expensive and often unnecessary, Lexington (through her) chose to

forego such testing, and in 2009 it found itself with "a can of worms" when another official acted

without consulting her.  SMF ¶31.  Only after engaging in costly and unnecessary remediation

did it file suit again Pharmacia, attempting to shift the burden of its voluntary undertaking onto

someone else.  Since Lexington waited years to act, its action is time barred.

---

[14] For a detailed analysis of the HVAC failures and general maintenance issues at Estabrook Elementary, *see* the
Expert Report of Wayne Hubbard, attached hereto as Exhibit F.  For a detailed analysis of the failing physical
building structure of the Estabrook Elementary School, *see* the Expert Report of David Peraza, attached hereto as
Exhibit G.  For a detailed analysis of the design, construction, management, operations, and maintenance of
Estabrook Elementary, *see* the Expert Report of CCA, LLC, attached hereto as Exhibit H.

## CONCLUSION

For the foregoing reasons, the Court should grant Pharmacia judgment as a matter of law on both Lexington's products liability claims and Chapter 93A claims.

Dated: November 17, 2014

Respectfully Submitted,

MONSANTO COMPANY,
SOLUTIA INC., and
PHARMACIA CORPORATION

By their attorneys,

CAMPBELL CAMPBELL
EDWARDS & CONROY, P.C.


/s/ Richard L. Campbell

Richard P. Campbell (BBO# 071600)
Richard L. Campbell (BBO # 663934)
Brandon L. Arber (BBO # 676425)
Diana A. Chang (BBO # 682317)
One Constitution Center, 3rd Floor
Boston, MA 02129
(617) 241-3000
rpcampbell@campbell-trial-lawyers.com
rlcampbell@campbell-trial-lawyers.com
barber@campbell-trial-lawyers.com
dchang@campbell-trial-lawyers.com

and

HUSCH BLACKWELL LLP

Carol A. Rutter (pro hac vice)
Robyn D. Buck (pro hac vice)
190 Carondelet Plaza, Suite 600
St. Louis, Missouri 63105
Tel: (314) 480-1500
carol.rutter@huschblackwell.com
robyn.buck@huschblackwell.com

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 17th day of November, 2014, the foregoing document was filed electronically.  Notice of this filing will be sent by e-mail to the following parties by operation of the Court's electronic filing system:

Esther L. Klisura (pro hac vice)
Sher Leff, LLP
450 Mission Street, Suite 400
San Francisco, California 94105
Telephone: (415) 348-8300
eklisura@sherleff.com

Robert Chapman (pro hac vice)
Jon-Jamison Hill (pro hac vice)
Eisner Kahan Gorry Chapman Ross & Jaffe
9601 Wilshire Boulevard, Suite 700
Beverly Hills, California 90210
(310) 855-3200
rchapman@eisnerlaw.com

Scott P. Lewis
Melissa C. Allison
David S. Mackey
Anderson & Kreiger LLP
One Canal Park, Suite 200
Cambridge, MA 02141
(617) 621-6500
slewis@andersonkreiger.com
malison@andersonkreiger.com
dmackey@andersonkreiger.com

Kevin J. Madonna (pro hac vice)
Kennedy & Madonna, LLP
48 Dewitt Mills Road
Hurley, New York 12443
Telephone: (845) 331-7514
kmadonna@kennedymadonna.com


                                        /s/ Richard L. Campbell_____

SLC-7379253-1