UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

TOWN OF LEXINGTON, on behalf of itself and all others similarly situated,

    Plaintiff,

vs.

PHARMACIA CORPORATION, SOLUTIA INC., and MONSANTO COMPANY,

    Defendants.

Case No. 1:12-cv-11645-DJC

**PLAINTIFF'S RESPONSE IN OPPOSITION TO DEFENDANTS'
MOTION TO STRIKE THE AFFIDAVIT OF DAVID L.
MACINTOSH AND TO EXCLUDE HIS EXPERT OPINIONS**

Pursuant to Local Rule 7.1(b)(2), Plaintiff, Town of Lexington, hereby responds to Defendants' Motion To Strike The Affidavit Of David L. MacIntosh And To Exclude His Expert Opinions ("Motion To Strike"; Doc. 142).

**BACKGROUND**

In their memorandum, Defendants, Pharmacia Corporation, Solutia Inc., and Monsanto Company, ask the Court to preclude Dr. MacIntosh "from testifying on the EPA's requirements regarding PCB remediation." (Doc. 143 at 15.) Specifically, Defendants contend Dr. MacIntosh is "unqualified" to render such legal opinions, which (in Defendants' view) are "incorrect" in any event. (Doc. 143 at 16-17.) To buttress these contentions, Defendants set forth a litany of supposed concessions Dr. MacIntosh made at his deposition. (*See* Doc. 143 at 16.)

Defendants also ask the Court to strike Dr. MacIntosh's affidavit in support of class certification (Doc. 127) and to preclude him from opining on "[h]is estimates regarding the cost per square foot of PCB remediation" and "the 'typicality' of the Estabrook school." (Doc. 142 at 2.) Nevertheless, Defendants clarify they are "not moving to exclude Dr. Macintosh from testifying regarding the remediation work he did for Lexington discussed in his first report." (Doc. 143 at 2 n.1.) But, because Lexington is proposing to redefine the class and issues for class determination (Doc. 198 at 12-14), Dr. MacIntosh's class certification opinions regarding the cost per square foot of PCB remediation and the typicality of the Estabrook school are no longer necessary. Lexington now withdraws those opinions, which renders the remainder of the Motion To Strike moot. *E.g.*, *Segelman* v. *City of Springfield*, 561 F. Supp. 2d 123, 124 (D. Mass. 2008). Now, the only remaining issue for the Court is whether Dr. MacIntosh can opine, based on his extensive personal experience, on how the U.S. Environmental Protection Agency ("EPA") in Region 1[1] applies its regulations in practice during PCB-remediation projects.

## ARGUMENT

### I. DR. MACINTOSH'S TESTIMONY REGARDING HIS PERSONAL EXPERIENCE WITH HOW THE EPA IN REGION 1 APPLIES ITS REGULATIONS IN PRACTICE IS ADMISSIBLE

Defendants have misconceived Dr. MacIntosh's EPA opinions as offering his legal interpretation of EPA regulations. But no expert is ever allowed to render legal opinions, and that is not what Dr. MacIntosh purports to do. Instead, Dr. MacIntosh will

---

[1] The EPA has ten regional offices. Region 1 is responsible for Connecticut, Maine, Massachusetts, New Hampshire, Rhode Island, and Vermont.

opine on something quite different: how, in his extensive personal experience, the EPA in Region 1 applies its regulations in practice during PCB-remediation projects.

For that reason, Dr. MacIntosh's testimony is admissible for two reasons. First, Dr. MacIntosh is not providing a legal interpretation of any EPA regulations, but rather is describing the EPA's and the PCB-remediation industry's customs and practices. Second, to the extent Dr. MacIntosh might refer to certain EPA regulations in the course of explaining those customs and practices, such testimony would be merely ancillary rather than directed to any ultimate legal issue.

### A. Dr. MacIntosh's Testimony Concerns The Customs And Practices Of The EPA In Region 1 And The PCB-Remediation Industry

In relevant part, Federal Rule of Evidence 702(a) provides that a "witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue." Fed. R. Evid. 702(a). Ordinarily, Rule 702(a) forbids experts from rendering legal opinions because they do not "help" the jury. *Id.* For that reason, the First Circuit has explained, "[i]t is black-letter law that '[i]t is not for witnesses to instruct the jury as to applicable principles of law, but for the judge.'" *Nieves-Villanueva* v. *Soto-Rivera*, 133 F.3d 92, 99-100 (1st Cir. 1997) (collecting cases from the First, Second, Fourth, Fifth, Sixth, Ninth, Tenth, and D.C. Circuits).

