UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| TOWN OF LEXINGTON, on behalf of itself and all others similarly situated,<br>    Plaintiff,<br><br>v.<br><br>PHARMACIA CORPORATION,<br>SOLUTIA INC., and<br>MONSANTO COMPANY,<br>    Defendants. | C.A. No. 12-CV-11645 |

### PHARMACIA CORPORATION'S[1] REPLY IN SUPPORT OF MOTION TO STRIKE THE AFFIDAVIT OF DAVID L. MACINTOSH AND EXCLUDE HIS EXPERT OPINIONS

In response to Plaintiff's Motion for Class Certification and the accompanying expert reports of Drs. MacIntosh and Herrick, Pharmacia was compelled to retain multiple defense experts to address the myriad assumptions made by Drs. MacIntosh and Herrick, to prepare for and attend the depositions of experts named by both sides, and to prepare its legal opposition to class certification as well as motions to exclude Drs. MacIntosh and Herrick's testimony. After all of that time and effort, in addition to abandoning its original class definition, the plaintiff has now withdrawn Dr. Herrick as a witness for the same reasons that Pharmacia urged all along in its correspondence and legal briefing. Lexington also now admits that Dr. MacIntosh's analysis regarding class-wide damages (the sole focus of his "declaration" in support of class certification and the primary focus of his second expert report) was indefensible, and is retracting him as a "cost estimation" expert. ("Opposition To Motion To Strike," Doc. 229 at 2.)

---

[1] This motion is made by Pharmacia Corporation, Solutia Inc., and Monsanto Company. The Defendants are collectively referred to as "Pharmacia" for ease and convenience only. Solutia Inc. and Monsanto Company have motions for summary judgment pending before the Court that have been fully briefed and argued by the parties.

1

Plaintiff's dilatory tactics concerning putative class definitions/class certification and plaintiff's unqualified experts in support have been prejudicial and costly to Pharmacia in the extreme. These tactics should be firmly rebuffed by this Court now, including by granting Pharmacia's Motion to Strike and Exclude the Opinions of Dr. McIntosh; accepting plaintiff's withdrawal of the opinions of its expert Herrick; and denying Lexington's efforts to start over on its futile class certification quest (as argued by Pharmacia at the hearing on January 14, 2015).

Lexington seeks to keep Dr. MacIntosh as an expert on the topic it describes as how "the EPA in Region 1 applies its regulations in practice during PCB remedial projects." (Doc. 229 at 2.) Dr. MacIntosh demonstrates in his published papers that his studies focus on such topics as:

- "radon exposure from granite countertops,
- the prevalence of fungal spores in office buildings,
- hydrogen sulfide in homes with "Chinese drywall,"
- the risk of disease transmission at airports, and
- occupational exposure at coal-fueled power plants.

(Exhibit A to Affidavit in Support of Reply, "August 29, 2014 Report and Resume of Dr. David MacIntosh", p. 16-27.) Radon, fungal spores, "Chinese drywall," and "coal-fueled power plants" may well be interesting matters, but they have no relevance here and hardly qualify Dr. MacIntosh as an expert in EPA regulations and practices with regard to PCBs. Lexington repeatedly refers to Dr. MacIntosh's "extensive personal experience[on how [the EPA] in Region 1 applies its regulations in practice during PCB remedial projects." (Doc. 229 at 2.) But, as he admits in his deposition testimony, Dr. MacIntosh's *only* work on PCB remediation in Region 1[2]

---

[2] The Environmental Protection Agency ("EPA") is the relevant federal governmental entity created by the Congress with specific delegated powers, including the ability to promulgate regulations in accordance with law and procedure set forth in the Administrative Procedure Act. Contrary to the suggestions made by Lexington in this and other memoranda filed with the Court, "Region 1" is a department of the EPA; it does not have statutory authority in

2

arose in the current case for Lexington at the Joseph Estabrook Elementary School in 2010. Aside for this single occasion in Region 1, Dr. MacIntosh claims to have worked on a second remediation that did not involve communications with Region 1 of the EPA. Dr. MacIntosh could not identify any other experience, education or training in this area and he therefore lacks the requisite knowledge, skill, experience, training, or education to qualify as an expert.

