UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| TOWN OF LEXINGTON, on behalf of itself and others similarly situated, | ) ) ) ) ) | |
| Plaintiff, | ) ) ) | |
| v. | ) ) ) | Civil Action No. 12-cv-11645 |
| PHARMACIA CORPORATION SOLUTIA, INC., and MONSANTO COMPANY, | ) ) ) ) ) | |
| Defendants. | ) ) ) | |

**MEMORANDUM AND ORDER**

**CASPER, J.**                                                                                     **March 24, 2015**

**I.    Introduction**

Plaintiff Town of Lexington ("Lexington") filed this putative class action against Defendants Pharmacia Corporation ("Pharmacia"), Solutia, Inc. ("Solutia") and Monsanto Company ("Monsanto") (collectively, the "Defendants") alleging that the Defendants breached the implied warranty of merchantability, based on design defect and failure to warn, in their manufacture and sale of polychlorinated biphenyls ("PCBs"). D. 1. Lexington also alleges violation of the Massachusetts consumer protection act, Mass. Gen. L. c. 93A, §§ 2 and 9. Id. Lexington previously moved for class certification. D. 118. Before the Court ruled on that motion, Lexington moved for leave to file an amended motion for class certification in which it amends its class definition. D. 197.

For the reasons stated below, the Court DENIES Lexington's original motion for class certification and DENIES Lexington's motion for leave to amend the class definition.

## II. Standard of Review

### A. Leave to Amend

In seeking leave to amend the class definition, Plaintiffs cite to Fed. R. Civ. P. 23(c)(1)(C) (providing that an order that grants or denies class certification may be altered or amended before final judgment). D. 198 at 6. Here, however, no order granting or denying class certification has occurred. Plaintiffs also cite to Fed. R. Civ. P. 15(a)(2) since, although they do not believe it necessary to amend their complaint, they would do so if the Court so desired to conform the operative complaint to the new class definition and class issues. D. 198 at 7 n.2. Since Rule 23(c)(1)(C) does not fit the situation presented by Plaintiffs' motion or the current status of this case, but the decision to grant or deny class certification remains committed to the Court's discretion, McCuin v. Sec'y of Health and Human Servs., 817 F.2d 161, 167 (1st Cir. 1987), the Court shall draw upon the liberal standard under Rule 15(a)(2) to determine whether, in its discretion, it should allow the Plaintiffs to amend its class definition. See Mogel v. Unum Life Ins. Co. of America, 677 F. Supp. 2d 362, 365 (D. Mass. 2009) (considering, in part, factors under Rule 15(a) where plaintiffs sought class certification, after denial of same, under a different provision of Rule 23(b)); Estrada v. Progressive Direct Ins. Co., Civ. No. 12-30020-FDS, 2014 WL 5323422, at *13 (D. Mass. October 20, 2014) (applying Rule 15(a) where plaintiffs introduced an "entirely new theory of liability" in their summary judgment papers).

Fed. R. Civ. P. 15(a) "mandates that leave to amend is to be 'freely given when justice so requires' . . . unless the amendment 'would be futile, or reward, *inter alia*,

2

undue or intended delay.'" Steir v. Girl Scouts of the USA, 383 F.3d 7, 12 (1st Cir. 2004) (quoting Fed. R. Civ. P. 15(a) and Resolution Trust Corp. v. Gold, 30 F.3d 251, 253 (1st Cir. 1994)). "[T]he liberal amendment policy prescribed by Rule 15(a) does not mean that leave will be granted in all cases." Acosta-Mestre v. Hilton Int'l of P.R., 156 F.3d 49, 51 (1st Cir. 1998) (quoting 6 Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, Federal Practice and Procedure § 1487, at 611 (2d ed. 1990)). "Among the adequate reasons for denying leave to amend are 'undue delay' in filing the motion and 'undue prejudice to the opposing party by virtue of allowance of the amendment.'" Id. (quoting Foman v. Davis, 371 U.S. 178, 182 (1962)). In addition, "[o]nce a scheduling order is in place, the liberal default rule is replaced by the more demanding 'good cause' standard of Fed. R. Civ. P. 16(b)." Steir, 383 F.3d at 12. If the motion to amend is filed after the defendants have sought a ruling on summary judgment, "a plaintiff is required to show 'substantial and convincing evidence' to justify a belated attempt" to amend a pleading. Id.

