```
1                   UNITED STATES DISTRICT COURT
                      DISTRICT OF MASSACHUSETTS
2

3     _____

4     TOWN OF LEXINGTON, et al.,

5                        Plaintiffs,      Civil Action
                                          No. 12-11645-DJC
6     V.
                                          June 1, 2015
7     PHARMACIA CORPORATION, et al.,      2:01 p.m.

8                        Defendants.
      _____
9

10

11               TRANSCRIPT OF MOTION HEARING

12          BEFORE THE HONORABLE DENISE J. CASPER

13             UNITED STATES DISTRICT COURT

14          JOHN J. MOAKLEY U.S. COURTHOUSE

15                   1 COURTHOUSE WAY

16                 BOSTON, MA  02210

17

18

19

20
                  DEBRA M. JOYCE, RMR, CRR
21                  Official Court Reporter
                 John J. Moakley U.S. Courthouse
22               1 Courthouse Way, Room 5204
                      Boston, MA  02210
23                  joycedebra@gmail.com

24

25
```

```
1    APPEARANCES:

2    FOR THE PLAINTIFFS:

3    BRYAN S. GOWDY, ESQ.
     Creed & Gowdy, P.A.
4    865 May Street
     Jacksonville, FL 32204
5    904-350-0075

6    KEVIN J. MADONNA, ESQ.
     Kennedy & Madonna, LLP
7    48 Dewitt Mills Rd
     Hurley, NY 12443
8    845-481-2622

9
     FOR THE DEFENDANTS:
10
     RICHARD P. CAMPBELL, ESQ.
11   RICHARD L. CAMPBELL, ESQ.
     DIANA A. CHANG, ESQ.
12   BRANDON L. ARBER, ESQ.
     Campbell Campbell Edwards & Conroy PC
13   One Constitution Plaza
     Third Floor
14   Boston, MA 02129
     617-241-3308
15

16

17

18

19

20

21

22

23

24

25
```

P R O C E E D I N G S

(The following proceedings were held in open

court before the Honorable Denise J. Casper, United States

District Judge, United States District Court, District of

Massachusetts, at the John J. Moakley United States Courthouse,

1 Courthouse Way, Boston, Massachusetts, on June 1, 2015.)

THE CLERK:  Civil action 12-11645, Town of Lexington

v. Pharmacia Corporation.

Would counsel please state your name for the record.

MR. GOWDY:  Bryan Gowdy on behalf of Town of

Lexington, the plaintiff.

Good afternoon, your Honor.

THE COURT:  Good afternoon.

MR. MADONNA:  Good afternoon, your Honor.  Kevin

Madonna for plaintiffs.

THE COURT:  Good afternoon.

MR. DICK CAMPBELL:  Good afternoon, your Honor.

Richard Campbell, Richard P. Campbell, here on behalf of

Pharmacia, Solutia, Inc. and Monsanto.  In conjunction with

your standing order of May 16, 2011 dealing with utilization of

other lawyers in a firm, I have with me Diana Chang, Brandon

Arber, and my partner, Richard L. Campbell, Rich Campbell.

THE COURT:  Good afternoon to all.

Counsel, I know that there are a number of pending

motions that I put on for hearing today, key among those was

1    the defendant's motion for summary judgment, but I also know

2    that there are a number of motions to strike various expert

3    opinions that were on for today, although one of them may now

4    be moot, the one regarding Mr. Herrick, if I'm recalling

5    correctly.

6          MR. GOWDY:  The defense filed a motion to strike

7    Mr. Herrick, and we've conceded -- we're not going to use his

8    opinion, we withdrew his opinion, so that would be moot.

9          Also, to help the Court, and given the limited time,

02:03 10   your Honor, unless the Court has specific questions for the

11   four motions to strike filed by plaintiff, I intended to just

12   rest on the papers on those --

13         THE COURT:  Okay.

14         MR. GOWDY:  -- and let the Court spend the rest of the

15   time on, I assume, the summary judgment motion and whatever

16   else the defense wants to argue.

17         THE COURT:  Okay.

18         And, counsel, in regards to, let's see, the

19   defendants -- of the motions to strike, let's see, at least

02:03 20   one -- at least one of those was a defense motion in regards to

21   Mr. MacIntosh, at least of the ones that I had on for hearing

22   today.

23         MR. GOWDY:  That's correct, your Honor.

24         THE COURT:  Okay.

25         Mr. Campbell, did you want to be heard on that today

 1    or rest on the papers?  This is on Mr. MacIntosh.

 2         MR. DICK CAMPBELL:  I think so, your Honor.  I'm

 3    reluctant to say "yes," but I am reluctant to say "no," because

 4    these lawyers have spent so much time to get ready for his

 5    hearing today.

 6         With respect to MacIntosh, part of his testimony was

 7    withdrawn or he was withdrawn --

 8         THE COURT:  In regards to remediation.

 9         MR. DICK CAMPBELL:  So there's just a residual part of

02:04 10   his testimony to be addressed.

 11        THE COURT:  So, counsel, I guess what I envision

 12   doing, maybe it will answer your question about timing, was I

 13   was inclined to give -- and maybe I should increase this number

 14   now if there's going to be less argument on the motions to

 15   strike -- I was inclined to give each side 20 minutes to

 16   address the summary judgment motion with a few minutes at the

 17   end for rebuttal to the defendant, and then allow ten minutes

 18   apiece on the motions to strike.  I suppose, counsel, I could

 19   leave that division as it is or I could add a little more time

02:05 20   on the summary judgment motion.

 21        MR. DICK CAMPBELL:  It seems to me the summary

 22   judgment motion can be handled in 20, 25 minutes apiece.

 23        THE COURT:  Counsel, do you have any difference of

 24   opinion on that?

 25        MR. GOWDY:  That's fine with the plaintiff, your

1    Honor.

2              THE COURT:  Okay.

3              So, counsel, why don't we just proceed in that manner,

4    and I'll hear the defendant as the moving party on the summary

5    judgment motion, Docket 140.

6              MR. DICK CAMPBELL:  Shall I proceed then?

7              THE COURT:  You may.

8              MR. DICK CAMPBELL:  Let me just start off by reminding

9    the Court of something obvious, that this is a property damage

02:05  10   case.  The property damage is said to have been caused by a

11   component part, a constituent element of an end product called

12   window caulk or sealant.  The component part or constituent

13   element of the window caulk that's complained about is a

14   chemical compound called polychlorinated biphenyls, but this is

15   not a property case in any conventional use of that term.  The

16   presence of the PCBs as a component part of the window caulk

17   didn't cause any failure of the window chalk, indeed, Lexington

18   kept the window caulk in place for decades beyond its useful

19   life.  There wasn't any failure of the window assemblies or the

02:06  20   mullions or curtain walls because the component part was

21   included in the window caulk.  And while PCB molecules

22   volatilized from caulk and migrated onto substrate -- by

23   "substrate" I'm referring to other tangible physical objects

24   that are touching the window caulk or close to the window

25   caulk.  So as PCB molecules volatilized from the calk onto the

1   substrate, that substrate wasn't damaged in any way.  The PCB

2   molecules didn't bring about any change in color of the

3   substrate or weaken the material strength of the substrate or

4   produce any odor or offensive sensory conditions with respect

5   to the substrate.  So the point is that the migration of PCB

6   molecules in really infinitesimal quantities that attached to

7   the substrate materials didn't cause any damage in any

8   conventional sense.

