**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

_____

|  |  |  |
|---|---|---|
| **TOWN OF LEXINGTON,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Civil Action No. 12-11645** |
| | ) | |
| **PHARMACIA CORPORATION,** | ) | |
| **SOLUTIA, INC., and MONSANTO** | ) | |
| **COMPANY,** | ) | |
| | ) | |
| **Defendants.** | ) | |
| | ) | |

_____)

## MEMORANDUM AND ORDER

**CASPER, J.**                                                         **September 23, 2015**

## I.    Introduction

Plaintiff Town of Lexington ("Lexington") has filed this lawsuit against Defendants Pharmacia Corporation ("Pharmacia"), Solutia, Inc. and Monsanto Company for (1) breach of implied warranty of merchantability based on design defect; (2) breach of implied warranty of merchantability based on failure to warn; and (3) violation of Mass. Gen. L. c. 93A.  D. 1.  Pharmacia has moved for summary judgment.  D. 140.  For the reasons stated below, the Court ALLOWS the motion.

## II.    Standard of Review

The Court grants summary judgment where there is no genuine dispute as to any material fact and the undisputed facts demonstrate that the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a).  "A fact is material if it carries with it the potential to affect the outcome of the suit under applicable law."  Santiago–Ramos v.

Centennial P.R. Wireless Corp., 217 F.3d 46, 52 (1st Cir. 2000) (quoting Sánchez v. Alvarado, 101 F.3d 223, 227 (1st Cir. 1996)).   The movant bears the burden of demonstrating the absence of a genuine issue of material fact.  Carmona v. Toledo, 215 F.3d 124, 132 (1st Cir. 2000); see Celotex v. Catrett, 477 U.S. 317, 323 (1986).  If the movant meets its burden, the non-moving party may not rest on the allegations or denials in her pleadings, Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986), but "must, with respect to each issue on which she would bear the burden of proof at trial, demonstrate that a trier of fact could reasonably resolve that issue in her favor."  Borges ex rel. S.M.B.W. v. Serrano–Isern, 605 F.3d 1, 5 (1st Cir. 2010).  "As a general rule, that requires the production of evidence that is 'significant[ly] probative.'"   Id. (quoting Anderson, 477 U.S. at 249) (alteration in original).  The Court "view[s] the record in the light most favorable to the nonmovant, drawing reasonable inferences in his favor." Noonan v. Staples, Inc., 556 F.3d 20, 25 (1st Cir. 2009).

**III.     Factual Background**

Lexington brought this action seeking recovery for environmental remediation of property damage allegedly suffered because of the presence of polychlorinated biphenyls ("PCBs"), which were banned by Congress as of 1979, in the indoor air of the Estabrook Elementary School ("Estabrook").  D. 1 ¶¶ 30, 37-38.  Lexington alleges that PCBs were present in the caulk used at Estabrook and at some point they leaked into the school indoor air.   D. 232 at 4.   Pharmacia, in its previous incarnation, sold PCBs to intermediaries who then used them to manufacture caulk and other building materials. Id. at 3. Lexington contends that Pharmacia was "the near-exclusive source of all PCBs

used in the United States" during the relevant time period and thus is responsible for the property damage they allegedly caused.  Id. at 2.

In September 2009, the United States Environmental Protection Agency ("EPA") issued guidelines regarding advised limits on PCB levels in school indoor air and recommending testing for PCBs in schools built or renovated between 1950 and 1978. Id. at 3.  Parents of school children in Lexington raised the issue of PCB contamination with the school district.  Id.  Lexington decided to conduct environmental testing in its schools to determine whether PCBs were present.  Id. at 4.  The testing at Estabrook revealed PCB levels in caulk at levels above federal regulations and that the PCB levels in the indoor air at Estabrook exceeded the limits indicated in the EPA guidelines released in September 2009.  Id.  Lexington then embarked on a remediation project at Estabrook, the costs of which it now seeks to recover from Pharmacia and its co-defendants.  D. 1 ¶¶ 52, 55.

## IV.    Procedural History

On September 4, 2012, Lexington brought this suit alleging that it sustained property damage due to Pharmacia's breach of the implied warranty of merchantability and violation of Mass. Gen. L. c. 93A.  D. 1.  The defendants moved to dismiss, D. 22, and for a more definite statement, D. 24.  The Court denied both motions.  D. 53 (adopting report and recommendations of Judge Boal, D. 48).  Pharmacia has now moved for summary judgment.  D. 140.  The Court held a hearing on the pending motion and took the matter under advisement.  D. 295.

## V.    Discussion

### A.    Design Defect

A plaintiff asserting a breach of warranty claim must show "(1) that the defendant manufactured or sold the product; (2) that a defect or unreasonably dangerous condition existed at the time the product left the defendant's hands so that it was not reasonably suitable for the ordinary uses for which goods of that kind were sold; (3) that at the time of [its] injury, the plaintiff was using the product in the manner that the defendant intended or that could reasonably be foreseen; and (4) that the defect or unreasonably defective condition . . . was a legal cause of the plaintiff's injury." Alves v. Mazda Motor of Am., Inc., 448 F. Supp. 2d 285, 300 (D. Mass. 2006) (quoting Lally v. Volkswagen Aktiengesellschaft, 45 Mass. App. Ct. 317, 337 (1998)).   Pharmacia argues that Lexington's case is lacking as to a showing that Pharmacia manufactured the PCBs found at Estabrook, evidence of a design defect in PCBs and the existence of a cognizable injury.