"[O]lder cases" in evidence law had "often contained strictures against allowing witnesses to express opinions upon ultimate issues." Fed. R. Evid. 704 cmt. But now, "[a]n opinion is not objectionable just because it embraces an ultimate issue." Fed. R.

Evid. 704(a). Nevertheless, the "task of separating impermissible questions which call for overbroad or legal responses from permissible questions is not a facile one." *Owen* v. *Kerr McGee Corp.*, 698 F.2d 236, 240 (5th Cir. 1983). For example, "the question, 'Did *T* have capacity to make a will?' would be excluded, while the question, 'Did *T* have sufficient mental capacity to know the nature and extent of his property and the natural objects of his bounty and to formulate a rational scheme of distribution?' would be allowed." Fed. R. Evid. 704 cmt.

But expert testimony about industry customs and practices is a different beast altogether. Unlike impermissible legal opinion testimony, "in general, the customs and practices of an industry are proper subjects for expert testimony." *Pelletier* v. *Main St. Textiles, LP*, 470 F.3d 48, 55 (1st Cir. 2006). For that reason, "[e]xpert testimony on industry standards is common fare in civil litigation." *Levin* v. *Dalva Bros., Inc.*, 459 F.3d 68, 79 (1st Cir. 2006) (citations omitted). For example, a shipping expert may testify as to "custom and usage in the trade." *Diotima Shipping Corp.* v. *Chase, Leavitt & Co.*, 102 F.R.D. 532, 535 (D. Me. 1984). Similarly, although district courts should exclude expert testimony "about federal law (whether directly or under the guise of FDA policy and procedure)," they should nevertheless allow experts to testify "about industry practice." *Bartlett* v. *Mut. Pharm. Co.*, 742 F. Supp. 2d 182, 189 (D.N.H. 2010). Such testimony is "help[ful]" within the meaning of Rule 702(a), because "[t]he jury is fully capable of understanding that there may be a gap between what the law requires and what industry members actually do." *Id.*

Given this legal framework, it is standard operating procedure in this District to "allow [an expert] to testify as to industry standards," *Allen* v. *Martin Surfacing*, 263 F.R.D. 47, 66 (D. Mass. 2009) (Saylor, J.), or to deny in part a motion to strike an expert affidavit whenever at least some portions of his or her testimony "are admissible as expert testimony of industry custom and practice," *Karp* v. *CIGNA Healthcare, Inc.*, 882 F. Supp. 2d 199, 205 n.4 (D. Mass. 2012) (Saylor, J.). In short, although "[t]he line between testimony regarding what the law requires and testimony describing how an industry practice typically operates is not always clear," the "latter form of testimony is admissible." *Ji* v. *Bose Corp.*, 538 F. Supp. 2d 354, 358 (D. Mass. 2008) (Gorton, J.) (permitting experts to testify about customs and practices in fashion industry regarding releases, but excluding expert testimony about the legal interpretation of those releases).

Defendants seize (Doc. 143 at 2, 16-17) on statements in Dr. MacIntosh's report that "[c]aulking and sealants that contain PCBs in excess of 50 ppm . . . must be removed from use," (Doc. 152 at 15), and that "[o]nce [PCB is] discovered," "[a] property owner must submit a remediation plan to the EPA for review." (Doc. 152 at 16.) "Actually," Defendants contend, "there is no regulatory requirement to sample building caulk for PCBs, there is no regulatory deadline for removing caulk once discovered, [and] there is no regulatory requirement to submit a remediation plan to EPA for review." (Doc. 143 at 15-16.)