Moreover, Dr. MacIntosh's testimony is unreliable because it is backed only by his own bare and totally unspecific citation to his "experience," and is devoid of any grounding in specific facts, data, or any objective principles and methods. Lacking any regulation, guidance document, or other communication to back up Dr. MacIntosh's contentions on EPA practices, Lexington instead points to "extensive personal experience [on how] the EPA in Region 1 applies its regulations in practice during PCB remedial projects" as support for each of his assertions. (Doc. 229 at 2.) Lexington makes no attempt to describe or define his "extensive experience", nor any attempt to indicate *what* in his prior experience (as anecdotal and subjective as it may be) leads Dr. MacIntosh to the conclusions he asserts in his report. (See id.) A bald assertion by a so-called "expert" backed by no more than self-serving yet empty proclamations of his "experience" is exactly the type of testimony that Rule 702 was intended to exclude. For that reason, Dr. MacIntosh's reports should be struck and his testimony precluded on this subject.

I.  **MacIntosh Lacks The Requisite Knowledge, Skills and Experience To Qualify As An Expert On PCB Regulation Or EPA Practices**

   A.  The Estabrook Project Was Dr. MacIntosh's Only Experience Working On A Remediation Project With The EPA in Region One

---

its own right. Likewise, Kim Tisa, the Region 1 PCB Coordinator, is a mid-level federal civil servant without any independent statutory authority. Ms. Tisa serves at the pleasure of the EPA Administrator, Gina McCarthy. Section 6(a) of the Toxic Substances Control Act grants the EPA "Administrator," not individual EPA employees, the authority to promulgate regulations.

3

In its Opposition to Defendants' Motion to Strike, Lexington repeatedly refers to Dr. MacIntosh's "extensive personal experience [on how] the EPA in Region 1 applies its regulations in practice during PCB remedial projects". (Doc. 229 at 2, 3.) Tellingly, Lexington's repeated assertions to Dr. MacIntosh's "extensive experience" are unsupported by any actual description of those experiences or how they informed his opinion on the EPA's requirements. (See id.) A look at his experience explains why.

When asked how many PCB projects he has billed on, Dr. MacIntosh attempts to evade the question by answering "several, at least:"

> Q. How many PCB remediation projects have you worked on in your career?
>
> A. Several, at least. I mean, there are some I have been heavily involved in, like, this project in Lexington. I have been heavily involved in the projects with the University of Cincinnati. There are others that I'm marginally involved in, kind of on the fringe. But we certainly have -- the company has completed many, and I have been involved in quite a few of those.

(Exhibit B to Affidavit in Support of Reply, MacIntosh Deposition, p. 41: 13-22.)

The University of Cincinnati projects were totally unlike Estabrook because the buildings were not occupied and were undergoing a complete "gut" renovation:[3]

> Q. Did the air levels exceed any EPA guidance?
>
> A. The first project, I don't think they did. That was a situation where the building was completely unoccupied and the building envelope wasn't gone. It had been removed, because the project was under a complete -- the building was under a complete renovation, so it was gutted. The only thing that remained was the concrete decking and the structural members holding up the decking. So there was a lot of ventilation in that space. It was kind of like being outside with a tarp around you.

(Exhibit B, MacIntosh Deposition, p. 48: 13-24.)

---

[3] A renovation that "guts" a building could trigger waste disposal regulations for various materials like asbestos, heavy metals, and organic chemicals. The remediation of Lexington's Estabrook school did not involve gutting the building. Indeed, it remained in use with PCB-containing materials in place for an additional four years after Dr. MacIntosh's employer completed its work.

It is unclear from Dr. MacIntosh's testimony whether he communicated with the EPA in connection with the University of Cincinnati project. But that project was in Ohio, which is within EPA's Region Five, and therefore cannot be said to contribute to Dr. MacIntosh's "extensive personal experience [on how] the EPA in Region 1 applies its regulations in practice during PCB remedial projects." (See Doc. 229 at 2.)

When asked if he had billed on any other projects other than Estabrook and the University of Cincinnati, Dr. MacIntosh testified that he was "pretty sure" he has, but neither of the other two projects appeared to involve any communications with the EPA:

> Q. Have you billed on more than two PCB remediation projects?
>
> A. I'm pretty sure I have.
>
> Q. What were the other PCB remediation projects that you have billed on, other than Lexington and the University of Cincinnati?
>
> A. It was work we were doing with another school system nearby in Massachusetts. I'm pretty sure I billed on that.

(MacIntosh Deposition, p. 42: 2-10.)