### B. General standards of class certification

Because an element of the Court's inquiry is the viability of the new class Lexington seeks to propose, the standards for class certification set forth in Fed. R. Civ. P. 23 are relevant here. Before embarking on the analysis required by Rule 23, however, "a court first should consider whether a precisely defined class exists and whether the named plaintiffs are members of the proposed class." Bentley v. Honeywell Intern, Inc., 223 F.R.D. 471, 477 (S.D. Ohio 2004). "[T]he definition of the class must be 'definite,' that is, the standards must allow the class members to be ascertainable." In re Nexium Antitrust Litig., 777 F.3d 9, 19 (1st Cir. 2015). Lexington asserts that the class, as

redefined, meets the strictures explicitly and implicitly mandated by Fed. R. Civ. P. 23. D. 194 at 13-20. If the new class meets the Court's threshold inquiry, then Lexington may sue as a class representative if all four conditions of Rule 23(a) are met:

> (1) the class is so numerous that joinder of all members is impracticable;
>
> (2) there are questions of law or fact common to the class;
>
> (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and
>
> (4) the representative parties will fairly and adequately protect the interests of the class.

In addition to the numerosity, commonality, typicality and adequacy requirements under Rule 23(a), the proposed class must also satisfy one of Rule 23(b)'s requirements. Lexington seeks certification pursuant to Rule 23(b)(3) requiring that "questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3); D. 194 at 19.

"A district court must conduct a rigorous analysis of the prerequisites established by Rule 23 before certifying a class." Smilow v. Sw. Bell Mobile Sys., 323 F.3d 32, 38 (1st Cir. 2003). "[D]istrict courts have broad discretion to grant or deny class certification." McCuin v. Secretary of Health & Human Servs., 817 F.2d 161, 167 (1st Cir. 1987). Plaintiffs bear the burden of proving that class certification is justified. Smilow, 323 F.3d at 38.

### III. Factual Background and Procedural History

Lexington originally brought this action on behalf of a plaintiff class consisting of "all school districts in Massachusetts that have one or more buildings with airborne [PCBs] above the public health levels established by the United States Environmental Protection Agency." D. 1 ¶ 1. The public health levels cited by Lexington refer to a 2009 press release issued by the Environmental Protection Agency ("EPA") regarding PCBs in school buildings and establishing recommended public health levels for PCBs in school indoor air. Id. ¶ 2. The EPA indicated that school districts should "consider testing to determine if PCB levels in the air exceed EPA's suggested public health levels." Id. ¶ 32. The EPA encouraged facility managers to be "vigilant in implementing and monitoring ventilation and hygienic practices to minimize exposures" and recommended that "[s]hould these practices not reduce exposure, caulk and other known sources of PCBs should be removed as soon as practicable." Id.

A predecessor entity to Pharmacia known as Monsanto ("Old Monsanto") is alleged to have been the exclusive manufacturer of PCBs in the United States between 1935 and 1978.[1] Id. ¶ 3. Old Monsanto formed Solutia when it divested itself of its chemical business. Id. ¶ 7. Similarly, Old Monsanto spun off Monsanto after the latter's creation and assumption of Old Monsanto's agricultural business. Id. ¶ 8.

Lexington tested the quality of the indoor air in its schools and, in 2010, discovered that the concentrations of airborne PCBs in Estabrook Elementary School's ("Estabrook") indoor air exceeded the public health levels disseminated by the EPA. Id. ¶¶ 36-37. Lexington alleges that it "commenced extensive remediation work to repair the property damage" to Estabrook, incurring "substantial costs." Id. ¶ 38.

---

[1] In 1976, Congress passed the Toxic Substances Control Act, which largely banned the use of PCBs beginning in 1979. D. 1 ¶ 30.

In September 2012, Lexington brought three causes of action. First, Lexington claims that the Defendants violated the implied warranty of merchantability by defectively designing the PCBs they manufactured and sold.[2] Id. ¶¶ 50-51. Second, Lexington asserts that the Defendants further breached the implied warranty of merchantability by failing to warn foreseeable users of the hazards associated with the use of PCBs. Id. ¶ 54. Third, Lexington contends that the Defendants' actions constituted unfair and deceptive practices in violation of Chapter 93A. Id. ¶ 57.