9           Another important point is the time period we're

02:07 10   talking about, prior to 1961, and I suppose all the way back to

11   1930, but at least from 1959 to 1961, when the Estabrook School

12   was designed, constructed, and then ultimately opened for use

13   in September of 1961, polychlorinated biphenyls were a

14   perfectly legal, perfectly useful product, a highly desirable

15   product on the part of caulk manufacturers or sealant

16   manufacturers because of the particular chemical qualities of

17   PCBs.

18           Now, Lexington advances three claims in this case, and

19   each one of the claims is based on the assumption that there is

02:08 20   a warranty obligation that was given or imputed to Pharmacia,

21   the manufacturer of PCBs back in the relevant time frame.

22           The first claim that they make in Count One is breach

23   of warranty for an alleged design defect; the second is breach

24   of warranty for an alleged failure to warn; and the third is an

25   alleged violation of 93A for breach of an alleged failure to

1    warn after the PCBs were no longer manufactured.  And I should

2    say that Pharmacia stopped manufacturing PCBs for so-called

3    plasticizer use, which would include calks and sealants, in

4    August of 1970.

5         All three of these claims fail for the reasons stated

6    in our brief.  Let me say at the outset, I don't think I can

7    cover everything in the brief in 20, 25 minutes.  We're

8    certainly not waiving any argument that we've made.  We ask the

9    Court to pay some attention to all of the arguments that we

02:09 10   make.

11        But all these claims fail because, first and foremost,

12   Lexington doesn't have any proof that the PCBs were defective

13   in any way, defectively designed.  That's the claim, a

14   defective design in this chemical molecule.  They don't have

15   any competent evidence to prove that.  They didn't retain any

16   chemist or chemical engineers or the like to establish that.

17        In a similar fashion, Lexington has no proof that

18   warnings and instructions were either needed or somehow

19   improperly delivered by Pharmacia back at that time.  Just like

02:09 20   with the design defect claim, Lexington, for whatever reason,

21   decided it didn't need any experts to advance the failure to

22   warn claim.  It has no experts on a design defect, no experts

23   on failure to warn.

24        As I mentioned a moment ago, the only claims asserted

25   are breach of warranty claims.  There is no negligence claim

asserted here.  So with respect to those claims, those breach
of warranty claims, they fail because there were no warranties
given by Pharmacia, there was no -- there was no relationship
between Pharmacia and the Town of Lexington at all with respect
to the Estabrook School or the calk or any relationship
whatsoever.  There is was no transactional or contractual
dealings between the parties ever.  And because of the timing
of everything involved in this case, because the transactions
related to the window caulk necessarily took place before 1961,
sometime between nineteen -- sometime probably between 1959 and
1961, but even there we don't know because we have no idea when
the calk was manufactured or by whom or where in the world it
was manufactured, we don't have any evidence of that.  And
because the injury that's complained of -- and I'll get to this
later -- took place before December 16, 1973, which is the
trigger date, because there were no transactional relationship
between Pharmacia and the Town of Lexington and because the
injury date is before that date, no warranties were imputed.
If there's no warranties, you can't breach a warranty that you
didn't give or that's not imputed to you.  And because the 93A
claim is related to the alleged breach of warranties, that
fails because there were no transactions or the like or -- and
the injury took place before that trigger date of September 16,
1973.  Indeed, if you think about the 93A claim, 93A didn't
even exist back at the relevant time frame, and the decisional

1　　law from the SJC is pretty clear that there is no retroactive

2　　application of 93A to acts and events that predate the

3　　enactment of the statute.

4　　　　　And lastly, and I think importantly, Lexington's

5　　claims are barred by the statute of limitations, and it's

6　　barred -- their claims are barred by the statute of limitations

7　　because they had actual knowledge, actual knowledge that PCBs

8　　were used in buildings, in building materials, in school

9　　buildings, and school building materials, that PCBs were used

02:12 10　　in window caulk, and it certainly knew that its schools

11　　included some, specifically the Estabrook School, that were

12　　constructed before 1979, and I'll explain that in a moment.

13　　　　　The relevant facts with respect to this summary

14　　judgment motion would include that, as I said a moment ago, the

15　　school was designed and constructed between 1959 and 1961.  It

16　　opened for use in 1961.  All of the principal actors, all of

17　　the architects, engineers, Town of Lexington officials who were

18　　part and parcel of the decision making related to the Estabrook

19　　School have long since died.  There's no -- they were never

02:13 20　　interviewed or deposed, there's no record of their knowledge of

21　　pertinent facts.  On top of that, the Town of Lexington did not

22　　maintain any substantial records relevant to the design and

23　　construction of the Estabrook School.  So, as a consequence,

24　　Lexington doesn't have any knowledge of the manufacturers,

25　　sellers, assemblers, constructors of the building or materials

1    men or subassemblers or assemblies installed at the school.

2         It didn't have any knowledge whether the building

3    materials, subassemblies or assemblies installed at the school

4    were even manufactured in the United States.  They don't know

5    that, and they can't know it.  That's never going to change

6    between now and a trial.  A trial is not going to give them the

7    opportunity to prove that which they have already conceded they

8    cannot prove.

9         They have no idea whether the contractors and

02:14  10    subcontractors --

11         THE COURT:  But just on that point, isn't there

12    evidence in the record in regards to the defendant's market

13    share in regards to controlling or having the domestic market

14    for PCBs, even if there were other manufacturers abroad?

15         MR. DICK CAMPBELL:  There's no question that Pharmacia

16    was the dominant manufacturer of polychlorinated biphenyl

17    products in the United States at this time.  There were

18    manufacturers of PCBs in other parts of the world.  There were

19    manufacturers of caulk and sealant in many parts of the world.

02:15  20    What's missing here in this case is any set of facts and

21    circumstances to show that the polychlorinated biphenyl

22    molecules found in the caulk at the Estabrook School were

23    manufactured in the United States, that the caulk was

24    manufactured in the United States, that the caulk, wherever it

25    was manufactured, incorporated PCBs manufactured by Pharmacia.

1    That is just nonexistent.  There is no evidence to support

2    that.  Nor in the plaintiff's *prima facie* case is there any

3    evidence, because the Town of Lexington didn't retain anybody

4    to address these subject matters in the time frame that they

5    were allowed do so.

6         They're trying through so-called rebuttal experts to

7    try to introduce evidence on three points, none of which really

8    get them across the goal line, but they are trying to introduce

9    testimony from three different experts as rebuttal experts to

02:16  10    try to bolster their *prima facie* case.  We have motions to

11    strike those experts.