### 1.    Identification of the Manufacturer of the PCBs at Estabrook

Pharmacia first argues that Lexington cannot identify Pharmacia as the manufacturer of the PCBs discovered at Estabrook.  D. 147 at 2-3, 13; D. 278 at 5-6. Lexington has no direct evidence that Pharmacia produced the PCBs used in Estabrook's caulking, but Lexington points to evidence that Pharmacia was the sole domestic source of PCBs during the relevant time period.  D. 232 at 7.  Lexington also relies upon the conclusion of its rebuttal expert Fan Li ("Li") that "the probability that PCBs contained in caulk used in the school buildings built or renovated between 1950 and 1978 in

Massachusetts . . . were produced by [Pharmacia] is at least 97.3%."[1]  D. 232 at 7; D. 232-1 at 44 ¶ 2.

One problem with Lexington's proffer is that Li is designated as a rebuttal expert and thus not as evidence in Lexington's case in chief.  Maraj v. Massachusetts, 953 F. Supp. 2d 325, 328 (D. Mass. 2013).  The Court concludes, however, that even without Li's opinion and construing the undisputed facts in Lexington's favor, Pharmacia's acknowledged dominance of the domestic market provides sufficient evidentiary support for Lexington's contention that Pharmacia manufactured the PCBs.  Pharmacia certainly disputes the inference Lexington draws from Pharmacia's domestic market share, noting that the decisions regarding whether to incorporate PCBs into caulk and in what proportion were solely in the discretion of the caulk manufacturer, which is not identifiable and thus not a party to this proceeding, and that Pharmacia's share of the global PCB market was less than forty percent.[2]  D. 147 at 13.  At the summary judgment stage, however, Lexington's evidence is satisfactory and a jury could weigh that evidence against Pharmacia's exculpatory evidence on this point.  Ultimately, however, the issue

---

[1] The defendants have moved to strike Li as an expert witness and to bar her testimony, arguing that Lexington's expert disclosure was untimely and that her opinions are unreliable and thus barred by Fed. R. Evid. 702.  D. 266.  Because the Court allows Pharmacia's motion for summary judgment, this motion is now denied as moot.

[2] Pharmacia also argues that Santiago v. Sherwin-Williams Co., 782 F. Supp. 186, 194-95 (D. Mass. 1992), rejected the application of a market share theory of liability in an analogous suit against lead pigment manufacturers.  D. 147 at 2.  The court reasoned that there were other potential causes of the plaintiff's injuries; the paint manufacturers determined the amount, if any, lead pigment to use; and "[n]o court has applied market share theory to a defendant that supplies an ingredient for a product packaged and sold by others."  Id. at 193, 194-95.  Lexington responds that it is not relying on a market share theory of liability (which imposes liability on culpable defendants in proportion to their market share), just on market share data to demonstrate causation.  D. 232 at 8.  The Court, therefore, focuses its analysis on how market share data bears upon the issue of identification of the manufacturer.

of identification of the manufacturer is moot given the other infirmities in Lexington's case discussed below.

2.   *Injury*

Massachusetts law requires that there was privity of contract between a plaintiff seeking to hold a defendant liable for breach of warranty arising from an injury occurring prior to December 16, 1973.  Thayer v. Pittsburgh-Corning Corp., 45 Mass. App. Ct. 435, 438 (1998).  If Lexington's injury preceded that date, its claim fails because there was no privity between Lexington and Pharmacia, the caulk at issue having been manufactured and installed by intermediaries.  If Lexington's injury occurred after 1973, then privity is not required.

Pharmacia contends that Lexington's injury occurred, if at all, in 1960 or 1961 when the caulk containing PCBs was installed at Estabrook.  D. 147 at 15.  Pharmacia relies primarily, as it has in the past, on Commonwealth v. Johnson Insulation, 425 Mass. 650 (1997).  It also points to the unrebutted testimony of Kevin Coghlan ("Coghlan"), a scientist retained by Lexington to address contamination at Estabrook, confirming that the volatilization of PCB molecules "began immediately when the caulk was installed" at Estabrook.  D. 278 at 16.  Coghlan also deemed it likely that "airborne levels of PCBs would have been highest in the earliest days of [Estabrook's] operation."  Id. at 17.

Lexington, on the other hand, urges an injury date of no earlier that September 2009, when the EPA issued its guidelines concerning PCB contamination of indoor air at schools.  D. 232 at 14-15.  It counters Coghlan's testimony with the opinion of its expert, Dr. David Macintosh ("Macintosh"), stating that PCB-containing caulk "can continue to

release vapor-phase PCBs into the air for decades."[3]  D. 232 at 15; D. 232-1 at 48-49 ¶ 25.

The question of when Lexington's alleged injury occurred was raised by the defendants in their motion to dismiss.  Judge Boal, in her report and recommendations, adopted by this Court, stated that "the determination of the date of the injury appears to be a complex question that turns on the facts of the case, such as the nature of PCBs and how they damage and contaminate property."  D. 48 at 13.  Judge Boal further noted that the Court could not determine the last date of installation on the record before it at that time.  Id.  There is no longer a dispute that the caulk at issue was installed at Estabrook prior to 1973.  See D. 232-1 at 5 (response 14).  But the parties offer very little evidence regarding the nature of PCBs and how they damage and contaminate property.  The record only indicates that caulk containing PCBs released PCBs into the air upon installation and it continued to release vapor-phase PCBs into the air for decades.