But in contending Dr. MacIntosh is offering incorrect legal opinions, Defendants misunderstand what he is actually saying. At deposition, Dr. MacIntosh could not have been any clearer that his testimony about EPA regulations was based on his extensive

5

personal experience with how the EPA in Region 1 applied those regulations in practice during PCB-remediation projects:

> Q. And on Page 3 [of your report], just under the Section 5 title, this states, "Unlike asbestos, EPA does not have 'manage-in-place approach' for these 'unauthorized' PCB products, such as caulking. Once discovered, they are to be taken out of service. The process by which PCB caulking is removed and the surrounding surfaces addressed is strictly regulated by EPA." That's what it says here?
>
> A. Yes.
>
> Q. And it says, "A property owner must submit plan to the EPA for review." That's what you wrote on Page 3, correct?
>
> A. Right.
>
> . . . .
>
> Q. As far as the regulation is concerned, though, the PCB-containing material could be left in place forever as long as it is not disposed of incorrectly; is that true?
>
> . . . .
>
> A. *In my experience in interacting with EPA in Region 1 over this matter* is that the expectation is that the materials will be managed with a goal of ultimate removal and disposal.
>
> . . . .
>
> Q. But there is no specified schedule or time line [for PCB removal]; is that correct?
>
> . . . .
>
> A. To my knowledge, there's no specific time line that must be met, except for, *in my experience here in Region 1, the expectation that it be done in a timely manner*. For example, take Estabrook. So we communicated about the remediation plans for Estabrook with Kimberly Tisa, the Region 1 PCB coordinator. And she stipulated that a requirement of the plan that we had to manage in place the PCBs that were not removed from the outside of the building, that we also stipulate the

endpoint for that program, and she wanted that endpoint to be as early as possible, and we suggested 2014 as possible. She said, okay, I'll take that.

. . . .

Q. And in your report you wrote that "Once discovered, they are to be taken out of service," correct?

A. Yes.

Q. But you didn't mention that there is no time line for removal; is that correct?

. . . .

A. Yes, that's my understanding of the regulations.

Q. What's your basis for this statement that "Once discovered, they are to be taken out of service"?

A. *Because I have not yet, that I can recall, encountered a situation where* EPA has said to us or agreed to us that we can keep the materials that contain the PCBs in the building indefinitely.

. . . .

Q. Can you provide me any citation that sets a remediation plan out as a requirement?

A. *It is a normal practice* when encountering contamination is to develop—and a decision is made to intervene in some manner, like remediate, *it is common practice* to develop a work plan that describes what will be done, what controls, if needed, will be put in place, how long you think it will take to do, what the objective is.

Q. Do the regulations require the building owner to engage the EPA?

A. Well, it is my understanding that when a building owner learns that they have concentrations or that they have PCBs in an unauthorized use that they are to notify the EPA.

Q. Can you cite me a portion of the regulations?

A. Not off the top of my head, no. *It is certainly the expectation here in our region.*

7

>Q. So your basis for this statement that "a property owner must submit a plan to the EPA for review" is solely based on your practice; is that correct?
>
>A. *It is based on my experience with this matter and my firm's practice. And it's what Kim Tisa, the Region 1 coordinator, asks us to do every time. She says, develop a work plan, please. I would like to see that as soon as possible. So we comply.*
>
>. . . .
>
>Q. So what was the basis for this statement that "The expectation of the Region 1 coordinator is that the owner will take the necessary steps to remediate as soon as feasible"?
>
>A. *The basis of that is our—is EH&E's experience with this issue in Region 1 and interacting with the Region 1 coordinator.*

(Doc. 155-2 at 2-6) (emphases added).

In short, Dr. MacIntosh is not offering his legal interpretation of any EPA regulations. Instead, he is offering opinions on "customs and practices," *Pelletier*, 470 F.3d at 55, within the PCB-remediation industry based on his extensive personal experience with the EPA in Region 1. In other words, what Dr. MacIntosh is actually saying is this: "in my extensive personal experience with the EPA in Region 1, once PCB is discovered, the EPA regulates PCB-remediation projects by requiring (1) submission to the EPA of a removal plan for review, and (2) timely removal and disposal of any caulking that contains PCB in excess of 50 ppm." And this expert testimony will be helpful, even if Defendants were correct that the EPA is misinterpreting its own regulations, because "[t]he jury is fully capable of understanding that there may be a gap between what the law requires and what industry members actually do." *Bartlett*, 742 F. Supp. 2d at 189. Simply put, legions of cases throughout the First Circuit and this District allow such expert testimony. *E.g.*, *Pelletier*, 470 F.3d at 55; *Levin*, 459 F.3d at

8

79; *Karp*, 882 F. Supp. 2d at 205 n.4 (Saylor, J.); *Bartlett*, 742 F. Supp. 2d at 189; *Ji*, 538 F. Supp. 2d at 358 (Gorton, J.); *Allen*, 263 F.R.D. at 66 (Saylor, J.); *Diotima Shipping Corp.*, 102 F.R.D. at 535. There is nothing unusual about it. To the contrary, it is "common fare." *Levin*, 459 F.3d at 79.[2]

### B. Dr. MacIntosh's References To EPA Regulations Are Ancillary And Not Directed To Any Ultimate Legal Issue

Moreover, to the extent Dr. MacIntosh might refer to certain EPA regulations during his testimony about how the EPA applies those regulations in practice, such references would be ancillary and not directed to any ultimate legal issues.