> ...
>
> Q. Do you know whether you billed on that project or not?
>
> ...
>
> A. I think I went to a meeting with the Superintendent and the school committee, [and to] review the risk assessment, I think we did something along those lines.

(Exhibit B, MacIntosh Deposition at p. 43:18-21.)

Dr. MacIntosh's work on this anonymous project in Massachusetts did not appear to involve any interaction between Dr. MacIntosh and the EPA. In fact, he was not even sure what he did for that anonymous project in Massachusetts. (See id.)

Similarly, according to Dr. MacIntosh, his work on a University of Rhode Island project had nothing to do with regulatory compliance or directing negotiations with the EPA, but rather dealt with exposure assessment of PCBs concentrations in blood:

> Q. Are there any other projects that you can remember billing on?
>
> A. I probably billed on EH&E's project with the University of Rhode Island. That would have been shortly after I started at EH&E. I certainly worked on that project.
>
> Q. And what did you do on that project?
>
> A. I was involved in the analysis of the PCB concentrations measured in blood serum drawn from participants in that part of the project.
>
> Q. Other than those four, can you remember any other PCB remediation projects that you have billed on?
>
> A. Not explicitly, but I might have.

(Exhibit B, MacIntosh Deposition, p. 44: 4-23.)

In short, it is clear from his experience and testimony that Dr. MacIntosh was only involved in a single PCB remediation project in which he interacted directly with EPA Region 1: the Estabrook project at issue in this lawsuit. (See id.) One project hardly qualifies him as an expert in EPA "practice."

Moreover, his work for Lexington demonstrated a lack of understanding of EPA's normal practice because he failed to analyze his client's compliance obligations and instead presented the EPA's advice as regulatory requirement. As John Woodyard explains in his report, Dr. MacIntosh failed to develop any kind of compliance strategy while working on the Lexington project that would indicate an understanding of the PCB regulations or the EPA's normal practices:

> "At no time did EH&E appear to develop their own independent approach or strategy for dealing with PCB caulk and building air at Estabrook. Instead, EH&E notified EPA of

6

> the findings on behalf of the town (which is not required) and essentially and improperly delegated to the EPA the guidance responsibilities for which EH&E itself was hired to perform by Lexington. EH&E then inexplicably treated the EPA's suggestions as though they were "the law", when in fact those suggestions are usually just part of the back-and-forth dialog that I have encountered on other similar projects involving the EPA."

(Exhibit C, Woodyard Report, p. 10.)

Dr. MacIntosh lacks any significant experience with PCB regulatory compliance or EPA practices and should not be allowed to testify as an expert "[on how] the EPA in Region 1 applies its regulations in practice to PCB remedial projects."

### B. Dr. MacIntosh Is Not An Expert In PCB Remediation Procedures, Methods and Compliance

Dr. MacIntosh is unqualified to testify on the EPA regulations and practice because he is not an expert in PCB remediation procedures, methods and compliance.

Dr. MacIntosh's own description of his professional experience does not indicate any expertise or experience with PCB regulatory compliance or EPA practices, nor does the rest of his resume or deposition testimony. In Dr. MacIntosh's resume, autobiographical summary, expert reports, and deposition testimony he professes an expertise in health science and exposure assessment,[4] not regulatory compliance. Dr. MacIntosh describes his professional experience as follows:

> "David MacIntosh is Chief Science Officer at Environmental Health & Engineering, Inc. (EH&E) in Needham, Massachusetts. Dr. MacIntosh oversees the scientific aspects of projects conducted by scientists, industrial hygienists, and engineers who specialize in diagnosing and analyzing the complex relationships among sources, pathways, and receptors of environmental stressors that influence health in the built environment. His recent activity has focused on problematic

---

[4] "EPA defines exposure as 'contact between an agent and the visible exterior of a person (e.g. skin and openings into the body)'. Exposure assessment is the process of measuring or estimating the magnitude, frequency, and duration of human exposure to an agent in the environment, or estimating future exposures for an agent that has not yet been released. An exposure assessment includes some discussion of the size, nature, and types of human populations exposed to the agent, as well as discussion of the uncertainties in the above information. Exposure can be measured directly, but more commonly is estimated indirectly through consideration of measured concentrations in the environment, consideration of models of chemical transport and fate in the environment, and estimates of human intake over time." (http://www.epa.gov/risk_assessment/exposure.htm)

building materials, ambient air quality, heavy metals, naturally occurring radioactive materials, persistent organic pollutants, and risk analysis training materials."