Lexington first moved for class certification in August 2014. D. 118. The Defendants opposed, arguing that the class as defined was not ascertainable. D. 151 at 6-7. According to the Defendants, it was impossible to identify the members of the proposed class because testing is the only way to establish the presence of PCBs, and school districts are not obligated to conduct such testing. Id. at 7. If the identity of class members is merely speculative, then Lexington could not demonstrate that the class was so numerous that joinder was impracticable, as required by Rule 23(a)(1). Id. at 9. The Defendants also disputed that the class, as proposed, satisfied the commonality, typicality and adequacy requirements of Rule 23(a) and Rule 23(b)(3)'s predominance and superiority prerequisites. Id. at 12-19.

In late December 2014, Lexington moved for leave to file an amended motion for class certification. D. 197. Responding to the Defendants' concerns regarding ascertainability, D. 198 at 7, Lexington proposed a new class:

---

[2]The Defendants maintain, and Lexington does not dispute (despite some of the allegations in its complaint), that Solutia and Monsanto never manufactured and sold PCBs. See D. 1 ¶ 3; D. 135 ¶ 18. Solutia and Monsanto were each formed after the sale of PCBs ceased. D. 1 ¶¶ 7-8. In a separate ruling issued today on Solutia and Monsanto's motion for summary judgment, D. 133, the Court considers whether either entity nonetheless assumed liability for Old Monsanto's chemical business.

> All school districts in Massachusetts that have one or more School Buildings[3] that were built or renovated between 1950 and 1978, as identified in the 2010 Needs Survey published by the Massachusetts School Building Authority. D. 198 at 12.

Lexington seeks to exclude from this class "any school district . . . that, at the time of class certification, has filed its own individual action against any of the Defendants seeking the past or future costs for investigation, remediating, or monitoring any School Building for PCB contamination or any other property damage caused by PCBs."[4] Id. Lexington further seeks certification of only certain liability-related issues under Fed. R. Civ. P. 23(c)(4), which provides that "[w]hen appropriate, an action may be brought or maintained as a class action with respect to particular issues." D. 194 at 5-7. Lexington proposes postponing resolution of other issues until after the trial of class-wide issues. Those issues, including the presence of actual injury, whether an action is barred by the statute of limitations and the extent of damages, would be tried in proceedings initiated by each school district in the anticipated class. Id. at 8. Notably absent from the proposed new class definition and class issues are any references to the presence of PCBs in school indoor air, the gravamen of the originally proposed class.

The Court heard the parties on the pending motion for class certification, D. 118, and the motion for leave to amend, D. 197, on January 14, 2015 and took these matters

---

[3] "A 'School Building' is defined as any building identified by the Massachusetts Department of Elementary and Secondary Education as public, Pre-K through 12 education institutions that support educational programs based on the Massachusetts curriculum framework." D. 198 at 12.

[4] This carve out addresses a motion to intervene filed by the Town of Westport ("Westport") in December 2014 for the purposes of opposing certification of the class (as originally defined) and opposing summary judgment. D. 174, D. 175 at 6. The Court postponed its decision regarding intervention, but permitted Westport to file *amicus* briefs opposing Lexington's motion for class certification, D. 118, and opposing Solutia and Monsanto's motion for summary judgment, D. 133. D. 181. In light of the Court's ruling today, Westport's motion to intervene, D. 174, is DENIED as moot.

under advisement. D. 218. At the hearing and in its motion papers, Lexington concedes that its motion for certification of the original class should be denied. D. 194 at 1-2 (stating that Lexington "acknowledges that Defendants and the putative interveners have raised a fair objection to the ascertainability of the class as originally defined"); D. 239 (transcript of 1/14/15 hearing in which Lexington's counsel acknowledged the appropriateness of denying original motion for class certification without prejudice in light of the motion to amend). The Court, therefore, DENIES Lexington's motion for class certification, D. 118, without discussion and without prejudice.

## IV. Discussion

### A. Lexington's Amendment is Untimely and Prejudices the Defendants

#### 1. *Prejudice to the Defendants*

Lexington set forth the original definition of the putative class in its complaint, filed in September 2012. D. 1. Lexington moved to certify the class, as then defined, in August 2014. D. 118. More than two years after commencement of the case, Lexington has requested permission to redefine an uncertified class in a manner that revises the theory on which it has proceeded since the suit's inception. "Particularly disfavored are motions to amend whose timing prejudices the opposing party by requiring . . . a likely major alteration in trial tactics and strategy." Steir, 383 F.3d at 12 (internal quotation marks omitted); Acosta-Mestre, 156 F.3d at 52 (concluding prejudice resulted from, *inter alia*, "a likely major alteration in trial strategy and tactics").