12         THE COURT:  Yes, and I know those were ones that I

13    didn't have on today.  Is my memory correct that they're not on

14    this particular issue?

15         MR. DICK CAMPBELL:  Those motions are not before the

16    Court today.

17         THE COURT:  No, no, I know, but meaning the experts,

18    the rebuttal experts that you're moving to strike, are any of

19    them on this issue about manufacture, I guess is what I'm

02:16  20    asking you?

21         MR. DICK CAMPBELL:  The Town of Lexington retained a

22    biostatistician from Duke University by the name of Fan Li.

23         THE COURT:  Yes.

24         MR. DICK CAMPBELL:  They retained her in February or

25    March of 2015, so long after the deadline for retaining experts

1    and disclosing experts set by the Court, long after our motion

2    for summary judgment was filed.

3         The Court granted an extension to Lexington to file a

4    response to our motion for summary judgment, and part of what

5    was done then was to go out and try to fill in the gaps, so to

6    speak, in their case.  One of the individuals that was retained

7    was this Fan Li.  She is not an expert -- as you will see when

8    you get to this motion, she's not an expert in any kind of

9    statistical analysis of market data, census data, she had never

02:17 10   done anything like this before.  She took -- she took SIC codes

11   that are used by researchers in market analyses and the like

12   that were given to her, selected by and given to her by

13   Lexington's lawyers.  She had no idea what they were, she

14   couldn't describe them, she couldn't identify them, she had no

15   idea whether they, the SIC codes she was reporting on had

16   anything at all to do with Pharmacia or window caulk at the

17   Estabrook School and the like.  All of that, ultimately, will

18   be before your Honor when and if we get to that motion.

19        The essence of her testimony now, and I have to say, I

02:18 20   think it was on Thursday or Friday of last week we received an

21   opposition to the motion to strike Fan Li, including an

22   additional report from Fan Li.  I haven't even read it.  I

23   haven't read the motion -- the opposition, I haven't read her

24   supplemental report or affidavit.  I was told by -- I think

25   Diana Chang told me that she had reduced her assessment of the

1    likelihood that Pharmacia made the PCB molecules found at the

2    Estabrook School from 97 percent to 95 percent, and I'll

3    address that, if need be, later on.

4         So just to go back to the underlying facts and

5    circumstances here, while it is true that Pharmacia was the

6    dominant manufacturer of PCBs in the United States, there is no

7    proof that the PCBs in the Estabrook School came from Monsanto,

8    there's no proof that the window caulk and sealant was made in

9    the United States.  There's no proof as to who made those

02:19 10   products.  There's no proof who made the window assemblies that

11   had the window caulk in place.  There's no proof as to who made

12   the sealant that would have surrounded the space between the

13   window assemblies and the curtain wall or between the curtain

14   wall and the structure of the building.  All of that is missing

15   and absent in this case.

16        In its complaint, Lexington averred about the ability

17   of a capacity of polychlorinated biphenyls to volatilize.

18   You'll find that in paragraph 17 of the complaint.  So right

19   from the get-go in this case, Lexington alleged, stated its --

02:20 20   a basis for its claim by saying that PCBs -- I'm quoting now --

21   PCBs are very stable compounds that do not readily degrade.  As

22   a result, PCBs persist in the environment for long periods of

23   time.  PCBs cycle between air, water, and soil, even when not

24   physically disturbed.  PCBs easily migrate from building

25   materials, such as caulk, into surrounding materials, such as

1   masonry, wood, drywall, and soil, thereby causing damage to

2   those surrounding materials.

3        When we presented the motion to dismiss a couple of

4   years ago, that paragraph was prominently presented to the

5   Court.  Lexington's response was to say, Well, they thought

6   maybe there was a likelihood that window caulk was installed at

7   the Estabrook School sometime after 1973 or 1979.  That turned

8   out to be not so, not provable in any way.  But my point in

9   raising the complaint is from the outset of the case, Lexington

02:21 10   was saying that its property damage resulted from the migration

11   of PCB molecules from the PCBs in the caulk to substrate, which

12   they define as masonry, wood, drywall, and soil, causing

13   property damage.  So the essence of their property damage claim

14   is that, at least in part, molecules of PCBs in caulk moved,

15   touched, adhered to other building materials, building features

16   causing damage.

17        THE COURT:  And what do you -- counsel, I guess this

18   relates to a few issues, but what is your best argument against

19   the town's argument that the injury happens -- I think it's in

02:22 20   2009 in regards to the EPA guidelines being issued?

21        MR. DICK CAMPBELL:  Well, I have two responses to

22   this.  Again, this goes back to the same thing, in the motion

23   to dismiss, and I think if you were to read the record, I guess

24   perhaps it was Magistrate Judge Boal who made the observation

25   or finding that the issuance of a press release by the EPA in

1    September of 2009 setting forth recommendations with respect to

2    testing or not testing building materials, testing or not

3    testing for the presence of PCB molecules in the air cannot

4    cause damage.  It did not cause damage and cannot cause damage.

5    So that's my first response to that.

6          But even more importantly, in this particular case,

7    ultimately Lexington called a company called Environmental

8    Health and Engineering or EH&E.  It assigned the chief

9    operating officer and principal scientist of EH&E, a fellow by

02:23 10   the name of Kevin Coghlan, to oversee the work at the Estabrook

11   School.  Kevin Coghlan played a primary role in informing the

12   citizens of the Town of Lexington as to whether or not any of

13   the issues related to the Estabrook School caused any health

14   hazard or the like.

15         Kevin Coghlan was deposed in this case before the

16   closeout of factual discovery and before the due date for the

17   identification of experts.  Kevin Coghlan, in great length,

18   testified that the migration of PCB molecules to substrate

19   occurs immediately upon installation of the caulk into the

02:23 20   building.  So back in 1961 or between 1959 and 1961, when

21   window caulk was installed at the Estabrook School that

22   contained PCB molecules, those molecules began to migrate and

23   attach to and adhere to the substrate materials immediately.

24   He went on to say, And the migration was in the greatest rate

25   immediately upon installation of the caulk in the school, and

1  then declined over time, over weeks, months, and perhaps years,

2  a few years, until it reached a steady state.  But to the

3  extent that the attachment of PCB molecules to brick and mortar

4  and metal or soil, that was taking place immediately upon

5  installation, and the highest rate of that migration, the

6  greatest amount of injury to the property, would have taken

7  place back in nineteen -- before 1961.

8          So their own principal scientist, in unrebutted

9  testimony, testified in this case that the injury, if you want

02:25 10  to call it injury, the injury to the Estabrook School happened

11  back before 1961.  That testimony was right out there for the

12  Town of Lexington to see and perceive and accept.  It was their

13  principal consulting scientist on their project, he gave that

14  testimony.  They didn't retain anybody to rebut or respond to

15  or say anything with respect to what Coghlan said on that

16  topic.  And in fact, I think -- before we filed our motion for

17  summary judgment, I think they were content with that

18  testimony.