Most of the cases cited by the parties do not shed significant light on the date of injury.  The Court already stated that Johnson Insulation does not compel the conclusion that injury occurred at installation because the issue in that case was the date from which prejudgment interest would be assessed.  D. 48 at 11-12; D. 53.  Lexington cites a number of statute of limitations cases discussing the discovery rule, which aids in determining when a cause of action accrues, but not when the actual injury occurred.  See, e.g., Cameo Curtains, Inc. v. Philip Carey Corp., 11 Mass. App. Ct. 423, 425, 427

---

[3] The Defendants have moved to strike Macintosh's affidavit and exclude his expert opinions.  D. 142.  The motion specifically argues that Macintosh should be precluded from testifying regarding the EPA's requirements for PCB remediation.  D. 143; D. 238.  The motion does not challenge Macintosh's opinion regarding PCB off-gassing cited by Lexington.  In light of the Court's holding today, the Defendants' motion to strike, D. 142, is denied as moot.

(1981) (holding that limitations period did not begin to run until "damage flowing from the injury [could] fairly be estimated" and stating, without elaboration, that lack of privity did not bar action). It also cites cases concerning injury to a person (not to property, as alleged here) holding that the first appearance of symptoms constitutes injury. See Thayer, 45 Mass. App. Ct. at 439-40 (holding privity not required where injury occurred in 1992 when plaintiff first became ill, not when plaintiff was exposed to asbestos from 1948 until 1952); Bouley v. American Cyanamid Co., No. 85-4368-Z, 1987 WL 18738, at * 8-9 (D. Mass. Oct. 21, 1987) (denying summary judgment on privity issue where evidence from 1978 showed decedent had had mass in his neck for twenty years while other evidence indicated symptoms did not appear until late 1970s); Payton v. Abbott Labs, 551 F. Supp. 245, 246 (D. Mass. 1982) (holding that injury for privity purposes occurred when the plaintiff experienced symptoms attributable to the drug DES, not when plaintiff's mother ingested DES).

The Court rejects Pharmacia's argument that Lexington was injured when PCBs first appeared in the indoor school air at Estabrook. It is true that the record indicates airborne PCBs were released upon installation of the PCB-containing caulk, no later than 1961. Lexington, however, could not have detected airborne PCBs at that time because testing methods were not developed until the 1980s, D. 232 at 16, nor was it alerted to the need to test the air until even later than that, possibly as late as 2009 when the EPA published its guidelines.

As to determining the date of injury, Lexington draws an analogy between the sick plaintiff in Thayer, who did not manifest symptoms of asbestos exposure until at least forty years after his exposure, and its sick building, Estabrook, that did not exhibit

symptoms of airborne PCBs until the town tested for them in 2009.  D. 298 at 21.

Lexington thus asserts that its injury did not occur until it tested for airborne PCBs and

confirmed the presence of injury.  D. 232 at 14-15.  The analogy to Thayer is apt, though

imperfect.  Unlike an asbestos patient, the property at Estabrook, including the indoor air,

would not have manifested any symptoms of its ailment because airborne PCBs are not

detectable absent testing.

The most persuasive case in Lexington's favor is Lewis v. General Elec. Co., 254

F. Supp. 2d 205 (D. Mass. 2003).   In that case, property owners sued claiming

negligence, trespass and nuisance arising from the defendant's disposal of fill dirt

containing PCBs on the plaintiffs' residential property.   Id. at 206.   A subgroup of

plaintiffs discovered the PCB contamination after they bought their property from

predecessors who were unaware of the damage.  Id. at 210.  General Electric argued that

the claims of those plaintiffs were barred because the injury to their property (the deposit

of the contaminated fill) occurred before they owned it and the claims were not assigned

to the plaintiffs as the current owners.  Id. at 214.  General Electric further argued that the

persistence of the contamination did not render the injury "new or continuous."  Id.  The

plaintiffs countered that their injury occurred after they acquired title to the property and

urged adoption of a form of the discovery rule.  Id.

The court was not persuaded by General Electric's position, reasoning that it was

unfair to hold that a claim could only be asserted by a party who was ignorant of his

damage.  Id. at 215.   A tortfeasor should not be able to "escape liability by the

happenstance of a property sale."  Id.  Although the discovery rule applies in the statute

of limitations context, the court concluded that the policy supporting the rule was

applicable, "which is (in essence) that hidden injuries become actionable only when the injured party knows, or reasonably should know, of injury." Id. at 215-16.  The court further reasoned that "this case has the peculiar feature that . . . *knowledge* of the injury is part and parcel of the injury itself." Id. at 216 (emphasis in original).  "[K]nowledge of the injury *was* the injury, to some extent," id. (emphasis in original), because the current property owners, not their predecessors, suffered the distress, anxiety and reduced property values that accompanied discovery of the PCB contamination.  "[W]ithout knowledge there was no damage." Id.

In the motion to dismiss, the Court discounted the applicability of Lewis because, as the Lewis court acknowledged, the facts presented and "the particular nature of the injury" compelled the result. Id.; D. 48 at 13.  A broad reading of Lewis, however, supports the argument that a party who has no reason to be cognizant of his injury is not injured at all.  Moreover, the facts before this Court demonstrate the "particular nature of the injury" here.  The PCB contamination at issue is similar to that in Lewis in that the owner of the property is unaware of the damage absent testing because the injury does not manifest itself in any otherwise observable manner, unlike the injury in Thayer, where the plaintiff became ill after exposure to asbestos.  The Lewis plaintiffs who acquired their property long after contamination were not injured until they had knowledge of their injury.  Similarly, it could be argued that Lexington was not injured until years after contamination, when it acquired the test results indicating elevated levels of airborne PCBs.