"[A] witness may refer to the law in expressing an opinion without that reference rendering the testimony inadmissible." *Specht* v. *Jensen,* 853 F.2d 805, 809 (10th Cir. 1988). "Indeed, a witness may properly be called upon to aid the jury in understanding the facts in evidence even though reference to those facts is couched in legal terms." *Id.* In other words, when an expert makes some "references to" statutory or regulatory provisions that are not "directly at issue," such testimony is "ancillary to the ultimate issue" and "d[oes] not improperly invade the province of the jury or the court." *Hangarter* v. *Provident Life & Accident Ins. Co.*, 373 F.3d 998, 1017 (9th Cir. 2004).

In this case, the EPA regulations are not "directly at issue." *Id.* Rather, they merely provide context for why "Lexington commenced extensive remediation work to repair property damage at Estabrook Elementary School," why "the EPA's public health

---

[2] Defendants do not explain why they believe Dr. MacIntosh is "unqualified" to provide such testimony. (Doc. 143 at 16.) Experts can be qualified by "knowledge, skill, experience, training, or education." Fed. R. Evid. 702. Here, Dr. MacIntosh has extensive personal experience with how the EPA in Region 1 regulates PCB-remediation projects in practice. (Doc. 155-2 at 2-6.)

levels for PCBs in school indoor air are an appropriate standard for evaluating property damage caused by PCBs," and why class members "did not suffer appreciable property damage from airborne PCBs prior to the establishment of the EPA's public health levels on September 25, 2009." (Doc. 1 at 11-13.) For that reason, Dr. MacIntosh may make "ancillary" references to those EPA regulations that are "couched in legal terms" in explaining how, in his experience, the EPA in Region 1 regulates PCB-remediation projects in practice. *Specht,* 853 F.2d at 809; *Hangarter*, 373 F.3d at 1017.

## CONCLUSION

For the foregoing reasons, the Court should deny the Motion To Strike as moot insofar as it asks the Court to strike Dr. MacIntosh's affidavit in support of class certification (Doc. 127) and his opinions regarding "[h]is estimates regarding the cost per square foot of PCB remediation" and "the 'typicality' of the Estabrook school." (Doc. 142 at 2.) The Court should also deny the Motion To Strike on the merits insofar as it asks the Court to preclude Dr. MacIntosh "from testifying on the EPA's requirements regarding PCB remediation." (Doc. 143 at 15.)

Respectfully submitted,

/s/ Bryan S. Gowdy
Bryan S. Gowdy (MBN 643442)
bgowdy@appellate-firm.com
filings@appellate-firm.com
CREED & GOWDY, P.A.
865 May Street
Jacksonville, FL 32204
(904) 350-0075 T
(904) 503-0441 F

*Counsel for Town of Lexington*

## CERTIFICATE OF SERVICE

I certify that on this 2nd day of March, 2015, the foregoing document was filed electronically using the Court's CM/ECF system, and notice of this filing will be sent by e-mail to the following parties by operation of that electronic filing system:

| **Pharmacia Corp., Solutia Inc., and Monsanto Co.** | **Town of Lexington** |
|---|---|
| Richard L. Campbell | Robert S. Chapman |
| Richard P. Campbell | Jon-Jamison Hill |
| Brandon L. Arber | Kevin J. Madonna |
| Diana A. Chang | Esther L. Klisura |
| Carol A. Rutter | Melissa C. Allison |
| Robyn D. Buck | Scott P. Lewis |
|  | David S. Mackey |
|  | Melissa C. Allison |

**Town of Westport and Westport Community Schools**

Carla Burke
Robin Greenwald
Todd D. Omen
William A. Walsh
Richard M. Sandman

/s/ Bryan S. Gowdy
Bryan S. Gowdy

11