(Exhibit A, Resume, Dr. MacIntosh, p. 13.)

Dr. MacIntosh testified that in his current position as Chief Science Officer at Environmental Health and Engineering, he is responsible for quality control on the *scientific* aspects of the work that EH&E does (not regulatory compliance). (Id.) He also provides litigation consulting services by providing exposure assessments and expert testimony on a range of different alleged chemical exposures (not on regulatory compliance or EPA practices). (Id.)

Dr. MacIntosh's publications are likewise primarily focused on exposure assessment rather than regulatory compliance or EPA practices. A survey of his publications show that his studies focus on such topics as radon exposure from granite countertops, the prevalence of fungal spores in office buildings, hydrogen sulfide in homes with "Chinese drywall," the risk of disease transmission at airports, and occupational exposure at coal-fueled power plants. (Id at 15-27.) None of his publications focus on regulatory issues, compliance, permitting, management strategies and processes as one would expect to see from an expert in those areas.

In fact, of the 122 publications and presentations listed on his CV, only 5 PCB remediation publications and presentations (excluding duplicates) are identified. (Id.) Each paper was published in the 2010-2012period, the same time frame as the Estabrook project. (Id.) Closer examination of these five publications shows they were either non-project papers that surveyed others' work or papers about his work on Estabrook. (Id.) Moreover, the focus of these papers was largely centered around exposure assessment and the science of PCB migration, not regulatory compliance or EPA practices. (Id.) This is consistent with Dr. MacIntosh's expertise

exposures and risk assessment with little if any experience and expertise on regulatory compliance issues. (Id.)

Dr. MacIntosh is unqualified to testify on the EPA regulations and practice because his education, training, and teaching experiences are focused on the scientific analysis of chemical exposure assessment, and not regulatory compliance.

## II. Dr. MacIntosh's Testimony Regarding The PCB Regulations And EPA Practice Is Unreliable

In its opposition, Lexington would like to rely on Dr. MacIntosh's "extensive experience" with PCBs to support his opinions on EPA "practices." Yet, Lexington does not even attempt to describe what his "extensive experience" consists of, nor does it attempt to indicate *what* in his prior experience (as anecdotal and subjective as it may be) leads him to the conclusions he asserts in his report. A bald assertion by a so-called "expert" backed by no more than self-serving descriptions of his own vague "experience" is exactly the type testimony intended to be excluded by Rule 702. *Calisi v. Abbott Labs.*, CIV.A. 11-10671-DJC, 2013 WL 5441355 at *5 (D. Mass. Sept. 27, 2013) ("A court may reject 'opinion evidence that is connected to the existing data only by the *ipse dixit* of the expert.'"). Moreover, Lexington cannot point to any regulation, guidance document, or other primary source to support Dr. MacIntosh's contentions on EPA "practices." Dr. MacIntosh's reports should be stricken and his testimony precluded on this subject.

### A. Dr. MacIntosh's Statements Regarding PCBs In Excess Of 50 ppm Are Unsupported And Flat Out Wrong

Dr. MacIntosh makes the following incorrect statements in his report: "[c]aulking and sealants that contain PCBs in excess of 50 ppm . . . must be removed from use"; "Unlike Asbestos, EPA does not have a 'manage-in-place' approach for these 'unauthorized' PCB

products, such as caulking", and "[o]nce discovered, they [PCBs] are to be taken out of service." (Exhibit A, p. 2-3.) These statements are plainly incorrect. PCB-containing material in excess of 50 ppm may be managed in place, and there is no EPA "practice" or regulation that requires removal.

In support of the statement that PCBs in excess of 50 ppm must be removed, Dr. MacIntosh cites to Title 40 Code of Federal Regulations Section 761.3. Section 761.3, however, does not require that PCBs in excess of 50 ppm be taken out of service. See 40 CFR 761.3. When confronted with this discrepancy, Dr. MacIntosh first claimed that the requirement was actually in the "action" part of the regulations:

> Q. Now, I have handed you Exhibit 5. That's 40 CFR 761.3, correct?
>
> A. Yes, it is.
>
> Q. Can you tell me if it says in the regulations that PCB-containing materials over 50 ppm must be taken out of service?
>
> …
>
> A. So this section that you handed me, 761.3, is definitions. I think it is the action part of the regs.