Lexington asserts that its new definition does not prejudice the Defendants because "the gravamen of the case will be the same" in that "[n]o new theories or claims would be added." D. 198 at 8. Until now, however, the theory of Lexington's case has

been that the levels of PCBs in school indoor air constitute an injury that requires remediation, the cost of which should be borne by the Defendants. D. 1 ¶ 1. With its motion to amend, Lexington alters course, stating that it "intends to prove only that . . . on behalf of itself, that the <u>caulk</u> in one of its School Buildings has a level of contamination in excess of 50 [parts per million]; and . . . on behalf of itself and the [new] [c]lass, that any PCB level of 50 [parts per million] or more in the <u>caulk</u> in any School Building is a cognizable injury that was caused by Defendants' breach of the implied warranty of merchantability and illegal conduct under Chapter 93A." D. 194 at 9 (emphasis in original).

Lexington's complaint, however, does not allege that the caulk in any of its own school buildings contained PCB levels in excess of 50 parts per million.[5] Although the complaint mentions caulk, it merely states that PCBs were used in caulk and that "PCBs are likely to be present in the caulk around windows, door frames, masonry columns, and other building materials in schools built or renovated" between 1950 and 1978. D. 1 ¶¶ 14-16. Lexington describes its "plan to conduct air testing of all of its schools built or renovated between 1950 and 1978" and the resulting discovery that Estabrook "was found to have concentrations of airborne PCBs in excess of the EPA's public health

---

[5] Although the issue is not raised by the Defendants, the Court notes that, in light of Lexington's proposed class issues, the allegations in Lexington's complaint do not support Article III standing. "Injury is a prerequisite to standing, and named plaintiffs need to satisfy this standing requirement through the stages of litigation." In re Nexium Antitrust Litig., 777 F.3d at 31-32. The First Circuit has indicated its approval of the approach that requires "[a]t least one named plaintiff [to] satisfy the actual injury component of standing in order to seek relief on behalf of himself or the class." Id. at 32 (quoting Stearns v. Ticketmaster Corp., 655 F.3d 1013, 1021 (9th Cir. 2011)). Here, Lexington's complaint does not allege the injury of which it now complains – the presence of caulk containing PCBs in excess of 50 parts per million in one of its school buildings. D. 1.

levels." Id. ¶¶ 36-37. Lexington's complaint and its pleadings since, save its motion for leave to amend, are devoid of any reference to the relevant injury being the presence of PCBs in caulk with no allusion to indoor air quality. Requiring the Defendants to adapt their defensive posture to Lexington's new theory of its case this far into the proceedings unduly prejudices the Defendants and, therefore, compels the Court to deny the motion. Steir, 383 F.3d at 12; Acosta-Mestre, 156 F.3d at 52; see Davis v. Lenox Hill Hosp., No. 03 Civ.3746 DLC, 2004 WL 1926086, at * 4 (S.D.N.Y. Aug. 31, 2004) (concluding that plaintiff's motion to amend class action complaint to add new named plaintiffs and expand basis for certification was untimely and caused unfair prejudice to defendants where "proposed amendments would change the nature of the claims in this case and would require the defendants to expend significant additional resources to conduct discovery and prepare for trial") (internal quotation marks omitted).

### 2. *Unjustified delay*

As Lexington itself points out, "[m]uch has happened in this putative class action since it was filed." D. 198 at 2. The Defendants have undertaken significant discovery with the original class definition in mind. The deadline for filing its motion for class certification expired four months before Lexington sought leave to redefine the class. D. 113 (adopting jointly proposed amendment to scheduling order in D. 112). The parties completed fact discovery related to class certification six months prior to Lexington's motion. Id. A scheduling order has been in place since December 2013, D. 75, and a trial date was set in August 2014, D. 115. The Defendants made two separate motions for summary judgment in November 2014. D. 133, 140. "When 'considerable time has elapsed between the filing of the complaint and the motion to amend, the movant has the

burden of showing some valid reason for his neglect and delay.'" Acosta-Mestre, 156 F.3d at 53 (quoting Stepanischen v. Merchants Despatch Transp. Corp., 722 F.2d 922, 933 (1st Cir. 1983) (internal quotation marks omitted)).