19          But the problem for the Town of Lexington with respect

02:25 20  to that testimony is that all of the transactions between the

21  Town of Lexington and whoever they transacted with took place

22  before 1961, before the building was occupied in September of

23  1961; and the unrebutted testimony about the physical features

24  of polychlorinated biphenyl molecules and adherence and

25  migration and injury to the property comes from Kevin Coghlan,

1    and it's unrebutted, that, too, took place immediately on

2    installation.  So we're talking about a transaction before

3    1961, injury to the property before 1961, and that is well

4    before the trigger date of December 16, 1973.

5            So there were no warranties given expressly because

6    there were no transactions involved with Pharmacia and the

7    town, there are no warranties imputed because the transactions

8    that took place with respect to this caulk and the injury to

9    the property that, as described by their people, the

02:26 10   Lexington's people, took place before 1961.  So --

11           THE COURT:  Counsel, I think we're at our 20 minutes.

12   I'm certainly fine with giving each side five extra minutes on

13   these arguments or -- counsel, do you want to address any

14   additional issues?

15           MR. DICK CAMPBELL:  The only additional issue that I'd

16   like to address now has to do with the statute of limitations.

17   And with respect to that issue, I want to say that -- bring to

18   your attention the same circumstances and arguments that are in

19   our brief.  The head of the Lexington Board of Health, the

02:27 20   chair of the Board of Health, is a renowned researcher, writer,

21   and teacher at the Boston University School of Public Health.

22   She has decades of experience dealing with risk assessment and

23   toxic substances, including PCBs.  She was the chair of the

24   Board of Health for at least ten years before 2009, before 2010

25   when remediation of the Estabrook School came back.  She had

1   full and complete knowledge about the presence of PCBs in

2   building materials, about the presence of PCB-containing

3   building materials in caulk and sealant, about the presence of

4   PCB-containing caulk in sealant in public schools.  She

5   testified that a research paper published by Mr. Herrick, one

6   of Lexington's experts, the one who was withdrawn, in 2004

7   entitled, "An Unrecognized Source of PCB Contamination in

8   Schools and Other Buildings" was published in one of the

9   highest impact journals in the field of environmental affairs,

02:28 10   and that Dr. Herrick, who's over at the Harvard School of

11   Public Health and his colleague, Michael McClean, who is at the

12   Boston University School of Public Health, when they published

13   this paper, it got wide dissemination in the field, it was

14   widely discussed, it caused a lot of discussion and activity,

15   including with the chair of the Board of Health in the Town of

16   Lexington.  That and the other items that we have identified in

17   our brief establish beyond peradventure that the Town of

18   Lexington had very substantial knowledge, was on inquiry notice

19   about the potential for PCBs in their public schools that were

02:29 20   constructed before 1979.  Dr. Heiger-Bernays was identified by

21   the Town of Lexington in representations to this Court about

22   our efforts to try to interview her and others as the person

23   most responsible in the Town of Lexington for environmental

24   health matters, a person who was responsible for overseeing and

25   taking action with respect to toxic pollutants in the air and

1   buildings and the like.  So she's also a very well-known writer

2   about taking conservative actions with respect to contamination

3   or environmental pollution, and in fact, didn't really get

4   involved in the initial actions to undertake remediation of

5   this school, it was all done by the head of facilities, a

6   fellow by the name of Goddard.  And she was very upset when

7   Mr. Goddard went and took these actions, and ultimately

8   described it as opening up a can of worms unnecessarily.

9          My point is the town, through its leaders, knew all of

02:30 10  the information necessary to take action at least eight years

11  before they filed this lawsuit.  They chose not to, and this

12  lawsuit came about because of a newspaper article in the Boston

13  Globe in September of 2009 that caused residents of Lexington

14  to put pressure on public officials.  I think the statute of

15  limitation bars this claim.

16          With that, I'll sit down, your Honor.

17          THE COURT:  Thank you, counsel.

18          Counsel, I'll hear any response or any additional

19  arguments you want to make in regards to your written

02:31 20  opposition.

21          MR. GOWDY:  Yes, thank you, your Honor.

22          I'll respond in a moment to many of those arguments.

23  Those were great jury arguments, I think, your Honor.  He's

24  arguing about what particular people at Lexington may or may

25  not have known, but I think on the statute of limitations, the

1  law is pretty clear that it's when you perceive it, and I'll

2  just briefly point the Court to -- we cited this in our papers,

3  the case of Thayer v. Pittsburgh-Corning from 1998, and it

4  says, In this case, Mr. Thayer's exposure to asbestos occurred

5  between 1948 and 1952.  We hold that his injury did not occur

6  until 1992, when he became ill and was diagnosed with the

7  disease.

8           Here, your Honor, the analogy we have is basically a

9  sick building, and Lexington didn't know that the building was

02:32  10  sick until it was tested, and that happened, as the Court

11  indicated, after September of 2009.

12           I want to clarify we're not claiming the press release

13  is an injury.  We were using that for class certification

14  purposes to say that no school district in the state could have

15  known to do the testing before the EPA gave that

16  recommendation; and therefore, that that would be an individual

17  issue.

18           Now that we've had class certification denied, any

19  school district, including Lexington, that comes in here, we're

02:32  20  going to look at the individual time when they knew, and it's

21  clearly after September of 2009.  It's when Dr. MacIntosh and

22  his group did the testing.

23           THE COURT:  Counsel, obviously I'll have to go back

24  and look at the underlying record more closely on this issue,

25  but isn't part of the defendants' argument here that there is

1    at least notice of risk?  Meaning, in the plaintiff's view, how

2    does that figure into the analysis I should do about notice of

3    injury?

4            MR. GOWDY:  Well, there -- he's claiming notice of

5    injury based on, for example, there's a person at the

6    department of health who is -- knows about PCBs.  That's really

7    not the issue here, your Honor.  The issue is about these PCBs

8    that volatilized from the caulk.  And the fact that that may

9    started happening back in 1961 isn't the point either.  The

02:33 10  point is when did Lexington know that the PCBs had volatilized

11   from the caulk and caused contamination in the air in the

12   school?  And so that's going to be a very factual inquiry.  In

13   our view, it couldn't have occurred until the testing occurred,

14   and nobody was doing this testing, and Lexington didn't do --

15   you heard a lot, but I didn't hear anything about testing

16   occurring before 2009, and nobody did this testing until after

17   the EPA gave the recommendation in September of 2009.  And I

18   think it's going to be very fact intensive.  He can make all

19   these jury arguments to the jury about the -- he goes through

02:34 20  each of these people associated with Lexington.  Our view is

21   the only people that can be charged with knowledge are the

22   Board of Selectmen, nobody else.  He wants to use other people,

23   but I think it's pretty clear, based on the case law we've

24   cited, your Honor, the -- as far as -- we cite the Cameo

25   Curtains case, which makes it even after the injury, it's when

1    the damage can be fairly estimated.  How can you estimate the

2    damage until you actually have done the testing and figured out

3    the scope of the PCB contamination?  And I think another case

4    that's very insightful, because it involves PCB contamination,

5    is the case from this court called Lewis, and the defendant

6    there, General Electric, was making essentially the same types

7    of arguments.  They were trying to charge the plaintiffs with

8    an injury as occurring in -- back when the PCBs might have

9    first started to do any type of invasion of the property.  And

02:35 10   the court there, it's a very long opinion, made it very clear,

11   one of the judges of this court, that it's going -- it's based

12   on the knowledge, that knowledge of the injury is part and

13   parcel of the injury itself.