The interests of fairness underlying the discovery rule suggest its extension to the question of when Lexington's injury occurred for purposes of the privity requirement,

particularly where the parties agree that the injury was not discoverable until the technology to conduct testing was developed in the 1980s.  And, even once the means to test existed, it is not clear when Lexington was put on notice of the risks associated with elevated levels of airborne PCBs that would have prompted it to conduct the testing. Pharmacia urges that Lexington was on inquiry notice of the risks of airborne PCB contamination by virtue of the knowledge of the chair of its board of health, Dr. Wendy Heiger-Bernays ("Heiger-Bernays"), who had extensive experience in the field of PCBs. D. 147 at 19.  According to Pharmacia, Heiger-Bernays "was aware of PCBs in indoor air as far back as 1996."  D. 141 ¶ 86.  Heiger-Bernays also confirmed that she was aware of a 2004 article by Robert Herrick, who was withdrawn as one of Lexington's experts, regarding hazards of PCBs called "*An Unrecognized Source of PCB Contamination in Schools and Other Buildings*."  Id. ¶¶ 87, 89.

Without deciding the exact date of injury, the Court concludes that, prior to 1973, Lexington was not reasonably aware of the possibility that it was injured.  Whether Lexington became aware of the potentiality of its claimed injury when the EPA issued its guidelines or when it first became aware of the risk of airborne PCB contamination, the result with respect to the issue of privity is the same.  The earliest date by which Lexington might have been on notice of the need to conduct testing, even according to Pharmacia, was in 1996, well past the elimination of the privity requirement in 1973. Lexington has thus demonstrated that it has a cognizable injury.

### 3.    *Evidence of a Design Defect*

Even if the Court had resolved the issue of privity in Pharmacia's favor, Lexington has failed to meet its burden as to the alleged design defect.  Generally, a

plaintiff asserting warranty liability must proffer expert testimony regarding the alleged product defect, that the defect existed at the time of sale, and that the plaintiff's injury resulted from the defect. Chartier v. Brabender Technologie, Inc., No. 08-40237-FDS, 2011 WL 4732940, at *9 (D. Mass. Oct. 5, 2011). "Therefore, 'in a products liability case of any sophistication, a plaintiff's failure to support [its] claims of a design defect with expert testimony is almost always fatal.'" Torres v. Skil Corp., No. 11-11232-MBB, 2013 WL 3105815, at *6 (D. Mass. June 17, 2013) (quoting Haughton v. Hill Labs., Inc., No. 06-11217-RGS, 2007 WL 2484889, at * 3 (D. Mass. Aug. 30, 2007)).

Pharmacia argues that Lexington has failed to offer expert testimony demonstrating that Pharmacia's design of PCBs was defective. D. 147 at 7; D. 278 at 7-10. Lexington responds by pointing to the three statements made by expert Dr. David Macintosh, a professional consultant retained by Lexington to provide advice on remediation and its expert concerning the source of the PCBs detected at Estabrook. D. 232 at 11; see D. 127 ¶¶ 1, 21. In his report, Macintosh opined that "PCBs are classified as semi-volatile compounds, meaning most PCBs are in liquid or solid state at room temperature and that some portion of PCBs can exist as a vapor in air." D. 232 at 11 (citing Lexington's statement of additional material facts, D. 232-1 at 48-49 ¶ 25). Second, Macintosh stated that "PCBs are also classified as persistent organic pollutants, meaning that PCBs are resistant to degradation and can be present in the environment for decades." Id. Finally, "[b]ecause of their semi-volatile and persistent nature, PCB-containing building materials, such as caulk, can continue to release vapor-phase PCBs into the air for decades." Id. Lexington further replies that it need not offer expert testimony because the alleged design defect is within the lay knowledge of the jury. Id.

at 10.  Finally, Lexington contends that an expert may opine generally regarding a design defect without specifying the exact defect.  Id.

The Court disposes first of Lexington's latter two arguments.   Lexington is correct that a plaintiff need not always present expert testimony to demonstrate the defective design of the product at issue, but the complexity of the product here calls for expert testimony.   The cases in which a court has permitted a jury to use its lay knowledge to determine whether a product suffered from an unreasonable design defect involve products the jury are likely to encounter in their daily lives and defects that are easily understood.  See, e.g., Smith v. Ariens Co., 375 Mass. 620, 627 (1978) (concluding that design defect of unshielded metal protrusions on snowmobile handlebar could be demonstrated by snowmobile itself without expert testimony); doCanto v. Ametek, Inc., 367 Mass. 776, 778, 782 (1975) (holding that jury could use lay knowledge to determine that the momentum of ironing machine rollers that sucked plaintiff's hand into machine after power had been shut off was design defect); see Marchant v. Dayton Tire & Rubber Co., 836 F.2d 695, 700 (1st Cir. 1988) (noting that "the SJC specifically held that in some circumstances, the plaintiff need not present any expert testimony at all in order to demonstrate unreasonable design" where a jury might be able to rely "on the basis of its own lay knowledge").   This case is not analogous to those where plaintiffs have been relieved of the obligation to proffer expert testimony regarding the alleged design defect. Cf. Morrell v. Precise Eng'g, Inc., 36 Mass. App. Ct. 935, 936 (1994) (holding lay knowledge of jury insufficient to find that round shape of holes in supporting brackets created foreseeable risk that nails would pull out causing scaffolding to collapse).  PCBs

are complex chemicals, the presence of a defect in which "cannot be inferred in the absence of expert testimony." Enrich v. Windmere Corp., 416 Mass. 83, 87 (1993).