(Exhbit B, MacIntosh Deposition, p. 95:13-16; p. 96: 6-8.)

Dr. MacIntosh later admitted that Section 761.3 did not stand for the proposition for which he cited, and confessed that his report "may not have been as accurate as it needed to be":

> Q. That's the definitions section that you cited in your report, correct?
>
> …
>
> A. (Witness reviews exhibit) Yes, this is the section that I cited as Reference No. 6. I think it may not have been as accurate as it needed to be.
>
> Q. Your report?

>    A. The citation, I think, should have been referencing the regulation more broadly than just this definitions section.

(Exhibit B, MacIntosh Deposition, Page 96: 9-20.)

Despite this admission, Dr. MacIntosh still clung to his now wholly unsupported assertion that removal was required "somewhere" in the regulations, but he could not recall the specific section. (Id.) In actuality, Dr. MacIntosh could not cite a relevant section of the regulations because none exist. **There is <u>no</u> requirement to remove materials that contain PCBs in excess of 50 ppm.**

Dr. MacIntosh's employer, EH&E, publishes instructions on its website to its customers that the "Business as Usual" approach is a valid one given the lack of any EPA requirement to remove the material:

> "Business as Usual
> Deciding not to act is an understandable reaction in light of resource constraints, readily available knowledge of the issue, and what is effectively EPAs policy of "don't ask, don't tell' about PCB-containing materials in buildings. This `business as usual' approach has some advantages such as avoidance or deferral of possible costs."

(Exhibit D, What You Need To Know About Managing PCBs in Schools, EH&E, Page 7.)

Dr. MacIntosh's superior, Kevin Coghlan, confirmed as much in his deposition:

>    Q. Okay. And here the company is, in its publication is recognizing that some schools, given issues like resource constraints, might understandably choose not to act?
>
>    A. They might not choose to even identify the issue.

(Exhibit E, Kevin Coghlan Deposition, p. 104: 9-16.)

Similarly, Dr. MacIntosh's assertion that there is no "manage in place" option for PCBs did not survive closer scrutiny. In his deposition, Dr. MacIntosh testified there actually is such an option:

11

> Q. So the procedure is different. But like asbestos there may be situations where you would advise a school to actually leave PCB-containing materials in place even if it contains greater than 50 ppm; is that correct?
>
> A. Oh, I think it is definitely possible to do so. I mean, this is a -- it can be and often is a complex situation where you have to consider many factors. Removal, like a removal right away of PCB-containing materials could be easy under some situations, and in other situations it may not be very feasible because of disruption to the use of the building, it could be cost, it could just be unacceptable to the community, and, therefore, decision-makers decide, well, let's just keep it in place. I kind of lost my train of thought. Sorry.

(Exhibit B, MacIntosh Deposition, p. 100: 10-24; p. 101 1-4.)

In fact, Dr. MacIntosh left PCB-containing caulk <u>in place</u> at Estabrook for approximately four years before the building was torn down. (Exhibit B, MacIntosh Deposition, p. 99: 12-15.)

Further, the EPA in its publications informs readers that it does not require the removal of PCB containing materials, contradicting Dr. MacIntosh's report. (See, for example, EPA's "Preventing Exposure to PCBs in Caulking Material" – EPA-747-F-09-005 dated August 2012.) EPA notes that encapsulation was found to be most effective for interior surfaces that contain "low levels of PCBs (i.e. several hundred parts per million)."

> **EPA is helping to address the issue of PCBs in caulk**
>
> EPA has conducted research on how the public is exposed to PCBs in caulk and on the best approaches for reducing exposure and potential risks associated with PCBs in caulk. Based on EPA's Office of Research and Development's laboratory research, encapsulation was found to be most effective for interior surfaces that contain low levels of PCBs (i.e. several hundred parts per million). Depending on the PCB reduction goal, the performance of the encapsulant, and the conditions of the building, the upper limit of the PCB concentration for successful encapsulation may vary.

Dr. MacIntosh has no reliable basis for his statements regarding the regulations or EPA's requirements. (Exhibit A, p. 2-3.) Moreover, Dr. MacIntosh's statements are directly contradicted by his own "extensive experience" with the Estabrook project, in which he actually

left PCBs in excess of 50 ppm in place for almost four years. (Exhibit B, MacIntosh Deposition, p. 99: 12-15.)