In the face of the considerable progress in this case, however, Lexington does not offer any evidence of "good cause" or "substantial and convincing evidence," justifying its delay in seeking a new class definition. Steir, 383 F.3d at 12. No new information prompting modification of the class has come to light as a result of the discovery process. The Defendants have repeatedly raised the difficulty of ascertaining the original class, beginning with their answers, D. 54 ¶ 1, D. 55 ¶ 1, D. 56 ¶ 1 (denying class is ascertainable), and reiterated in their joint scheduling conference statement (asserting class is unascertainable as a fail-safe class), D. 64 at 4. Lexington had ample information and opportunity to seek its amendment much earlier. Frappier v. Countrywide Home Loans, Inc., 750 F.3d 91, 95-96 (1st Cir. 2014) (affirming denial of motion to amend where plaintiff had sufficient information regarding a claim to assert it at the outset of litigation).

Lexington's substantial change to the class definition and its proposed class issues would likely require additional discovery and a postponement of the scheduled trial date, considerations counseling against amendment. Steir, 383 F.3d at 12 (stating that a motion to amend that necessitates a re-opening of discovery and postponement of trial prejudices a defendant); Acosta-Mestre, 156 F.3d at 52 (affirming denial of motion to amend where additional four months of discovery and one year trial postponement would have been required). This suit, already two and half years old, would be further delayed.

Lexington's substantial delay in moving to amend and the resulting postponement

to the resolution of this case both compel the Court to deny Lexington's motion. Steir, 383 F.3d at 12 (stating "the longer a plaintiff delays, the more likely the motion to amend will be denied, as protracted delay, with its attendant burdens on the opponent and the court, is itself a sufficient reason for the court to withhold permission to amend"); Acosta-Mestre, 156 F.3d at 52 (stating that "where allowing the amendment will cause further delay in the proceedings, 'undue delay' in seeking the amendment may be a sufficient basis for denying leave to amend"); see Gaston v. Exelon Corp., 247 F.R.D. 75, 85-86 (E.D. Pa. 2007) (denying motion to amend complaint to add additional defendant and change proposed class because of undue delay, prejudice and futility); Bennett v. Central Tel. Co. of Ill., 97 F.R.D. 518, 521-22 (N.D. Ill. 1983) (denying motion to amend class definition as an effort to amend the complaint and stating that "[t]o allow what is really a new lawsuit to be filed now would be disruptive, would trigger large-scale new discovery and likely require a substantial part of the already-completed discovery to be gone over, and would generally disserve the interests of justice").

### B. Lexington's amendment would be futile because its proposed class definition is overbroad and vague

Before engaging in the Rule 23 analysis, a court must decide whether the proposed class satisfies the implicit requirement of ascertainability, namely, whether it is feasible to identify if a particular school district is a member of the class. See In re Nexium, 777 F.3d at 19; Donovan v. Philip Morris USA, Inc., 268 F.R.D. 1, 6 (D. Mass. 2010). All class members need not be identified at the commencement of the action, but the class needs to be determinable using "stable and objective factors." Shanley v. Cadle, 277 F.R.D. 63, 67 (D. Mass. 2011) (citing Donovan, 268 F.R.D. at 6). When "class members [are] impossible to identify prior to individualized fact-finding and litigation,

12

the class fails to satisfy one of the basic requirements for class action under Rule 23." Crosby v. Social Sec. Admin. of U.S., 796 F.2d 576, 580 (1st Cir. 1986).

"The class definition should describe the operative claims, issues, or defenses, such as injury resulting from securities fraud or denial of employment on account of race." Federal Judicial Center, Manual for Complex Litigation § 21.222 (2004). "While class definitions obviously are tailored to the specifics of every case, important elements of defining a class include: (1) specifying a particular group that was harmed during a particular time frame, in a particular location, in a particular way; and (2) facilitating a court's ability to ascertain its membership in some objective manner." Rowe v. E.I. Dupont de Nemours & Co., 262 F.R.D. 451, 455 (D.N.J. 2009) (quoting Bentley v. Honeywell Int'l Inc., 223 F.R.D. 471, 477 (S.D. Ohio 2004)). "The important distinguishing characteristic of [a] . . . class[] is that [its] scope is defined by the activities of the defendants." Alliance to End Repression v. Rochford, 565 F.2d 975, 978 (7th Cir. 1977); see Duffin v. Exelon Corp., No. CIV A 06 C 1382, 2007 WL 845336, at * 3 (N.D. Ill. Mar. 19, 2007) (explaining that "[w]hen determining overbreadth, courts inquire whether the class is defined by the defendants' activities"). A viable class definition need not prove that all class members have suffered an injury, but a class definition "must have some relation to the Defendant's activities." Rowe, 262 F.R.D. at 455 (quoting O'Connor v. Boeing N. Am., Inc., 184 F.R.D. 311, 320 (C.D. Cal. 1998) (internal alteration omitted)).