14        THE COURT:  And, counsel, what is -- and what is the

15   injury itself?

16        MR. GOWDY:  The injury is the PCB contamination to

17   the -- as the Court ruled at class certification based on our

18   complaint, the airborne PCB contamination, which we're now

19   stuck with.  And that -- there's no way that could have been

02:36 20   known until the testing was done.

21        The fact that -- the fact that people may generally

22   have known about PCBs isn't enough, your Honor.  And I would

23   say the injury is all the remediation.  That goes to fairly

24   estimating the damage.  I'm not sure how you can fairly

25   estimate the damage under the Cameo case until you actually

1   have done the testing.  You have to know the scope of the

2   remediation.  If we had come in 1961 and sued, what we would

3   have asked for at that point?  There wasn't even the technology

4   to do the testing back then.  If we had done any -- if we had

5   sued before we had done the testing, what would we have asked

6   for in damages?  And it's our belief that the EPA

7   recommendation at least creates a question of fact about the

8   inquiry notice.

9        Did your Honor have any further questions on this

02:37 10  issue?

11       THE COURT:  I understand the parties' positions.

12       MR. GOWDY:  I just -- big picture, your Honor, I think

13  this case and what the PCBs is distinct -- there's two facts

14  here that are very distinct that make it different from any

15  other type of product liability case.  One is Monsanto was

16  virtually the sole producer in the United States of PCBs.

17  Their own documents said they were the sole producer.  There's

18  court decisions that say they're the sole producer.

19       THE COURT:  So what do you say to your brother's

02:37 20  argument that even if that's true and not really disputed here,

21  and I didn't hear counsel disputing that fact, the plaintiff

22  still can't show that the PCBs in this caulk in this building

23  were produced by them?

24       MR. GOWDY:  Right.  Well, we're here on the civil

25  standard of more likely than not, your Honor, and you don't --

1   we don't have to trace the PCB from Monsanto's factory to the

2   distributor to the caulk producer to the contractor and into

3   the school.  We just have to have evidence, even circumstantial

4   evidence, that it's more likely than not that the PCB

5   originated from Monsanto.  And the undisputed evidence is that

6   Monsanto produced at least 98 percent of the PCBs in the United

7   States during the entire relevant time period, and sometimes

8   more than that.

9         THE COURT:  And is that in reliance on -- and I know I

02:38 10   don't have this formally on for argument in regards to -- it's

11   Professor Li?

12         MR. GOWDY:  Well, your Honor, she relies on that fact,

13   but I think that fact can be gained from government sources and

14   was in the record before she even filed an affidavit.

15         What their point is, is that that 98 percent number

16   has some missing data, and we're using her as a missing data

17   statistics expert, which is -- she does -- she is very well

18   qualified for.  And what their point is this:  Well, yeah,

19   there's a 98 percent -- I mean, their expert, Mr. Barocci,

02:39 20   conceded that if we only look at the universe of domestic

21   production and we don't use foreign imported PCBs and foreign

22   imported caulk -- and I went through a hypothetical with him in

23   his deposition -- that there's a 98 percent chance then, if we

24   keep it in that universe, a 98 percent chance that Monsanto

25   produced the PCBs in the school.  And the analogy I had, your

Honor, was if we take a hundred pens and we put them in a box

and your Honor put in two of them and I put in 98 of them and

they're identical and we pick out one pen, there's a 98 percent

chance that that pen is the one that I put in.

And Mr. Barocci said, Well, any college statistics

professor would tell you that's wrong.  So we went out and

hired a college statistics professor as a rebuttal expert.  And

she -- Mr. Barocci is not -- he's economics related, I'm not

questioning his qualification -- but she came back and she --

she examined the, quote, missing data, which is -- and one

thing you'll never hear the defendants tell you, your Honor,

they'll never quantify the, quote, missing data.  There are

published statistics about how much PCBs were imported into the

United States and how much caulk was imported into the United

States, and she went through that, and she made an assessment

that knocks -- and each time we do it, they come back with some

other missing data, but the number moves from, like, 98 percent

to 95 percent, your Honor.  And I would suggest that even in a

criminal case, if you had a 95 percent certainty, that that

would be enough for a conviction.  We don't need that here.  We

just have the more likely than not standard.  And they're

holding -- if you read Mr. Barocci's expert opinion, all he

keeps saying is it's inappropriate to infer this with

certainty.  Your Honor, we don't have to have proof beyond a

reasonable doubt.  I think we had enough evidence starting with

1    the fact that Monsanto produced over 98 percent of the PCBs in

2    the United States, and at some years they produced all of it.

3    Whatever doubt was brought up with Mr. Barocci's opinion,

4    Dr. Li, Professor Li, has rebutted that.

5        Does the Court have any more questions on that topic?

6        THE COURT:  No, counsel, I understand your position in

7    that regard.

8        MR. GOWDY:  I think the other distinguishing feature

9    here, your Honor, is that PCBs are very different than a lot of

02:42 10   these cases you're reading, and that the United States Congress

11   made a judgment to ban any manufacturing, distribution, selling

12   of PCBs in the United States.  The only PCBs that are left here

13   are the ones that were produced before 1978.

14       THE COURT:  Counsel, what do you say to your brother's

15   arguments, which I think were largely in the papers, that you

16   can't have the design defect claim or at least so far as it

17   alleges an unreasonably dangerous product where at the time of

18   the production, at the time that the product left the

19   defendant's hands it wasn't unreasonably dangerous?

02:43 20   MR. GOWDY:  Well, I would disagree.  When it did leave

21   the defendant's hands, it was unreasonably dangerous, and just

22   because it was legal at the time doesn't mean that it was not

23   unreasonably dangerous.

24       I would, actually, point the Court to the Restatement

25   Third, Section 4, which makes it clear that if a product is

1   illegal -- if a product complies with safety requirements --

2   which we're not saying it did, there really weren't any safety

3   requirements back in the first half of the century in the 1950s

4   and '60s -- but even if it did, that's just evidence, not

5   conclusive evidence, evidence of a non-defect.

6         I also want to point the Court to Comment e of

7   Restatement Third of Torts, because they cite Comment d in

8   their papers, and they cite Comment f. In their papers.  But

9   this is what Comment -- and I'm reading some of this from

02:44  10   Comment b, which talks about Comment e, and it says, Some

11   courts, while recognizing that in most cases involving

12   defective design, the plaintiff must prove the availability of

13   a reasonable alternative design also observed that such proof

14   is not necessary in every case involving design defects.