Lexington's argument that it need not specify the exact defect in PCBs is similarly misplaced. Lexington cites Massachusetts Prop. Ins. Underwriting Ass'n v. LG Elecs. U.S.A., Inc., 902 F. Supp. 2d 173 (D. Mass. 2012). In that case, the plaintiff sued the manufacturer and seller of a microwave oven alleged to have started a fire. Id. at 174. The plaintiff's expert testified that the fire was caused by a malfunction "where the fan motor, circuit board and control circuitry is located," but he did not identify the precise point of ignition or describe a specific design defect. Id. at 177. Lexington, however, fails to allege any defect in Pharmacia's design of PCBs with the level of specificity provided by the expert in the LG case.

Turning to the expert testimony cited by Lexington, the statements from expert Macintosh describe the intrinsic characteristics of PCBs, such as their semi-volatility and persistent nature, but they do not explain why Pharmacia's design of PCBs was defective. The essence of Lexington's design defect claim is that PCBs are inherently dangerous and that fact alone warrants submission of its case to the jury. Lexington largely relies on its assessment that its "design defect claim involves a chemical product whose risks so far outweighed the benefits that manufacture of the product was, for all practical purposes, banned by federal law." D. 232 at 9. Lexington reiterated this contention at the hearing on this matter, arguing that PCBs are so inherently dangerous that eventually they were banned by Congress and that, even if the sale of PCBs was legal at the time Estabrook was built, that fact alone does not indicate that PCBs were not unreasonably dangerous at the time of sale. D. 298 at 27. Lexington further argued that the inherently dangerous

nature of PCBs relieves it of the obligation to prove that there was a feasible alternative design.  Id. at 28.

While Congress's eventual ban of PCBs is indicative of their inherent danger, the fact that Congress banned PCBs does not demonstrate that the risks addressed by Congress in 1979 were reasonably foreseeable in 1961, when construction of Estabrook was completed.  "A manufacturer has the duty to design products 'so they are reasonably fit for the purposes for which they are intended.'"  Marchant, 836 F.2d at 69 (quoting Smith, 375 Mass. at 624).  "A product is 'reasonably fit' for the purposes if the design prevents the 'reasonably foreseeable risks attending the product's use in that setting.'"  Id. (quoting Back v. Wickes Corp., 375 Mass. 633, 641 (1978)).

Just as Massachusetts law rejects a hindsight analysis when assessing a duty to warn, holding manufacturers liable only for failure to warn of risks that were reasonably foreseeable at the time of sale or could have "been discovered by way of reasonable testing prior to marketing the product," Hoffman v. Houghton Chem. Corp., 434 Mass. 624, 637 (2001) (quoting Vassallo v. Baxter Healthcare Corp., 428 Mass. 1, 23 (1998)), it also requires that the design of the product avoid the risks that were reasonably foreseeable or discoverable by reasonable testing at the time the product was sold.  "Most courts agree that, for the liability system to be fair and efficient, the balancing of risks and benefits in judging product design and marketing must be done in light of the knowledge of risks and risk-avoidance techniques reasonably attainable at the time of distribution."  Rest. (Third) Torts:  Prod. Liab. § 2, comment (a).  This is why the Restatement specifically references "foreseeable risks of harm posed by the product" at issue in a design defect case.  Id. § 2 & comment (a).  Massachusetts case law is in

accord.  Chartier, 2011 WL 4732940, at * 8 (observing that "[m]anufacturers have a duty to design products with reasonable care to eliminate foreseeable defects or dangers to product consumers" and that manufacturers are "held to the standard of an ordinary reasonably prudent designer in like circumstances") (internal quotation marks omitted); Johnson v. Brown & Williamson Tobacco Corp., 122 F. Supp. 2d 194, 201 (D. Mass. 2000) (stating that "[u]nder Massachusetts law, a manufacturer has a duty to exercise reasonable care to prevent injury to foreseeable users of a product it knows or should know is dangerous").

The question then is, what risks attending the use of PCBs were reasonably foreseeable at the time they were purchased and installed at Estabrook?  Congress's ban of PCBs nearly twenty years after the purchase and installation of PCBs at Estabrook is an instance of Congress weighing the "desirability of commercial distribution of . . . [a] widely used and consumed, but nevertheless dangerous, product[]."  Rest. (Third) Torts: Prod. Liab. § 2, comment (d).   Lexington does not offer evidence, however, that the risks that prompted the Congressional ban were reasonably foreseeable during the construction of Estabrook.