**B.    There Is No Requirement To Submit A Remediation Plan To The EPA Upon Encountering Material With PCBs In Excess Of 50 ppm**

Dr. MacIntosh also asserts in his report that there is an EPA requirement to submit a remediation plan to the EPA for review upon encountering PCBs in excess of 50 ppm. Once again, lacking any regulatory support for this bold claim, Dr. MacIntosh relied on the experience from his sole PCB remediation project – Estabrook. Then, in circular fashion, he concluded that this must be the "practice" in EPA Region 1 because he never experienced a situation where a PCB-remediation plan was not submitted to the EPA:

> Q. This states, "Property owner must submit a remediation plan to the EPA for review"; is that correct?
>
> A. That's -- yes, you read that sentence correctly.
>
> Q. And do you know where that would be required in the regulations?
>
> A. I don't know if it is called out specifically in the regulations. It might be. But I know in practice that's what we have to do here in Massachusetts.
>
> Q. What are the consequences for not doing that?
>
> A. I don't know what the consequences are for not doing that because I haven't experienced that yet.

(Exhibit B, MacIntosh Deposition, p. 97: 9-24.)

Once again, Dr. MacIntosh resorts to vague appeals to his own "experience" because he lacked objective support for his statement that a PCB-remediation plan was, in fact, required. As John Woodyard explained in his report, there is no such requirement in the regulations (or EPA "practice") to submit a remediation plan to the EPA for review. (See Exhibit C, Woodyard Report.)

Dr. MacIntosh submitted a remediation plan to EPA for the Estabrook project, but he did not know whether that action was required. Dr. MacIntosh should not be allowed to opine on the EPA's regular "practice" or its regulatory requirements based on one work site and his own bare assertions.

### III. Lexington Cannot Couch Dr. MacIntosh's Opinions As "Industry Practice" Because He Opines On EPA Regulations, Not Practice

Dr. MacIntosh should be disqualified as an expert because he lacks knowledge of even those regulations he specifically cites and purports to rely on in his report. Lexington's attempt to make an artificial distinction between the "law" and testimony about "industry practice" is nothing more than a transparent attempt to excuse Dr. MacIntosh's ignorance of the underlying rules and procedures controlling the "practice" in which he purports to have an "extensive experience."[5] Expert knowledge on "industry practice" should include knowledge of the regulations underlying that practice.

Dr. MacIntosh clearly opines about the EPA <u>regulations</u>, not practice. For example, Lexington requests that this Court qualify Dr. MacIntosh to present the following statements to the jury as his expert opinion:

> Manufacturing, importation and most uses of PCBs in the U.S. are currently prohibited under the Toxic Substances Control Act. [Fn. 4: 15 U.S.C. Sec. 2601 et seq. 1976. U.S. Environmental Protection Agency (EPA): Toxic Substances Control Act.] Federal regulations that establish authorized uses and disposal practices for PCBs are stated in the Code of Federal Regulations, Title 40, Part 761 (40 CFR 761). The manufacture and further use of PCBs was effectively banned in the U.S. in 1977. [Fn. 5: EPA TSCA of 1976, previously cited.] Materials manufactured with PCBs that contain PCBs in concentrations greater than 50 parts per million (ppm), and for which a specific exemption is not listed in the regulation, are considered "unauthorized" by the EPA and

---

[5] At the same time, Lexington attempts to disqualify John Woodyard (Defendants' expert in PCB remediation regulation, procedure and practice whose report is mostly concerned with responding to the unreliable and incorrect statements made by Dr. MacIntosh) by asserting that Mr. Woodyard is an impermissible legal expert, despite the fact that Mr. Woodyard's responsive testimony is clearly based on a combination of both his experience interacting with the EPA on actual PCB remediation projects and his working knowledge of the PCB regulations, and is submitted to correct Lexington's own assertions on the EPA's regulatory requirements.

14

are to be taken out of use and disposed of in accordance with the regulations. [Fn. 6: EPA 40 CFR 761.3, Polychlorinated biphenyls (PCBs) manufacturing, processing, distribution in commerce and use prohibitions. Code of Federal Regulations. Title 40, Part 761, Section 3, Definition. Washington, DC: U.S. Environmental Protection Agency.] Caulking and sealants that contain PCBs in excess of 50 ppm are examples of products that are considered "unauthorized" and must be removed from use. (P. 2, Dr. MacIntosh's Expert Report of Aug. 29, 2014.)[6]

...