The definition proposed by Lexington includes all school districts in Massachusetts that constructed or renovated schools within a specified time period. This definition fails to inform potential class members or the Court what claims Lexington

13

asserts or what issues are central to the case. It does not describe the harm alleged to have been suffered by class members. It also neglects to specify any alleged misconduct by the Defendants. Although Lexington requests that the issues of causation and damages be postponed to individual trials following resolution of class issues, Lexington still must define the class on whose behalf it acts with some precision.

Several cases are instructive. In <u>Daigle v. Shell Oil Co.</u>, 133 F.R.D. 600, 602-603 (D. Co. 1990), the court declined to certify a class defined as all persons who resided or owned real or personal property within defined boundaries during a specified time period. <u>Id.</u> at 602. The plaintiffs sought to recover personal injury and property damages allegedly caused by the defendants' activities at a nearby toxic waste disposal pond. <u>Id.</u> at 601. The court found that the scope of the class was not defined in terms of the defendants' activities; instead "the plaintiffs arbitrarily have drawn lines on a map, and declared that certain persons within those geographical boundaries constitute a class." <u>Id.</u> at 602-603. Without a logical reason to draw those boundary lines relating to the defendants' activities, the plaintiffs failed to prove ascertainability. <u>Id.</u> at 603; <u>see</u> <u>Duffin</u>, 2007 WL 845336, at * 3 (concluding that class defined "in geographic terms unrelated to evidence" of the chemical contamination at issue was overbroad). Similarly, here, Lexington has used state lines to circumscribe a class without logically relating the scope of the class to the alleged wrongdoing of the Defendants.

In <u>Rink v. Cheminova, Inc.</u>, 203 F.R.D. 648, 668 (M.D. Fla. 2001), the Court declined to certify a class of plaintiffs that included owners or operators of tropical fish farms "to which malathion product was directly or indirectly applied causing death, deformity, or other damage to tropical aquatic life." <u>Id.</u> The chemical malathion had

14

been used in a spray applied aerially to eradicate an infestation of medflies. Id. at 654. The Court concluded that the class was too vague because it included damage from "malathion product" rather than specifying the Defendant's product. Id. at 668.

In the case at bar, the proposed class does not reference any product alleged to have caused property damage, let alone the PCBs allegedly manufactured by the Defendants. If the class before the Rink court was vague, Lexington's asserted class is even more so where there is no reference to the injury alleged. The form of class definition used by Lexington applied to the Rink facts would result in a plaintiff class of all owners of tropical fish farms within a prescribed area, without reference to the chemical at issue or the harm it allegedly caused. The more narrowly defined class failed to pass muster in Rink, as does the broader definition employed by Lexington. See Pagan v. Dubois, 884 F. Supp. 25, 26, 28 (D. Mass. 1995) (declining to certify class of inmates of Latino ethnic derivation as overbroad because those who could communicate in English were not harmed by lack of staff able to communicate in Spanish); cf. Pella Corp. v. Saltzman, 606 F.3d 391, 394 (7th Cir. 2010) (per curiam) (concluding district court properly certified class of owners of a certain Pella window whose windows had not manifested alleged defect because "[w]hile it is almost inevitable that a class will include some people who have not been injured by the defendant's conduct," "[t]he narrow way in which the district court defined the class[] here eliminates concern that the definition[] [is] overbroad or include[s] a great many people who have suffered no injury"); Shanley, 277 F.R.D. at 68-69 (concluding numerosity satisfied where plaintiffs presented evidence that a vast majority of cited consumer accounts were delinquent, making them likely targets of unlicensed debt collection, the prohibited activity common to the class, but

nonetheless denying certification for lack of ascertainability because, to determine class membership, additional information regarding types of debts of each putative class member was required).

Because the proposed class is defined overly expansively, it fails the threshold ascertainability inquiry required prior to certification, and the Court is unable to analyze its viability under the requirements set forth in Rule 23. Futility of amendment, along with the delay and prejudice discussed above, warrants the Court's conclusion that Lexington should not be permitted to amend its class definition.

## V.     Conclusion

For the foregoing reasons, the Court DENIES Lexington's motion for certification of the class, as originally defined. D. 118. The Court also DENIES Lexington's motion for leave to amend the class definition. D. 197. In light of this ruling, Westport's motion to intervene, D. 174, is DENIED as moot.

**So Ordered.**

/s/ Denise J. Casper
United States District Judge