15         Comment e to Section 2 provides approaches to the

16   establishment of defective design other than those in Section

17   2(b), which is what they're relying on, your Honor.

18         Comment e provides a further qualification of the rule

19   in Section 2(b).  The restatement recognizes the possibility

02:45  20   that product sellers may be subject to liability even absent a

21   reasonable alternative design when the product design is

22   manifestly unreasonable.

23         And this is what the Congress had to say, your Honor,

24   and the EPA, I want to read a few things here because there's

25   some -- they seem to be disputing that PCBs are dangerous.

1          Responding to the dangers associated -- and I'm

2    reading from a DC Circuit case -- responding to the dangers

3    associated with the use of PCBs and other toxic chemicals,

4    Congress in 1976 enacted the Toxic Substance Control Act.

5    Section 6(e) refers solely to the disposal, manufacturing,

6    processing, distribution, and use of PCBs.  No other section of

7    the Act addresses the regulation of a single class of

8    chemicals.

9          Your Honor, this is not guns, this is not cigarettes.

02:46 10    Congress has made a judgment that this product is dangerous, so

11    has the EPA.  That distinguishes from a lot of the case law

12    that you're going to be looking at because that case law was

13    built on an assumption that courts should not overrule

14    congressional and legislative decisions.  Congress has spoken,

15    this is a dangerous product.

16          The special attentions accorded to PCBs in the Toxic

17    Substance Control Act resulted from the recognized seriousness

18    of the threat that PCBs pose to the environment and human

19    health.  During the debate over the Senate version of the Act,

02:46 20    Senator Nelson, the author of the amendment, adding the PCB

21    subsection to the Senate bill, noted that PCBs were widespread

22    in the environment and that they posed significant potential

23    dangers to human health and to wildlife.

24          PCBs are extremely toxic to humans and wildlife.  The

25    extent of their toxicity is made clear in the EPA support

1    document accompanying the final regulations in which the EPA

2    Office of Toxic Substances identified several adverse effects

3    resulting from human and wildlife exposure to PCBs.  Your

4    Honor, and the cite on that case is 636 F.2d 1267.

5         The EPA in 1979 said this in its Environmental Impact

6    Statement, PCBs pose a significant risk to the health of man

7    and numerous other living things.  A number of adverse effects

8    on living organisms have been demonstrated, including, but not

9    limited to -- and there's a long list here, and one of them

02:47 10   is carcinogenic.

11         More recently, your Honor, 2007, 72 Federal Register

12   53152 on page 53153, The EPA has determined that PCBs cause

13   significant human health effects, including cancer, immune

14   system suppression, liver damage, skin irritation.  PCBs

15   exhibit neurotoxicity, as well as reproductive and

16   developmental toxicity.  PCBs are readily absorbed through the

17   skin and are absorbed at faster rates when inhaled.

18         THE COURT:  But, counsel, doesn't it matter, though,

19   that we're talking about -- and there you were reading me

02:48 20   things that -- recognition that has happened over time.

21   Doesn't it matter here that there seems to be no dispute that

22   the caulking containing the PCBs, putting aside the parties'

23   dispute about who produced the PCBs, that it was installed in

24   the school in 1961 or at sometime prior to that?  Doesn't it

25   matter that even by 2009, when the recommendations come out

1    from the EPA that whatever concerns about toxicity there were

2    about PCBs, it wasn't until some point later that it was

3    determined that there were particular concerns about airborne

4    contaminants?  Doesn't that affect what analysis I should

5    engage in here about whether or not there's a sufficient

6    showing of design defect?

7         MR. GOWDY:  I think it's an analysis the jury

8    undertakes, your Honor, and I would point the Court to Marchant

9    v. Dayton.  The fitness of a product is a question of degree

02:49 10   depending largely, although not exclusively, on reasonable

11   consumer expectations.  Even where the design creates a risk of

12   foreseeable harm, the question is whether this risk was

13   unreasonable.

14        The Supreme Judicial Court of Massachusetts has

15   explained how this determination should be approached.  And

16   Marchant, your Honor, is a 1st Circuit case.  The jury must

17   weigh competing factors, and I won't list them all, your Honor,

18   but two of them are the gravity of the danger posed by the

19   challenged design and the likelihood that such danger would

02:50 20   occur.

21        THE COURT:  But I guess what I'm trying to make -- and

22   it may be an imperfect analogy here, but even in the context of

23   cigarettes, I mean, part of the claims brought against

24   cigarette companies is that there was knowledge about the

25   unreasonable danger posed by cigarettes at the time that they

1   were manufactured and distributed.  Is there a basis for

2   showing that here?

3        MR. GOWDY:  Yes, your Honor, and you could look at

4   Mr. Kaley's deposition, the corporate representative.  He

5   testified on page 101, 102, 105 that by the 1950s, the toxic

6   hazard of PCBs was well-established.  And there's other cites I

7   have from there, your Honor, but it's been known for a long

8   time to Monsanto, based on their own documents, that it was

9   toxic.

02:51 10       Now, their point seems to be, Well, we didn't know the

11   scope of the toxicity, but that's -- I submit, your Honor,

12   that's a question for the jury as to whether they -- as to

13   whether this is a defective product that's unreasonably

14   dangerous and to whether they should have given better

15   warnings.  But the idea that somehow -- this product has a

16   clear record, just based on the administrative record, your

17   Honor, if we just had that, I could keep quoting from the

18   administrative record, which we could admit, your Honor, under

19   the public record exception, that this has been a dangerous

02:52 20   product.  There's documents in this court file showing that

21   Monsanto has known that this is a dangerous product.  There's

22   testimony from Monsanto's corporate representative that they

23   knew this was a dangerous product and they gave some warnings

24   and it's up to the jury to determine whether those warnings

25   were adequate.  And they weren't warnings about not using it in

1    caulk, your Honor, which is causing the harm here.

2        I think the Court is asking the right questions, but I

3    think if you look closely at Massachusetts law, Massachusetts

4    law gives a lot of leeway here to the jurors, and it's not a

5    decision for the Court.

6        I would say that -- I think the one thing I'd like to

7    point out is if anybody were to produce a PCB today, it would

8    be a per se defective product.  It is an illegal product.  So

9    the question here -- now, Monsanto -- and I want to go back to

02:53 10   the fact that they were the sole, exclusive producer for many

11   years.  Why didn't they find out this toxicity?  They were the

12   only entity in the United States making it.  And the case law

13   on the warning, your Honor, it's -- I want to clarify that, if

14   I can -- I know I don't have much time, and I want to give

15   Mr. Campbell an opportunity to rebut, as I'm sure he will, but

16   it's -- give me one second, your Honor.  It's that what is

17   reasonably foreseeable at the time of the sale or could have

18   been discovered by way of reasonable testing prior to

19   marketing.  The Lewis case from the SJC, 434 Mass. 643.