In addition to the report of expert Macintosh already discussed, Lexington cites to portions of the deposition of Dr. Robert Kaley ("Kaley"), the defendants' corporate representative, for evidentiary support that Pharmacia knew that PCBs were inherently dangerous long before they were outlawed by Congress.  At his deposition, Kaley was shown a document from 1951 noting that "the toxicity hazard of [PCB] fumes is well established."  D. 170-7 at 27.  Kaley acknowledged that it was "common knowledge at the time that there were toxicological effects on at least animals" from PCB fumes, with

the added qualification that the fumes were released at "elevated temperatures," meaning "hundreds of degrees." Id. at 28. After being shown another document from 1953 that stated "[a]s I am sure you know, [PCBs] cannot be considered nontoxic," Kaley was asked whether Pharmacia at any time believed that PCBs were nontoxic. Id. Kaley replied that "every chemical's toxic under some circumstance, so . . . I don't think [Pharmacia] ever believed that PCBs were nontoxic under a particular set of circumstances." Id. The cited evidence, even construed in the light most favorable to Lexington, might demonstrate dangers presented by PCBs in certain circumstances, but it does not support a conclusion that Pharmacia knew of the inherent danger of PCBs or, more specific to the risk about which Lexington complains, of the risk that PCBs would volatilize into airborne form after being installed as a component in window caulk.

Lexington also relies upon Environmental Def. Fund, Inc. v. Environmental Prot. Agency, 636 F.2d 1267 (D.C. Cir. 1980), to demonstrate the risks and dangers inherent in PCBs. That court, by way of background, explained that Congress responded to the dangers of PCBs and other chemicals by passing the Toxic Substances Control Act ("TSCA") in 1976. Id. at 1271. The court found noteworthy that Congress dedicated an entire section of the TSCA to PCBs even though the act regulated all chemical substances. Id. "The special attention accorded to PCBs in the [TSCA] resulted from the recognized seriousness of the threat that PCBs pose to the environment and human health." Id. During debate, Senator Nelson, who authored the PCB subsection in the Senate version of the bill, "noted that PCBs were widespread in the environment and that they posed significant potential dangers to human health and to wildlife." Id. Again, while the substantial dangers associated with PCBs may have been apparent in 1976

when Congress debated and passed the TSCA, Lexington must offer evidence that those risks were reasonably foreseeable in 1961.  Moreover, even if the Court credits Macintosh's report, Kaley's testimony and the findings that precipitated the enactment of the TSCA, the specific risk at issue is the presence of PCBs in caulk and the resulting presence of PCBs in the indoor air of a building.  Lexington has not shown that that particular danger was reasonably foreseeable in 1961.[4]

Contrary to Lexington's argument, a finding that Lexington has not offered sufficient evidence of a design defect does not overrule the legislative determination that PCBs are inherently dangerous.  To defeat summary judgment here, Lexington was obligated to show a disputed issue that the danger that was recognized by Congress in 1979 was also reasonably foreseeable in 1961.  It has failed to do so.

The Court's conclusion that an inherent danger in the product at issue is not conclusive of a design defect is supported by the case law.  PCBs are comparable to cigarettes in that both products could be deemed inherently dangerous and cigarettes arguably cannot be consumed safely because of the risk of cancer they pose.  The fact that smoking causes cancer, however, does not by itself prove that cigarettes are defectively designed.  Johnson v. Brown & Williamson Tobacco Corp., 345 F. Supp. 2d 16, 20 (D. Mass. 2004) (stating that "[i]t is insufficient for a plaintiff to allege that an entire class of products is inherently dangerous" and that, instead, "the law requires a showing that the specific cigarettes consumed by the smoker were defective").  A

---

[4] The Court also rejects Lexington's argument that, on this record, the determination of the reasonableness of Pharmacia's design of PCBs should be left to the jury.  Back, 375 Mass. at 642.  To defeat summary judgment, Pharmacia must point to specific admissible facts that show a disputed issue of material fact about reasonable foreseeability.  Lexington, however, as discussed above, has not offered evidence of the foreseeable dangers posed by PCBs at the time they were used in its school building.

defectively designed cigarette is one that "deviated from the norm in some untold way." Id. (internal quotation marks omitted).  The First Circuit has rejected the argument that "liability for a design defect is cognizable even absent any showing that the product was defective in a way above and beyond its inherent characteristics."  Kotler v. American Tobacco Co., 926 F.2d 1217, 1224 (1st Cir. 1990), vacated on other grounds, 505 U.S. 1215 (1992), on remand, 981 F.2d 7 (1st Cir. 1992) (addressing preemption and declining to revisit holdings on breach of implied warranty issues).  In Kotler, the Court disagreed with the notion that absent a "non-inherent defect," a "breach of warranty can be found based solely on a risk/utility analysis," as implied by Lexington's argument that PCBs are defectively designed because their risks outweigh their benefits to such an extent that they were banned.  Id. at 1225.  Product manufacturers must design their products such that they "are fit for the ordinary purposes for which such goods are used," Mass. Gen. L. c. 106, § 2-314(2)(c), but "a reasonably fit product need not be a risk-free product." Osorio v. One World Techs., Inc., 659 F.3d 81, 85 (1st Cir. 2011); Wayslow v. Glock, Inc., 975 F. Supp. 370, 379 (D. Mass. 1996) (stating that "there is no duty to design a product that is 'risk free' or 'risk proof'") (citing Morrell, 36 Mass. App. Ct. at 936).

An even more apt analogy is lead paint, which, like PCBs, was banned in the late 1970s.  16 C.F.R. § 1303.1(a) (regulation of Consumer Products Safety Commission). Lexington's argument parallels the unsuccessful argument asserted by the plaintiff in City of Phila. v. Lead Indus. Ass'n, Civ. A. No. 90-7064, 1992 WL 98482, at *3 (E.D. Pa. Apr. 23, 1992).  In Lead Indus. Ass'n, the plaintiff sued a group of lead pigment manufacturers to compel them to remove lead paint from city-owned buildings.  Id. at *1. Like Lexington, the plaintiffs there argued that the product at issue, lead pigment, was

inherently dangerous and did not suggest an alternative feasible design.   Id. at *3.
Instead, the plaintiffs contended that the defendants should have produced a non-toxic
substitute for lead pigment, just as Lexington argues that Pharmacia should have
substituted other chemicals for PCBs.   Id.   The court dismissed the city's claim,
concluding that the "challenge is to the product itself, not to its specific design."   Id.