Unlike Asbestos, EPA does not have a "manage-in-place" approach for these "unauthorized" PCB products, such as caulking. Once discovered, they are to be taken out of service. The process by which PCB caulking is removed and the surrounding surfaces addressed is strictly regulated by EPA. A property owner must submit a remediation plan to the EPA for review.

(Exhibit A to Affidavit in Support of Reply, "August 29, 2014 Report and Resume of Dr. David MacIntosh", p. 3.) In its opposition, Lexington now claims that the above opinion is not an "interpretation of any EPA regulations," but merely a description of EPA "practices." (Opposition to Motion to Strike, page 8.) Lexington argues that Dr. MacIntosh only makes "'ancillary' references to those EPA regulations that are 'couched in legal terms.'" (Doc. 229, p. 10.) However, it is clear from his report that Dr. MacIntosh makes unambiguous statements about what the EPA regulations require and do not require. (Exhibit A, p. 3.) In support of those statements, he cites to specific sections of the relevant statutes and regulations. He does not cite to his own "experience" or even examples of prior EPA "practice." He cites the regulations themselves. (Id.)

---

[6] Dr. MacIntosh's first report of Feb 14, 2014 included a similar summary of the PCB regulations and statutes:

Manufacturing, importation and most uses of PCBs in the U.S. are currently prohibited under the Toxic Substances Control Act. [Fn. 4: 15 U.S.C. Sec. 2601 et seq. 1976. U.S. Environmental Protection Agency (EPA): Toxic Substances Control Act.] Federal regulations that establish authorized uses and disposal practices for PCBs are stated in the Code of Federal Regulations, Title 40, Part 761 (40 CFR 761). The manufacture and further use of PCBs was effectively banned in the U.S. in 1977. [Fn. 5: EPA TSCA of 1976, previously cited.] Materials manufactured with PCBs that contain PCBs in concentrations greater than 50 parts per million (ppm), and for which a specific exemption is not listed in the regulation, are considered "unauthorized" by the EPA and are to be taken out of use. [Fn. 6: Title 40 Code of Federal Regulations Section 761.3.]The EPA regulations also stipulate thresholds for PCB levels in materials other than primary sources that are subject to removal. [Fn. 7: 40 CFR 761.3, previously cited.] (Dr. MacIntosh's Expert Report of Feb 14, 2014.)[6]

15

An expert seeking to opine on remediation procedure and EPA compliance should certainly have a thorough understanding of the actual regulations involved, and support his assertions not only by referencing his own experience, but also by citing and relying on the actual regulations, statutes and guidance materials promulgated by the EPA. See <u>In re Fosamax Prods. Liab. Litig.</u>, 645 F. Supp. 2d 164 (S.D. N.Y. 2009) (finding that an expert's opinions based on "her experience and her understanding of FDA regulations will be helpful to the jury.") This is exactly what Dr. MacIntosh was attempting to do in his report. He hopes to explain the complex regulatory framework that governs PCB remediation. However, as discussed above, Dr. MacIntosh's assertions are wholly unsupported by the regulations he cites.

Now, after realizing that their regulatory expert did not have a thorough comprehension of the underlying regulations, Lexington seeks to change its position and claim that Dr. MacIntosh's report is not meant to describe the regulations that he incorrectly opines about, but rather to describe "practice in the industry" based on his unspecified, but "extensive", experience.

Lexington even goes one step further and adopts the bafflingly inconsistent position that "[i]n this case, the EPA regulations are not 'directly at issue.'" (Doc. 229, p. 10.) According to Lexington, the EPA regulations merely provide context for why "Lexington commenced extensive remediation work to repair property damage at Estabrook Elementary School...". (Doc. 229, p. 10.) It is unclear what Lexington means by "context." It is even less clear how the plaintiff can possibly claim that the EPA regulations are "not at issue" after it specifically requested that this court certify *exactly those issues* for class treatment. In its motion seeking to restart the case by re-writing its class definition, Lexington wrote:

> "Plaintiff also requests, under Rule 23(c)(4), that the Court certify "particular issues" for class treatment.3 These common issues include:

16

> ...
> - whether Class members are authorized to use in their School Buildings caulk containing PCBs in excess of 50 parts per million ("ppm") and whether such caulk must be removed, disposed, or otherwise remediated;
>
> - whether Class members are entitled to declaratory relief stating that caulk containing PCBs in excess of 50 ppm at a School Building is an unauthorized use that must be removed, disposed, or otherwise remediated pursuant to federal regulations and whether Defendants are legally responsible for the costs of such removal, disposal, or other remediation;"

("Memorandum In Support Of Motion To Continue Class Certification Hearing," Doc. 198, p. 15.)