02:54 20       Your Honor, they were the custodian of this product

21   for 40, 50 years.  Why didn't they find this out?  Why did it

22   take somebody in Sweden or someone from outside telling them

23   this?  Why is it that they waited until 1970 to stop selling

24   this to caulk producers?  They finally figured it out in 1970.

25   They voluntarily stopped selling it to caulk producers.  Why

1    did it take them that long?  This is a question the jury should

2    be able to decide, your Honor.

3         THE COURT:  Counsel, and I'll go back and look at your

4    papers on this, but is it your position that part of the

5    plaintiff's showing here doesn't require -- and I think this is

6    what you were just saying a few minutes back -- that it

7    doesn't -- the town doesn't have to show a reasonable

8    alternative design?

9         MR. GOWDY:  Correct, your Honor.  Under Comment e to

02:55 10   the Restatement Third of Torts Product Liability, Section 2,

11   which the Massachusetts courts have adopted and the parties

12   have cited in their papers, says -- I'll quote it again -- This

13   restatement recognizes the possibility that product sellers may

14   be subject to liability even absent a reasonable alternative

15   design when the product design is manifestly unreasonable.

16   This is an illegal product.  It's not like cigarettes, your

17   Honor, it's not like guns, which is the case law they cite.

18        THE COURT:  In which -- right -- in which at least in

19   those cases I think there is a requirement of a reasonable

02:55 20   alternative design.

21        MR. GOWDY:  There is.  And in the cigarette cases,

22   which I'm somewhat familiar with, your Honor, there's clear

23   Congressional record that was not -- did not prohibit that

24   product, that Congress endorsed the continued sales of that

25   product.  So when you read that case law -- and the guns, we

have the same thing, they cite guns and cigarettes.  If you dig

into that case law, the policy behind the alternative design is

so that courts don't overrule the legislature.  Here, the

legislature has spoken.  You are not going to be overruling any

legislator if you -- if this Court finds this is an inherently

unreasonably dangerous product.  You'll be agreeing with the

legislature.

THE COURT:  Counsel, I think we're at around the end

of your time.

MR. GOWDY:  Yes, your Honor.

THE COURT:  Was there anything you wanted to add?

MR. GOWDY:  No, your Honor.  We'll rest on the papers

and appreciate your Honor's time today.

THE COURT:  Thank you, counsel.

MR. DICK CAMPBELL:  Could I have a couple of minutes,

your Honor, just to respond?

THE COURT:  Yes.

MR. DICK CAMPBELL:  First of all, I'd like to respond

on three or four matters.

First, with respect to the determination of the state

of knowledge of a corporation, under Massachusetts law, under

1st Circuit law, a corporation's knowledge, just by the nature

of a corporation is the accumulation of all knowledge of all of

the employees of the corporation.  That applies equally to a

town as it does to any other corporation.  It's not about

```
  1   looking at a specific person and saying that person knew X.
  2   The town is charged with the knowledge of all of its employees.
  3   I focused in on one, the chair of the Board of Health.  The
  4   town is charged with her knowledge.  You can look at the Bank
  5   of New England case, which is a 1st Circuit case; you can look
  6   at the Josleyn and Billmyer case, that's the American Honda
  7   kickback scheme case, that's a 1st Circuit case; you can look
  8   at the Bacon Wilson case, which is the 425 Mass. 63, that's an
  9   SJC case.
02:57 10       And Lexington in its brief and again here in this
 11   courtroom actually told the Court that the town can only be
 12   charged with knowledge if the Board of Selectmen had that
 13   knowledge.  That is just flat-out wrong.  And they cite in
 14   their paper to the Beinecke case, Town of Nantucket v.
 15   Beinecke, 379 Mass. 345.  If you look at that case, that's a
 16   case involving basically corruption on the part of the town
 17   moderator and the town counsel who together ended up buying and
 18   selling land to a third person, Mr. Beinecke, and they profited
 19   at the expense of their employer.  The SJC goes out and
02:58 20   describes the type of people who could contribute to the
 21   knowledge of the town, including the -- including the town
 22   counsel.  Well, goodness, in the case of Lexington, the town
 23   counsel is a fellow by the name of Lahey at Anderson & Kreiger,
 24   he's one of the most renowned environmental lawyers in the
 25   Commonwealth of Massachusetts.  Their reference to the Board of
```

1    Selectmen comes from this sentence in that opinion:  Obviously

2    in a town where the Board of Selectmen have been appointed as

3    agents to bring suits on behalf of the town, their knowledge

4    would be sufficient.  But that case doesn't stand for the

5    proposition that the Board of Selectmen is the only group or

6    entity that determines the state of knowledge of the town.

7            The Town of Lexington here is charged with the

8    knowledge of all of their employees, including Mr. Lahey;

9    including Dr. Heiger-Bernays; including Mr. Cody, the health

02:59 10   director; including Mr. Goddard, all of whom we identify in our

11   brief.

12           When you get to the state of knowledge of the Town of

13   Lexington through Dr. Heiger-Bernays, she testified

14   unequivocally and at length about her knowledge of the

15   Herrick-McClean article entitled, "An Unrecognized Source of

16   PCB Contamination in Schools and Other Buildings."  In the body

17   of that report, Herrick's published report, there's all kinds

18   of discussion about volatilized PCB molecules within the indoor

19   air of schools and how that might constitute a hazard, a health

03:00 20   hazard, that might increase the body burden of PCB molecules

21   within the adipose tissue, and so on.  And there was an

22   explicit recommendation that testing be undertaken.

23           Now, the Town of Lexington knew this back in 2004,

24   they actually knew more than that because they were

25   participating in an EPA tools for schools program, which is

1  explicit in its statements about PCB contamination or PCB

2  presence in a town -- in a building.

3        So the Town of Lexington knew all of this, they chose

4  not to act.  That's okay.  PCBs in building materials are

5  perfectly legitimate.  You can leave them there forever.

6  There's no requirement that you ever remove them.  The Town of

7  Lexington was under no responsibility to do anything with the

8  PCBs in caulk in that school.  They chose to act.  They didn't

9  have to do a thing.  They -- in fact, they left the PCBs in the

03:01 10  building caulk for almost a year before they did anything at

11  all.  They left the kids in the school, they didn't tell the

12  parents.  Why?  Because they concluded there was no public

13  health hazard whatsoever.

14        They continued to keep the PCBs in the schools for

15  four years after the EPA press release.  Four years until they

16  built a new school and then they moved the kids and the

17  teachers and the staff out.

18        So this assertion that there's some public health

19  hazard there is belied by their actions.  It's belied by the

03:01 20  testimony of all their people, the public statements of their

21  public officials, Kim Tisa, the EPA regional one supervisor,

22  all telling everybody in Lexington there is no health hazard

23  here.