Another court that considered an allegation that lead pigment was defectively
designed similarly concluded that the plaintiff failed to state a claim because "[a] claim
for defective design cannot be maintained where the presence of lead is the alleged defect
in design, and its very presence is a characteristic of the product itself."   Godoy v. E.I. du
Pont de Nemours & Co., 319 Wis. 2d 91, 115 (2009).   The court reasoned that the
plaintiff failed to identify a defective design feature in lead pigment other than the
presence of lead, but removing lead from lead pigment would render it a different product
entirely.   Id. at 112-13.   Analogizing to aluminum foil, which cannot be aluminum foil
without the presence of aluminum, the court concluded that "a defective condition
[cannot] arise from harmful ingredients that are characteristic of the product."   Id. at 113.
Similarly, here, PCBs cannot be PCBs without the presence of PCBs themselves, along
with their inherent characteristics.   Rather, Lexington must point to some aspect of
Pharmacia's design of PCBs, not the mere presence of PCBs, to sustain its claim for
design defect.

As in Lead Indus. Ass'n and Godoy, Lexington does not challenge the design of
the product at issue, but the product itself.   A plaintiff does not meet its burden of
demonstrating a design defect by alleging that "an entire class of products is inherently
dangerous."   Johnson, 345 F. Supp. 2d at 20.   "[C]ourts do not impose liability based on a

conclusion that an entire product category should not have been distributed in the first instance." Wayslow, 975 F. Supp. at 381 (quoting draft of Rest. (Third) Torts: Prods. Liability).  "In such a case liability can only be assigned to the manufacturer if it has breached its duty to warn of the product's harmful nature." Lead Indus. Ass'n, 1992 WL 98482, at * 3.

Lexington's argument regarding rendering a product *per se* defective overlaps with its contention that it is not required to demonstrate a feasible safer design to prove a design defect.  The Supreme Judicial Court has "declared that a reasonable alternative design must be shown before a defendant may be found liable for breach of the implied warranty of merchantability based on a design defect." Evans v. Lorillard Tobacco Co., 465 Mass. 411, 444 (2013); see Kotler, 926 F.2d at 1225 (stating that "w[e] are aware of no Massachusetts case in which liability attached in the absence of evidence that some different, arguably safer, alternative design was possible" and characterizing "the existence of a safer alternative design" as the "*sine qua non* for the imposition of liability").  Lexington urges that there were equally effective and economical alternative chemicals that could have been used as plasticizers in place of PCBs, D. 232 at 9, but Lexington does not present a safer alternative design of PCBs, instead contending that such a showing is not required due to the inherent danger of PCBs.

The Restatement (Third) of Torts provides that a product "is defective in design when the foreseeable risks of harm posed by the product could have been reduced or avoided by the adoption of a reasonable alternative design."  Rest. (Third) Torts § 2(b). The requirement that a "plaintiff show a reasonable alternative design applies in most instances even though the plaintiff alleges that the category of product sold by the

defendant is so dangerous that it should not have been marketed at all." Id. § 2, comment (d).  Examples include alcoholic beverages, firearms and above-ground swimming pools. Id.  "[C]ourts have not imposed liability for categories of products that are generally available and widely used and consumed, even if they pose substantial risks of harm. Instead, courts have generally concluded that legislatures and administrative agencies can, more appropriately than courts, consider the desirability of commercial distribution of some categories of widely used and consumed, but nevertheless dangerous, products." Id.

Congress eventually "consider[ed] the desirability of commercial distribution" of PCBs, Rest. (Third) Torts § 2, comment (d), and determined that they should no longer be marketed.  This determination distinguishes PCBs from alcoholic beverages, firearms and above-ground swimming pools.  But, at the time Estabrook was built, PCBs were also a category of product that was "generally available and widely used." Id.

Lexington's argument relies primarily on other comments to the Restatement. Comment (b) states "[s]ome courts . . . while recognizing that in most cases involving defective design the plaintiff must prove the availability of a reasonable alternative design, also observe that such proof is not necessary in every case involving design defects."  Comment (e) further explains that "[s]everal courts have suggested that the designs of some products are so manifestly unreasonable, in that they have low social utility and high degree of danger, that liability should attach even absent proof of a reasonable alternative design."

Lexington has not presented any evidence regarding the "range of relevant alternative designs," Rest. (Third) Torts:  Prods. Liability § 2, comment (e), available

when PCBs were installed at Estabrook or whether an alternative design would have produced the characteristics that made PCBs desirable or sufficiently explained why this is an instance under certain comments to the Restatement in which they are relieved from showing a reasonable alternative design.  Likewise, there is no proof that Pharmacia's design of PCBs was "manifestly unreasonable, " id., at the time that Estabrook was built.  As already discussed, the eventual ban of PCBs by Congress does not demonstrate that the product should have not have been marketed in 1961 without some showing that the dangers later credited by Congress were reasonably foreseeable during the relevant time period.