Despite explicitly asking the court to certify issues of regulatory applicability and oversight for class treatment, Lexington now claims that Dr. MacIntosh's testimony will be "helpful, even if Defendants are correct" that his report and proffered testimony completely misinterpret the regulations. (Doc. 229, page 8). There is something fundamentally absurd about arguing that an expert witness should be able to testify on regulatory compliance even if his proffered testimony is of the underlying regulations is plainly wrong.

Lexington seeks to introduce this opinion testimony in order to prove that the remediation actions Lexington took were *legally required* and therefore its alleged damages were *caused by* the presence of PCBs.

Regardless of how Lexington intends to use Dr. MacIntosh's testimony, whether he is being held out as an expert in EPA "industry practice", PCB regulations, or both, Dr. MacIntosh needs to pass muster under the *Daubert* standard, which he cannot do. Dr. MacIntosh lacks sufficient knowledge of the relevant subject matter under Rule 702 and therefore should be excluded. Any prohibition on legal testimony is completely beside the point.

### III. CONCLUSION

For the reasons discussed above, the Defendants request that Dr. MacIntosh's report be struck and his testimony excluded.

Dated: March 16, 2015

                                          Respectfully Submitted,

                                          MONSANTO COMPANY,
                                          SOLUTIA INC., and
                                          PHARMACIA CORPORATION

                                          By their attorneys,

                                          CAMPBELL CAMPBELL
                                          EDWARDS & CONROY, P.C.

                                          /s/ Richard P. Campbell

                                          Richard P. Campbell (BBO# 071600)
                                          Richard L. Campbell (BBO # 663934)
                                          Brandon L. Arber (BBO # 676425)
                                          Diana A. Chang (BBO # 682317)
                                          Sean M. Hickey (BBO # 690865)
                                          One Constitution Center, 3rd Floor
                                          Boston, MA 02129
                                          (617) 241-3000
                                          rpcampbell@campbell-trial-lawyers.com
                                          rlcampbell@campbell-trial-lawyers.com
                                          barber@campbell-trial-lawyers.com
                                          dchang@campbell-trial-lawyers.com
                                          shickey@campbell-trial-lawyers.com

                                                and

                                          HUSCH BLACKWELL LLP

                                          Carol A. Rutter (pro hac vice)
                                          Robyn D. Buck (pro hac vice)
                                          190 Carondelet Plaza, Suite 600
                                          St. Louis, Missouri 63105
                                          Tel: (314) 480-1500

carol.rutter@huschblackwell.com
robyn.buck@huschblackwell.com

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 16th day of March, 2015, the foregoing document was filed electronically. Notice of this filing will be sent by e-mail to the following parties by operation of the Court's electronic filing system:

Bryan S. Gowdy
Creed & Gowdy, P.A.
865 May Street
Jacksonville, FL 32204
Telephone: (904) 350-0075
bgowdy@appellate-firm.com

Esther L. Klisura (pro hac vice)
Sher Leff, LLP
450 Mission Street, Suite 400
San Francisco, California 94105
Telephone: (415) 348-8300
eklisura@sherleff.com

Robert Chapman (pro hac vice)
Jon-Jamison Hill (pro hac vice)
Eisner Kahan Gorry Chapman Ross & Jaffe
9601 Wilshire Boulevard, Suite 700
Beverly Hills, California 90210
rchapman@eisnerlaw.com
jhill@eisnerlaw.com
(310) 855-3200

Scott P. Lewis
Melissa C. Allison
David S. Mackey
Anderson & Kreiger LLP
One Canal Park, Suite 200
Cambridge, MA 02141
(617) 621-6500
slewis@andersonkreiger.com
malison@andersonkreiger.com
dmackey@andersonkreiger.com

Kevin J. Madonna (pro hac vice)
Kennedy & Madonna, LLP
48 Dewitt Mills Road
Hurley, New York 12443
Telephone: (845) 331-7514
kmadonna@kennedymadonna.com

/s/ Richard P. Campbell