24        I'm sorry for getting carried away here --

25        THE COURT:  Counsel, and I don't want to go back over

1    everything that I know is covered in great detail in your

2    papers, and I assure both sides that I'll go back with all of

3    your arguments in mind.

4          I guess one -- one of the things your brother brought

5    up, which I think is addressed in your papers, but I'll hear

6    you on it further if you want to comment on it, is this

7    requirement about the safer alternative design.  I took it to

8    be the defendants' position that that's part of the showing

9    that the town needs to make here, but, as you heard, your

03:02 10   brother takes the position that it not be made under the

11   Restatement.  Is there anything you want to add about that,

12   counsel?

13         MR. DICK CAMPBELL:  Well, it is addressed in our

14   papers.  The case law, decisional law in the Commonwealth

15   Massachusetts is just the opposite of what my brother told you,

16   there is a requirement to prove a safer alternative design.

17   There are circumstances, and Lexington cites to some, like the

18   snowmobile case that had a metal rod on the handlebar, that if

19   the driver of the scooter hit something or stopped suddenly, he

03:03 20   or she could have a head impact into a medal rod aimed at her

21   head.  The jury was entitled in that case to look at the

22   configuration of the steering handle and conclude on their own

23   that was a defect in the design.  There are cases like that.

24   This is it not one of them.

25         The law is crystal clear in this jurisdiction that in

1    a complex case like this one, the plaintiff must have expert

2    testimony.  This is not a case that can be left to the ordinary

3    layperson, because knowledge of the chemical structures, the

4    chemical engineering, the state of the art in the chemical

5    industry back from 1930 to 1979 is not within the common

6    understanding of the average layperson.  They must have expert

7    testimony on design defect, they must have expert testimony on

8    failure to warn.  They don't have it, and that was a conscious

9    choice on the part of Lexington.  They knew they had an

03:04 10   obligation to do that, they chose not to.

11         My brother stood before you a moment ago and suggested

12   that statements made by the Congress or the EPA in 1976 or 1979

13   when TSCA was enacted by the Congress or when the regulations

14   were promulgated under the APA by the Environmental Protection

15   Agency on a delegation of authority under TSCA somehow prove

16   that there's a defect in a chemical back in 1930 to 1961.

17   Nothing could be further from the truth.

18         They have an obligation to prove to the jury what the

19   ordinary, responsible, reasonable chemical manufacturer knew or

03:04 20   should have known, did or should have done in that time frame,

21   not 20 years later.  The law in this Commonwealth is clear that

22   one does not evaluate retrospectively the design of a product.

23   The jury is charged and will be charged in this case, if we go

24   to a jury, that their job is to decide whether the design of

25   the product prior to 1961, whenever this product was supposedly

made by Pharmacia, whether the design back then was

unreasonable and defective.  They have to prove back then what

the state of knowledge was on -- in the chemical industry to

determine whether or not warnings were necessary or the

warnings instructions that were given were reasonable and

appropriate, not 20 years later.  In order do that, they have

to have competent, qualified people to render that testimony,

and they chose, they chose not to do that.

Last thing, and I'll sit down.

03:05   There's the analogy of the pen that Mr. Gowdy used in

the deposition --

THE COURT:  The 98 and two, I think.

MR. DICK CAMPBELL:  What if you have a hundred pens

and 98 were made by company X and the other two were not, is

there a 98 percent chance that the pen that ends up in a

person's hands was made by the X defendant?

Well, if you think of the pen as caulk, think of the

pen as caulk or sealant.  The question then becomes:  Where did

the PCB component part of the caulk come from, and who made it?

03:06   And on his analogy, you don't know.  Unless you know where the

ink was made and by whom, you have no idea what the

relationship is between the maker of the pen and the X

defendant.

And I would give you this analogy, and I harken to it

in part because of the work that I've done for motor vehicle

1    manufacturers over the years but also back in law school, and I

2    still remember law school a little bit, there were always

3    analogies to motor vehicles.

4        Imagine a hundred motor vehicles that are exactly

5    alike in all -- like a PCB molecule made by somebody in Germany

6    or the United States.  These motor vehicles look alike, they're

7    all gray; they don't have any manufacturer's tags or emblems on

8    them; you can't look at the automobile and say, That's a

9    General Motors car or Ford car or Nissan or Toyota.  Imagine a

03:07 10   hundred of them.  They look exactly alike, and they are all

11   randomly put together.  Ninety-five out of the hundred were

12   made by GM, five were made by Toyota, Nissan, Mercedes-Benz.

13   And randomly, those hundred identical cars go into a tunnel and

14   one of them, one of them smacks into the side of the tunnel and

15   causes property damage.  At the end of the day, can you charge

16   General Motors with responsibility for that accident?  The

17   answer is, no, you can't, you need more.  That is the proper

18   analogy in this circumstance.

19       I'm done.  Thank you very much, your Honor.

03:08 20       THE COURT:  Thank you.

21       Counsel, given the time, I'm not sure what we have

22   sufficient time to address the other motion to strike, but did

23   you -- counsel --

24       MR. GOWDY:  Could I just say --

25       THE COURT:  Yes, briefly and then --

1          MR. GOWDY:  Just -- first of all, then just take the

2      inside of the pen and imagine it's a PCB.  They made 98 of them

3      and all the pens in the world.  So it's a 98 percent chance

4      that this would have come from Monsanto.  It's that simple.

5      They made 98 percent of the PCBs in the United States, and we

6      have Professor Li to come in and account for the domestic.

7          Second point on the design defect.  There's no way to

8      make PCBs safely, and that's why the alternative feasible

9      design doesn't work, and that's why I wanted to comment --

03:08 10          THE COURT:  I understand the town's position.  I also

11      understand the time frame I have to look at.  I understand the

12      arguments on either side.

13          Counsel, I do have another matter on in a few minutes,

14      but was there anything -- I think it was -- was it on the

15      defendant's motion to strike?  Did you want to be heard?

16          MR. DICK CAMPBELL:  I just turn to my colleagues and

17      they're all willing to forgo the opportunity to address you

18      today, but I want it noted that I brought the young lawyers

19      here to court for that purpose.

03:09 20          THE COURT:  Noted, counsel, and noted for the record

21      that counsel was prepared to argue.

22          MR. DICK CAMPBELL:  All right, thank you.

23          THE COURT:  Counsel, as always, you've given me a lot

24      to think about.  I know that it's also in the context of these

25      other motions to strike which I'm also keeping in mind.

1          MR. GOWDY:  Thank you, your Honor.

2          THE COURT:  Thank you.

3          Thank you, counsel.

4          (Court adjourned at 3:09 p.m.)

5                    - - - - - - - - - - - -

6                       CERTIFICATION

7          I certify that the foregoing is a correct transcript

8     of the record of proceedings in the above-entitled matter to

9     the best of my skill and ability.

10

11

12

13    /s/Debra M. Joyce_____          July 7, 2015_____
      Debra M. Joyce, FCRR              Date
14    Official Court Reporter

15

16

17

18

19

20

21

22

23

24

25