As for Lexington's assertion that Pharmacia should have manufactured a plasticizer other than PCBs, that argument boils down to a complaint that the caulk manufacturer defectively designed the caulk when it chose a formula that included PCBs rather than an alternative plasticizer.  Lexington, however, has not sued the manufacturer of the caulk used at Estabrook (nor can it identify the caulk manufacturer).  It may not impute the absent manufacturer's liability, if any, to Pharmacia, which did not develop the caulk formulation.  See Lead Indus. Ass'n, 1992 WL 98482, at *3.

In summary, Lexington has not met its burden to rebut Pharmacia's showing as to design defect for the purpose of summary judgment.  Accordingly, the Court allows Pharmacia's motion for summary judgment on Lexington's claim for breach of implied warranty of merchantability based on design defect.

**B.      Failure to Warn**

Lexington also asserts a breach of warranty claim premised on Pharmacia's failure to warn that "the use of PCB-containing building materials, such as caulk, under

normal conditions, can result in airborne PCBs at levels of concern to humans." D. 232 at 12.

Pharmacia argues that Lexington has failed to demonstrate that "airborne PCB levels presented a reasonably foreseeable risk at the time of the sale of the PCBs in 1961." D. 278 at 12. The Court agrees. A product manufacturer has a duty to warn regarding risks that are reasonably foreseeable at the time of sale or could have been "discovered by way of reasonable testing prior to marketing the product." See Vassallo, 428 Mass. at 22-23. As discussed, *supra*, Lexington cites no evidence that the risk of airborne PCBs was reasonably foreseeable or discoverable at the time the caulking was supplied to the constructors of Estabrook. D. 232 at 11-13. As already noted, Lexington asserts that "analytical methods used to detect PCBs at Lexington's schools were only developed in the 1980s." Id. at 16. Just as Lexington could not identify its injury absent the appropriate testing technology, it is unclear how Pharmacia was to warn of the same injury even though it could not be discovered at the time Lexington acquired the PCB-laden caulk. "[A] defendant will not be held liable under an implied warranty of merchantability for failure to warn or provide instructions about risks that were not reasonably foreseeable at the time of sale or could not have been discovered by way of reasonable testing prior to marketing the product." Vassallo, 428 Mass. at 23. The Court allows Pharmacia's motion with respect to Lexington's claim for breach of implied warranty based on failure to warn.[5]

---

[5] Pharmacia further defends here by arguing that the bulk supplier doctrine satisfied its duty to warn. D. 147 at 10-12. "The bulk supplier doctrine allows a manufacturer-supplier . . . of bulk products, in certain circumstances, to discharge its duty to warn end users of a product's hazards by reasonable reliance on an intermediary." Hoffman v. Houghton Chem. Corp., 434 Mass. 624, 629 (2001). Because the Court concludes that

### C.      Chapter 93A

To the extent that Lexington's claim for violation of Chapter 93A is derivative of its breach of implied warranty claims, the Chapter 93A claim also fails.  Pimental v. Wachovia Mortg. Corp., 411 F. Supp. 2d 32, 40 (D. Mass. 2006) (dismissing Chapter 93A claim where plaintiff failed to sustain contract and negligence claims on which it was based).  Lexington contends that an additional basis of its Mass. Gen. L. c. 93A claim is a continuing duty to warn.  D. 232 at 13.  According to Lexington, Pharmacia had on ongoing obligation to issue warnings regarding PCBs "in 1970 and every year thereafter."  Id.  The duty to warn imposes on a manufacturer "the standard 'of an expert in the field, and [the manufacturer] will remain subject to a continuing duty to warn (at least purchasers) of risks discovered following the sale of the product.'"  Lewis v. Ariens Co., 434 Mass. 643, 647 (2001) (quoting Vassallo, 428 Mass. at 22-23).  A continuing duty to warn arises when (1) "a seller knows or reasonably should have known of product dangers discovered post-sale;" (2) "a reasonable person in the seller's position would provide a warning;" (3) "those to whom a warning might be provided can be identified;" and (4) "the warning [can be] effectively communicated to them."  Id. at 647-48 (internal quotation marks omitted).

Lexington has not demonstrated that Pharmacia could have identified Lexington and effectively communicated a warning to it.  Lexington admits that it was not a direct purchaser from Pharmacia.  See, e.g., D. 232 at 3.  Instead, during the course of the construction of Estabrook, an unknown contractor used an undetermined brand of caulk that contained PCBs.  Given that it was at least one step removed from the purchasing

---

the risk of PCBs complained of here was not reasonably foreseeable, it need not reach this defense.

decision, Lexington does not explain how Pharmacia was to identify Lexington or otherwise effectively communicate any danger associated with PCBs.  For all these reasons, Lexington's Chapter 93A claim fails.[6]

## VI.    Conclusion

For the foregoing reasons, the Court ALLOWS Pharmacia's motion for summary judgment, D. 140.[7]

**So Ordered.**

/s/ Denise J. Casper
United States District Judge

---

[6] The Court need not address Pharmacia's argument that Lexington's warranty claims are barred by the applicable three-year statute of limitations, D. 147 at 18-20, because the Court has concluded that Pharmacia is entitled to judgment on all claims.

[7] The Defendants also moved to exclude the opinions of Lexington's expert Robert Herrick, arguing that he was not qualified to opine on the numerosity requirement of class certification.  D. 144.  In light of the Lexington's proposed redefinition of the class before the Court's class certification decision, D. 241, Lexington withdrew Herrick as an expert witness.  D. 228.  D. 144, therefore, is denied as moot.